# APPENDIX OF EXHIBITS FOR UGSI STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Exhibit A: Affidavit of UGSI Vice President of Engineering & Technology Thomas R. Marti

Exhibit B: Transcript of October 23, 2015 Deposition of Eugene Palermo

Exhibit C: Palermo's Answers to Interrogatories

Exhibit D: Excerpt from Transcript of December 29, 2015 Deposition of Alliance for PE Pipe Executive Director Peter Dyke

Exhibit E: Palermo's Response to Requests for Admission

Exhibit F: Palermo Slide Show

Exhibit G: UGSI's Second Set of Requests for Admission

Exhibit H: Excerpt from Transcript of March 14, 2016 deposition of Dr. Pat Leevers

Exhibit I: Dale Edwards Expert Report

Exhibit J: Steve Ferry Expert Report

Exhibit K: ISO 13477, principle 5

Exhibit L: Excerpt from Transcript of March 22, 2016 Expert Deposition of Eugene Palermo

Exhibit M: Eugene Palermo email to Wes Long

Exhibit N: Excerpt from Transcript of December 4, 2015 Deposition of Julie Morrison

Exhibit O: Julie Morrison email to Dan Christensen

Exhibit P: Excerpt from Transcript of November 24, 2015 Deposition of Steven Verseman

Exhibit Q: Steve Verseman email to Dan Christensen

Exhibit R: UGSI Cease and Desist Letter to Eugene Palermo

Exhibit S: Eugene Palermo email to Robert Walker

# Exhibit A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

UNDERGROUND SOLUTIONS, INC., a
Delaware corporation,

        Plaintiff,

v.

EUGENE PALERMO, a/k/a GENE
PALERMO,

        Defendant.

Case No. 13-cv-8407

Judge Matthew Kennelly

### AFFIDAVIT OF PROOF PURSUANT TO
### FEDERAL RULE OF CIVIL PROCEDURE 56(C)

I, Thomas R. Marti, after having been duly sworn state that if I were called to an evidentiary hearing, I would competently testify on the basis of personal knowledge to the following:

1.      I am employed by Underground Solutions, Inc. ("UGSI") as Vice President of Engineering & Technology.

2.      My job duties include the management and oversight of the engineering functions for Fusible PVC®; and the development and maintenance of the technologies for Fusible PVC®.

3.      I am familiar with the allegations of this lawsuit and the harm suffered and expense incurred as a result of the Defendant, Eugene Palermo's, false and misleading statements about UGSI products.

4.      UGSI is a Delaware corporation with its principal place of business in Poway, California.

5.      In February, 2016, UGSI was acquired by Aegion Corporation, which is based in St. Louis, Missouri.

6.      UGSI is the sole manufacturer of Fusible PVC® Pipe, a thermally butt-fused polyvinyl chloride pipe that is implemented by third parties in applications in the water, wastewater, electrical and telecommunications industries.

7.      UGSI sells thermally butt-fused PVC pipe under various trade names, including

Fusible PVC® Pipe, FPVC®, Fusible C-900®, and Fusible C-905®, depending on the intended use of the pipe.

8.      UGSI competes for jobs in municipal water and wastewater applications with the high-density polyethylene ("HDPE") pipe industry, including the Performance Pipe division of Chevron Phillips.

9.      Defendant Eugene Palermo made false and misleading presentations about UGSI products, including Fusible PVC® Pipe, whose presentation I attended at the ASCE Pipelines conference in Miami, Florida in 2012, and believe that similar presentations were also made at the following conferences throughout the United States:

      a. Florida AWWA (November 2010)

      b. Minnesota Rural Water Association (March 2012)

      c. Michigan AWWA (September 2012)

      d. Michigan Rural Water Association (March 2013)

      e. Florida AWWA (December 2013)

10.      The audiences in the above conferences included pipe industry consumers, including contractors and engineers who select pipe for use in municipal water and wastewater applications, and who advise municipalities concerning the same.

11.      Consumers in the pipe industry, including contractors and engineers who select pipe for use in water and wastewater applications have been materially influenced by Palermo's statements about Fusible PVC® Pipe.

12.      UGSI employees have had to travel around the country to rebut Palermo's false and misleading statements about Fusible PVC® Pipe, including those made in the Palermo Slide Show.

13.      UGSI will continue to suffer harm to its reputation and in the form of having to spend time and money rebutting Palermo's false and misleading material if an injunction is not entered preventing Palermo from making false and misleading statements about Fusible PVC® Pipe in the future.

Pursuant to 28 U.S.C. §1764, I declare under penalty of perjury that the foregoing is true and correct.

Executed on _____April 1, 2016_____ (date).

(Signature

Exhibit B

VIDEOTAPED DEPOSITION OF EUGENE PALERMO
October 23, 2015
IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

---

UNDERGROUND SOLUTIONS, INC., a )
Delaware corporation, )
)
Plaintiff, )
) NO. 13-cv-8407
vs. )
)
EUGENE PALERMO, a/k/a GENE )
PALERMO, )
)
Defendant. )

---

APPEARANCES:
FOR THE PLAINTIFF:
CHRISTOPHER SHEEAN, ESQ.
Attorney at Law
Swanson, Martin & Bell, LLP
330 North Wabash Avenue, Suite 3300
Chicago, Illinois 60611
STEPHEN STANCZAK, ESQ.
Attorney at Law
Underground Solutions, Inc.
78-075 Main Street, Suite 202
La Quinta, California 92253

FOR THE DEFENDANT:

JOHN D. FITZPATRICK, ESQ.
Attorney at Law
Mandell Menkes, LLC
One North Franklin Street, Suite 3600
Chicago, Illinois 60606

ALSO PRESENT: Tom Marti, Underground Solutions
Matt Poplin, Videographer

---

1  Exhibit 11 - Letter Dated 8/31/11        239
2  Exhibit 12 - E-Mails               241
3  Exhibit 13 - E-Mail PAL000616          246
4  Exhibit 14 - E-mail PAL000122          247
5  Exhibit 15 - E-Mail PAL000120          249
6  Exhibit 16 - E-mail Dated 7/6/13         253
7  Exhibit 17 - Invoice           256
8  Exhibit 18 - Invoice           259

3

---

1                I N D E X
2  Examinations                    Page
3
4  EUGENE PALERMO
5  EXAMINATION BY MR. SHEEAN              5
6
7
8
9            E X H I B I T S
10 No.        Description          Page
11
12 Exhibit 1 - UGSI00677-UGSI00739        74
13 Exhibit 2 - UGSI00591-UGSI00609        75
14 Exhibit 3 - Characteristics of Butt Fusion   76
15 Joints In Thermal Plastic Pipe For Water
16 Applications.
17 Exhibit 4 - PowerPoint Presentation       77
18 Exhibit 5 - PowerPoint Presentation       78
19 Exhibit 6 - UGSI00045-UGSI0066         79
20 Exhibit 7 - UGSI00067 through UGSI00110    80
21 Exhibit 8 - UGSI00269-UGSI00306        80
22 Exhibit 9 - Correlating Plastic Pipe Field   81
23 Failures With RCP Critical Pressure For Water
24 Pipe Applications
25 Exhibit 10 - PAL00170           238

2

---

1            S T I P U L A T I O N
2       The videotaped deposition of EUGENE PALERMO,
3  called as a witness at the instance of the Plaintiff,
4  taken pursuant to all rules applicable to the Federal
5  Rules of Civil Procedure by agreement on the 23rd day
6  of October, 2015, at the Hilton Knoxville Airport, 2001
7  Alcoa Highway, Alcoa, Tennessee, before David L. Kelly,
8  Licensed Court Reporter, pursuant to stipulation of
9  counsel.
10      It being agreed that David L. Kelly, Licensed
11 Court Reporter, may report the videotaped deposition in
12 machine shorthand, afterwards reducing the same to
13 typewriting.
14      All objections except as to the form of the
15 questions are reserved to on or before the hearing.
16      It being further agreed that all formalities
17 as to notice, caption, certificate, transmission,
18 et cetera, excluding the reading of the completed
19 videotaped deposition by the witness and the signature
20 of the witness, are expressly waived.
21
22
23
24
25

4

---



EUGENE PALERMO,
having first been duly sworn, was examined and deposed
as follows:
EXAMINATION BY MR. SHEEAN:
Q.    Would you please state your full name for
the record.
A.    Yes.  My name is Eugene Frank Palermo.
Q.    Mr. Palermo, my name is Christopher
Sheean.  I represent the Plaintiff in this matter,
Underground Solutions, Incorporated, in a lawsuit that
was brought against you in the Northern District of
Illinois.
        Have you -- I know you've had your
deposition taken before, but just so we're clear, we'll
go over a couple of the ground rules so we have a clear
record.
        For each question that I ask, you're
going to need to answer out loud and verbally.
Although we're videotaping the deposition, nods of the
head and shakes of the head aren't really able to be
recorded by our court reporter.  Okay?
A.    Yes.
Q.    If you have any questions about a
question that I ask, let me know, and I'll try and
clarify or I'll rephrase it.  But if you answer a

5

question, I'll assume that you understood it, fair
enough?
A.    Yes.
Q.    And if you need to take a break, so long
as there's no question pending, we can take a break at
any time.  Okay?
A.    Yes.
Q.    Mr. Palermo, are you married?
A.    Yes.
Q.    And how long have you been married?
A.    Since 2002.
Q.    And where do you reside?
A.    Friendsville, Tennessee.
Q.    And what's your address?
A.    654 Watershaw Drive in Friendsville.
Q.    Where were you born?
A.    I was born in Morgantown, West Virginia.
Q.    What year?
A.    1947.
Q.    And did you attend high school?
A.    I did.
Q.    Where did you attend high school?
A.    St. Thomas Military Academy.
Q.    Where is that located?
A.    Saint Paul, Minnesota.

6

Q.    What year did you graduate?
A.    1965.
Q.    Did you, following your graduation from
high school, attend any college or university?
A.    I did.
Q.    Immediately following your graduation
from high school?
A.    Yes.
Q.    What college or university did you attend
first?
A.    The first one was The College of
St. Thomas in Saint Paul, Minnesota.
Q.    How long did you attend The College of
St. Thomas?
A.    Four years.
Q.    Did you obtain any sort of degree from
The College of St. Thomas?
A.    I have a bachelor of science.
Q.    In what?
A.    In chemistry.
Q.    So that would have been 1969?
A.    Correct.
Q.    Did you continue on with your education
at that point or did you enter the workforce?
A.    I continued my education.

7

Q.    What was your next college or university
you attended?
A.    Michigan State University.
Q.    And how long did you attend Michigan
State University?
A.    Four years.
Q.    And did you obtain any degree as a result
of your attendance at Michigan State University?
A.    Yes.
Q.    What was that?
A.    I have a doctorate in analytical
chemistry.  By the way, we're still relishing the last
10-second victory.
Q.    Now I know how you came to see -- to find
Mr. Fitzpatrick as your counsel today.  I'm sorry, your
degree was a masters?  Is that what --
A.    A Ph.D.
Q.    A Ph.D. in chemistry.  Okay.  What was
your dissertation on?
A.    Atomic emissions spectroscopy and atomic
florescent spectroscopy for water analysis.
Q.    Did you continue on with your education
after completing your Ph.D. at Michigan State
University?
A.    No.

8



McCorkle Litigation Services, Inc.
Chicago, Illinois  (312) 263-0052

| 1 | Q. As part of your Ph.D., did you have to |
| 2 | develop a thesis? |
| 3 | A. Yes. |
| 4 | Q. Did you have to present your |
| 5 | dissertation? |
| 6 | A. Yes. |
| 7 | Q. Was your dissertation published? |
| 8 | A. Yes. |
| 9 | Q. Was it published in any peer-reviewed |
| 10 | journals? |
| 11 | A. No. |
| 12 | Q. Okay. Was it subjected to any sort of |
| 13 | scholastic rigger in terms of the analysis done by |
| 14 | your professors and by your committee to approve your |
| 15 | Ph.D.? |
| 16 | MR. FITZPATRICK: Objection to form. |
| 17 | THE DEPONENT: It was reviewed by my |
| 18 | professor and a couple of the other professors at |
| 19 | the university. |
| 20 | BY MR. SHEEAN: |
| 21 | Q. And did you have to develop factual |
| 22 | underpinnings for the thesis that you presented at your |
| 23 | dissertation? |
| 24 | A. I'm sorry, could you repeat that? |
| 25 | Q. Did you have to develop factual |

9

| 1 | underpinning, support, for your thesis that you |
| 2 | ultimately presented at your dissertation? |
| 3 | A. I basically did research, collected the |
| 4 | data. I gave a couple of presentations, and then the |
| 5 | thesis was a summary of all the research that I had |
| 6 | done, the data that I had developed. |
| 7 | Q. And the research |
| 8 | methodology -- methodologies that you followed in order |
| 9 | to complete that research, were those standard, |
| 10 | well-developed, approved methodologies recognized in |
| 11 | the field of chemistry? |
| 12 | A. It depends. In some cases, yes. In some |
| 13 | cases it was new technology. |
| 14 | Q. In the cases of the existing technology, |
| 15 | you had -- you had to make sure that you satisfied the |
| 16 | prerequisites to make sure that your scientific |
| 17 | experiments, your research, was valid, right? |
| 18 | A. Yes, to the extent that it could be |
| 19 | proven because a lot of it was new. |
| 20 | Q. Right. I was talking about the |
| 21 | established -- |
| 22 | A. Right. |
| 23 | Q. That was part of my question. All right. |
| 24 | After completing your Ph.D. from Michigan State, what |
| 25 | was your first job? |

10

| 1 | A. I was immediately employed by the DuPont |
| 2 | Company. |
| 3 | Q. And where was that located? |
| 4 | A. Wilmington, Delaware. |
| 5 | Q. What was your title? |
| 6 | A. I was a research scientist in the |
| 7 | analytical physical measurements group of the plastics |
| 8 | department of DuPont. |
| 9 | Q. And how long did you have that title? |
| 10 | A. I spent a year and a half in the thermal |
| 11 | analysis group, a year and a half in the infrared |
| 12 | group. So it would be three years total. |
| 13 | Q. What were your responsibilities? |
| 14 | A. In the thermal analysis lab, I was |
| 15 | responsible for conducting analyses of various samples |
| 16 | that were submitted either within the plastics |
| 17 | department or other departments within the DuPont |
| 18 | Company. |
| 19 | In the infrared lab, I did similar |
| 20 | analyses. At that time the analytical group was |
| 21 | compromised of approximately 35 to 40 Ph.D. chemists |
| 22 | and around 20 or 30 with masters and millions of |
| 23 | dollars in analytical equipment. |
| 24 | The head of the analytical physical |
| 25 | measurements group, a gentleman named Johnny Mitchell, |

11

| 1 | decided that because analytical testing within the |
| 2 | DuPont Company was somewhat cyclable based on how well |
| 3 | sales were going, et cetera, he wanted to make sure |
| 4 | that he could keep his group together. And so he |
| 5 | started what he called outside business services. |
| 6 | Basically this was an opportunity for the |
| 7 | analytical group within DuPont to do high-level |
| 8 | analytical testing for other companies outside of |
| 9 | DuPont. Because of my background, personality, he |
| 10 | asked me to head up that group, and I was the primary |
| 11 | contact with outside clients. |
| 12 | Samples would be sent to me for analysis. |
| 13 | I would then distribute them to the appropriate group |
| 14 | to do the analytical testing. I then would collect the |
| 15 | data, write the report, and then present the report to |
| 16 | the client. |
| 17 | Q. What was your next position after that |
| 18 | first position at DuPont? |
| 19 | A. I was next transferred to the -- it's |
| 20 | called the outside -- let's see, it was within their |
| 21 | research and development division. It was a marketing |
| 22 | group within the research and development division |
| 23 | located downtown Wilmington, and that marketing group |
| 24 | was -- was an interface between the research and |
| 25 | development chemists at the experimental station and |

12



McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052

| | |
|---|---|
| 1 the operating divisions within the plastics department<br>2 primarily.<br>3       It was a two-way streak. If there were<br>4 particular plastics that were needed with certain<br>5 properties, they would come to us, and we would go to<br>6 the research people and say, "We need this type of a<br>7 plastic with these properties."<br>8       Or the other direction: The research<br>9 scientists would come to us and say, "This is a new<br>10 plastic we've just developed as these properties. Go<br>11 out and see if you can find a market for it." So I was<br>12 in that particular marketing group for about a year and<br>13 a half.<br>14    Q.    Okay. What was the next title that you<br>15 had at DuPont after you left the marketing group?<br>16    A.    After I left the marketing group, I was<br>17 then transferred -- and DuPont is a large company.<br>18 They have a history of transferring people. They want<br>19 their technical people --<br>20    Q.    I just want the title.<br>21    A.    Technical specialist, I believe.<br>22    Q.    What year are we up to now when you're a<br>23 technical specialist at DuPont?<br>24    A.    19 -- approximately 19 -- fall of 1976.<br>25    Q.    How long did you stay at DuPont?<br><br>13 | 1    A.    September of '96.<br>2    Q.    And then where did you go after you left<br>3 Elf Atochem?<br>4    A.    At that point I was selected to be the<br>5 technical director of the Plastics Pipe Institute.<br>6    Q.    Why did you -- did you voluntarily leave<br>7 Elf Atochem?<br>8    A.    That's a good question. I had no plans<br>9 of leaving Elf Atochem. I assumed I would have a long<br>10 career there. The nominating committee coerced me into<br>11 applying for the position of technical director.<br>12       I had the interview. The following day<br>13 the vice president of SPI, Society of Plastics<br>14 Industry, called me to offer me the position. I<br>15 initially declined because I really wanted to stay with<br>16 Elf Atochem.<br>17       He convinced me it was best for the<br>18 industry if I became the technical director, at which<br>19 point I agreed, and I resigned from Elf Atochem and<br>20 assumed the position of technical director.<br>21    Q.    What is Plastic Pipe Institute?<br>22    A.    The Plastics Pipe Institute is a trade<br>23 association comprising of resin manufacturers, pipe<br>24 manufacturers, fittings, tools, the pertinences, all<br>25 related to the plastic piping industry.<br><br>15 |
| 1    A.    I stayed with DuPont until 1991 when the<br>2 group I was with, the Aldo pipe group, was sold to a<br>3 joint venture between Nesty and Uponor.<br>4    Q.    Did you go with either one of the -- with<br>5 that group?<br>6    A.    Yes. I stayed with the Aldo group and<br>7 went with the new business in 1991.<br>8    Q.    What was the new company called that you<br>9 were working for?<br>10    A.    Uponor Aldyl Company.<br>11       THE COURT REPORTER: Can you say that one<br>12 more time?<br>13       THE DEPONENT: Uponor, U-p-o-n-o-r,<br>14 Aldyl, A-l-d-y-l, Company.<br>15 BY MR. SHEEAN:<br>16    Q.    How long did you work for Uponor?<br>17    A.    I was with them until March of 1995, at<br>18 which point I was hired by another chemical company<br>19 called Elf, and that's E-l-f, Atochem, A-t-o-c-h-e-m.<br>20 They hired me specifically to develop a market for<br>21 their Nylon 11 product in gas distribution.<br>22    Q.    How long were you with Elf Atochem?<br>23    A.    I was with them approximately a year and<br>24 a half.<br>25    Q.    Okay. So until sometime in '96?<br><br>14 | 1    Q.    Is it -- strike that. Does the Plastic<br>2 Pipe Institute represent all manufacturers of plastic<br>3 pipe or only a select group?<br>4    A.    The Plastics Pipe Institute represents<br>5 all plastics used for piping applications with the<br>6 exception of PVC. PVC has their own trade association<br>7 known as UniBell. That's U-n-i-B-e-l-l, capital "U"<br>8 and capital "B".<br>9    Q.    And was that true when you were the<br>10 technical director of PPI?<br>11    A.    Yes. At that time we had quite a bit of<br>12 literature, technical literature, on PVC, and we used<br>13 to always cooperate with UniBell on updating the PVC<br>14 literature.<br>15       And it then came to an agreement between<br>16 UniBell and PPI that UniBell would assume the<br>17 continuation of that literature. The --<br>18    Q.    And that was before you started as<br>19 technical director?<br>20    A.    That was during the time.<br>21    Q.    Okay.<br>22    A.    During the time, right. The only -- I'm<br>23 sorry, the -- with regard to PVC, of course, PVC is<br>24 included in a lot of the literature that I worked on<br>25 and developed through the Hydrostatic Stress Board.<br><br>16 |



McCorkle Litigation Services, Inc.<br>Chicago, Illinois (312) 263-0052

```
 1      Q.    I know you have a lot to tell me, and I
 2   appreciate that.  But I'm limited to seven hours for
 3   this deposition, and I'm going to use every seven of
 4   those hours.  I promise you.  And I'm going to do
 5   everything I can to finish within the seven hours, but
 6   I need you to answer the questions that I ask and not
 7   try to add on --
 8      A.    Certainly.
 9      Q.    -- extra commentary, if it's not
10   necessary.  How long were you the technical director of
11   PPI?
12      A.    Approximately eight years.
13      Q.    So until about 2004?
14      A.    I believe, yes.  December 2003 is when I
15   left.
16      Q.    Why did you leave PPI?
17      A.    I left PPI because I decided that I
18   wanted to become a consultant for the plastic piping
19   industry.
20      Q.    Was that a voluntary separation from
21   PPI?
22      A.    Yes.  It was my decision.
23      Q.    And starting in -- at that time in
24   December of 2003 or shortly thereafter, is that when
25   you -- you began operating Palermo Plastics Pipe
```
17

```
 1   Consulting?
 2      A.    Yes.  It started January 1, 2004.
 3      Q.    And other than the job descriptions that
 4   you've just provided to me, any other background in the
 5   plastics pipe industry?
 6      A.    No.  That's pretty much it.
 7      Q.    Have you ever designed a plastic piping
 8   system for water distribution?
 9      A.    I have worked with water companies and
10   assisted them in -- in how to determine the pressure
11   rating and what -- what type of pressure rating method
12   was used and what the pressure rating would be.
13      Q.    Which water companies have you assisted
14   in setting their pressure ratings for their water
15   piping system?
16      A.    There's been a few.  I can't remember how
17   many of them.  East Bay one -- East Bay Mun is one that
18   I recall.  I don't recall the names of the others.
19      Q.    Other than helping them to determine the
20   pressure rating for their water piping system, have you
21   ever designed a plastic piping system for water
22   distribution?
23      A.    No.
24      Q.    Have you ever constructed a plastic
25   piping system for water distribution?
```
18

```
 1      A.    No.
 2      Q.    Have you ever operated a plastic piping
 3   system for water distribution?
 4      A.    No.  That's what the water company does.
 5      Q.    What makes you qualified to offer
 6   opinions on designing plastic piping systems for water
 7   applications?
 8            MR. FITZPATRICK:  Objection to form.
 9   What opinions are you referring to?
10            MR. SHEEAN:  The opinions that he's
11   proffered on his website.
12            MR. FITZPATRICK:  So not opinion
13   testimony in this case, opinions that are at issue
14   that you-all are alleging are false?
15            MR. SHEEAN:  He's rendered myriad
16   opinions in -- in -- on his website, and that's
17   what I'm asking about.
18            MR. FITZPATRICK:  Defending his
19   qualifications with respect to those opinions?
20            MR. SHEEAN:  For now, yeah.
21            MR. FITZPATRICK:  Sure.
22            THE DEPONENT:  Okay.  You want to repeat
23   that question for me?
24   BY MR. SHEEAN:
25      Q.    What makes you qualified to offer
```
19

```
 1   opinions on your website and in your consulting
 2   business on designing plastic piping systems for water
 3   distribution?
 4      A.    In the design of water systems, if you're
 5   referring to the pressure rating, it would be my
 6   background with the Hydrostatic Stress Board.
 7            If in the design you're referring to
 8   rapid crack propagation in plastic pipe, it would be my
 9   background and experience with plastic piping materials
10   and the testing of them.
11      Q.    When you say the testing of plastic
12   piping materials, what are you referring to?
13      A.    Referring specifically to the rapid crack
14   propagation, I'm referring to the -- the two test
15   methods that were developed within the ISO standards
16   specifically for testing plastic piping materials for
17   resistance to RCP.
18      Q.    So you have familiarity with those two
19   test methods?
20      A.    I was on the ISO working group that
21   developed them.
22      Q.    For both ISO13477 and 13478?
23      A.    Yes.
24      Q.    Have you ever conducted any testing of
25   plastic pipe pursuant to ISO13477?
```
20



McCorkle Litigation Services, Inc.
Chicago, Illinois  (312) 263-0052

```
 1       A.    It depends on your -- what you mean by
 2  your question.  If you mean in the laboratory if I ran
 3  the experiment?
 4       Q.    Yes.
 5       A.    No, I have not personally prepared the
 6  samples or ran the experiment in a laboratory.
 7       Q.    What has your involvement been in
 8  conducting testing pursuant to ISO13477?
 9       A.    I have read articles on testing that has
10  been done using the ISO test method, and I have been
11  involved with the testing of plastic pipe using that
12  ISO test method.
13       Q.    I'm sorry, you read articles, and then
14  what was the second half of that?
15       A.    I have been directly involved with
16  clients who wanted to have the -- the ISO testing done
17  and work with the laboratory and arrange for the
18  testing to be done.
19       Q.    And which clients are you referring to?
20       A.    Let's see, one of them was Washington Gas
21  Light.  They experienced an RCP failure in their
22  12-inch high-density polyethylene pipe.
23             So I worked with the laboratory to do S4
24  testing on comparable 12-inch pipe, and I also worked for
25  with another client, P&F Distributors, and arranged for

                                              21
```

```
 1  the ISO testing to be done on 12-inch fusible PVC
 2  pipe.
 3       Q.    Which laboratory did you work with on the
 4  Washington Gas & Light testing?
 5       A.    GTI, which is the Gas Technology
 6  Institute.
 7       Q.    Where are they located?
 8       A.    In Des Plaines, Illinois.
 9       Q.    And what about for P&F, which was the
10  laboratory that you worked with?
11       A.    That one was Jana, J-a-n-a, Laboratories.
12       Q.    Where are they located?
13       A.    They're located in Aurora, Ontario.
14  That's A-u-r-o-r-a.
15       Q.    And what was your involvement in
16  specifically dealing with P&F and Jana Labs in terms of
17  arranging for the S4 testing?
18       A.    We had pipe samples that were obtained.
19  Some of the pipe samples were joined by butt fusion.
20  Some of the pipe samples were joined with the bell and
21  spigot.
22             Samples were test -- were shipped to Jana
23  Labs, and then the request was for the laboratory to
24  determine the critical pressure.  And once knowing the
25  critical pressure, to then test the specimen with the

                                              22
```

```
 1  fusion joint and bell-and-spigot joint.
 2       Q.    You didn't have any involvement in
 3  actually setting up the S4 testing equipment such as
 4  the baffles and things of that nature, did you?
 5       A.    No.  That's what the laboratory does.
 6       Q.    Okay.  How many plastic pipe events have
 7  you investigated?
 8       A.    I'm sorry, could you be more specific?
 9       Q.    How many plastic pipe failures have you
10  investigated as a consultant?
11       A.    Hundreds.
12       Q.    And how many of those involved PVC
13  piping?
14       A.    Perhaps 30 or 40, roughly.
15       Q.    To the best of your recollection,
16  approximately how many of those failures overall -- I'm
17  not just limiting it to PVC, but how many of those
18  failures occurred during construction?
19             MR. FITZPATRICK:  Objection to form.
20             THE DEPONENT:  During construction, a
21       small percentage.
22  BY MR. SHEEAN:
23       Q.    Can you give me a rough estimate of what
24  percentage?
25       A.    Maybe 10 percent, approximately.

                                              23
```

```
 1       Q.    And how many of those failures occurred
 2  in service?  What percentage?
 3       A.    Well, that would be primarily the other.
 4       Q.    So 90 percent?  Okay.  I didn't -- I
 5  didn't know if there was an "other" category.  So if
 6  you've investigated hundreds of failures and
 7  approximately 30 to 40 of those failures were PVC, what
 8  number would you say of HDPE pipe have you
 9  investigated?
10       A.    Oh, perhaps, ballpark, 50 or 60 percent
11  would be polyethylene.
12       Q.    And of those 50 to 60 percent, how
13  many -- what percentage of those are 4710 HDPE?
14       A.    4710 would be a very, very low number.
15       Q.    In the course of investigating HDPE pipe
16  failures, have you ever concluded that the failure was
17  a result of a material defect?
18       A.    Most of them were not.  There were some
19  that were material defect, but that would be on both
20  percentage.
21       Q.    What percentage of PE pipe that you have
22  investigated involved material defects, approximately?
23       A.    Again, I don't know.  It would be 5, 10,
24  15 percent.  It would be a low number.
25       Q.    Did you ever conclude in the course of

                                              24
```



| | |
|---|---|
| 1  investigating HDPE pipe that the failure was caused by | 1  the lawyers and to the client regarding some pipe |
| 2  construction error? | 2  incident? |
| 3      A.      Yes. | 3          A.      Yes. |
| 4      Q.      What percentage of the failures that | 4          Q.      And how many such cases? |
| 5  you've investigated of PE pipe involved construction | 5          A.      In -- most of the time that I'm retained |
| 6  error?  And by that I mean contractor error. | 6  by legal counsel I am retained, and I don't know the |
| 7      A.      Probably that would be a higher number. | 7  exact terminology, as an expert witness, which would be |
| 8  Some are in the 50 to 75 percent perhaps. | 8  divulged to the other party. |
| 9      Q.      And what percentage of the PE pipe | 9              Sometimes I'm retained -- I'm not sure of |
| 10  failures that you've investigated have involved | 10  the terminology.  Is it called a fact witness, when |
| 11  operator error? | 11  someone who only provides information to the lawyer, |
| 12      A.      When you say "operator", that could also | 12  but I'm not disclosed to the other side.  And then many |
| 13  be construction because a lot of times the operators do | 13  times it starts that way, and then I'm disclosed as an |
| 14  the construction. | 14  expert. |
| 15      Q.      That's fair.  That's a fair point.  I'm | 15          Q.      Approximately how many times have you |
| 16  talking about once the pipe is in service and the | 16  been retained by a lawyer, but not disclosed as an |
| 17  construction team is offsite.  So something that occurs | 17  expert? |
| 18  once the pipe is up and running. | 18          A.      That would be a low percentage. |
| 19      A.      And when you say "operator", are you | 19          Q.      Can you give me a number? |
| 20  meaning the end-user, the owner of the pipeline? | 20          A.      I could guess. |
| 21      Q.      Correct. | 21          Q.      Give me your best guess. |
| 22      A.      Okay.  That would be a low percentage. | 22          MR. FITZPATRICK:  I'd rather you not |
| 23      Q.      When you do these investigations, who are | 23  guess.  You're here to testify as a fact witness. |
| 24  you typically hired by? | 24  BY MR. SHEEAN: |
| 25      A.      That depends. | 25          Q.      Is it more than 10? |
| | |
| 25 | 27 |

| | |
|---|---|
| 1      Q.      Is there one group that predominates?  I | 1          A.      Maybe. |
| 2  mean, is it -- is it the end-users that's hiring you | 2          Q.      Okay.  Is it more than 20? |
| 3  predominately?  Is it the contractor that's hiring you? | 3          A.      Likely not. |
| 4  Is it the material manufacturer? | 4          Q.      Okay.  And in some cases you've been |
| 5      A.      Yes, yes, and yes, or lawyers. | 5  asked to -- you've been identified as an expert, |
| 6      Q.      For those entities? | 6  correct? |
| 7      A.      Yes. | 7          A.      In most cases I'm identified as an |
| 8      Q.      When you are hired to investigate these | 8  expert. |
| 9  pipe failures, is part of your charge to determine the | 9          Q.      Approximately how many cases have you |
| 10  cause of the failure? | 10  been identified as an expert on behalf of a party? |
| 11      A.      Yes.  Many times that is what we are | 11          A.      Well, it would be 100 minus the 10 or 20. |
| 12  requested to do is to try to determine the cause. | 12  So maybe 80 to 90 percent. |
| 13      Q.      So in those investigations it does matter | 13          Q.      Do you keep a tally that you provide to |
| 14  what caused the failure? | 14  the counsel as part of your obligation to disclose |
| 15          MR. FITZPATRICK:  Objection to form. | 15  where -- when and where you've been identified as an |
| 16          THE DEPONENT:  It depends on the | 16  expert? |
| 17  particular situation.  I'd say most of the time, | 17          A.      No. |
| 18  yes. | 18          Q.      Do you have a list of cases in which |
| 19  BY MR. SHEEAN: | 19  you've been deposed and/or testified? |
| 20      Q.      Now, in your role as a consultant, you | 20          A.      Yes. |
| 21  have acted as an expert witness several times, | 21          Q.      Approximately how many cases have you |
| 22  correct? | 22  been deposed and/or testified? |
| 23      A.      Yes. | 23          A.      Approximately 15 or a little more, in |
| 24      Q.      In some instances you've been retained | 24  that ballpark. |
| 25  solely to act as a consultant to provide counseling to | 25          Q.      And in those approximately 15 cases where |
| | |
| 26 | 28 |



1 you've been disclosed as an expert, how many of those
2 involved HDPE pipe?
3     A.    I'm sorry, could I -- we back up?  I
4 thought your question was how many times had I been
5 deposed.
6     Q.    You're right.  I'm sorry.  I'm sorry,
7 you're right.  In those 15 cases where you have been
8 deposed and/or testified, how many times were you
9 identified as an expert on behalf -- strike that.
10          Let me go back to my first question.  In
11 the approximately 80 or so, I think, or 90 cases that
12 you said you've been identified as an expert, right?
13     A.    Wrong.  It was 80 to 90 percent.
14     Q.    Eighty to 90 percent.  I thought -- okay.
15 So in those cases, how many -- what percentage of those
16 cases involved HDPE pipe?
17     A.    Very, very roughly maybe half, but it
18 could be less.  It could be more because I've -- I work
19 with a variety of different materials.
20     Q.    What percentage of those cases involved
21 PVC pipe?
22     A.    Maybe in the 10 to 20 percent, roughly.
23     Q.    Do you know, as you sit here today, any
24 areas where you had been qualified to testify as an
25 expert by a court?

29

1     MR. FITZPATRICK:  Objection to form.
2 Calls for a legal conclusion.
3     THE DEPONENT:  I'm sorry, I don't quite
4 understand the question.
5 BY MR. SHEEAN:
6     Q.    If you know, I'd like to know whether or
7 not you are aware of any specific areas where the court
8 indicated you were qualified to testify as an expert.
9     MR. FITZPATRICK:  The same objection.
10     THE DEPONENT:  I'm not sure what you
11 mean by a court stating that I'm qualified to
12 testify.
13 BY MR. SHEEAN:
14     Q.    Have you ever been the subject of a
15 Motion to Disqualify you as an expert?
16     A.    Yes.  That is a strategy that's used in
17 some cases that I was involved in.
18     Q.    Have any of those Motions to Disqualify
19 you ever been successful?
20     A.    No.
21     Q.    Have any of those motions ever resulted
22 in you having to limit what you're entitled to testify
23 to?
24     A.    None that I recall.
25     Q.    Have you ever received payment from

30

1 Performance Pipe for your consulting services?
2     A.    I have worked for Performance Pipe.  They
3 are a division of Chevron Phillips.  So my actual
4 payment was -- for invoices was Chevron Phillips.
5     Q.    If I say "Performance Pipe", you'll know
6 what I mean, right?
7     A.    Performance Pipe as the entity under the
8 corporation of Chevron Phillips, yes.
9     Q.    Thank you.  What sort of services did you
10 provide for Performance Pipe?
11     A.    Several.
12     Q.    Can you identify them, please?
13     A.    I have been an expert witness on behalf
14 of Performance Pipe in -- in some of their legal cases.
15 I have been hired by Performance Pipe to give
16 presentations to some of their clients for various
17 topics, and I have been hired by Performance Pipe to
18 give presentations specifically about fusible PVC.
19     Q.    Not all of those presentations that you
20 were paid to give were solely to Performance Pipe
21 customers, were they?
22     A.    Some were to Performance Pipe customers
23 where there was an issue -- a question about the pipe
24 or a question about the pressure rating.  So I would be
25 hired by Performance Pipe to go to their customer to

31

1 explain which pressure rating should be used or in
2 another case to talk about -- one particular case
3 was -- there was a question about the resin that was
4 used.
5     Q.    I'm not sure you heard my question.  My
6 question was:  Not all of the presentations that you
7 were paid to give by Performance Pipe were limited to
8 customers of Performance Pipe, were they?
9     A.    That's correct.
10     Q.    What's -- what is the business of
11 Performance Pipe, if you know?
12     A.    They manufacture polyethylene pipe and
13 fittings.
14     Q.    Does Performance Pipe compete with
15 Underground Solutions for customers in the water
16 distribution industry?
17     MR. FITZPATRICK:  Objection.  Foundation.
18 BY MR. SHEEAN:
19     Q.    You can answer, if you know.
20     A.    Yes.
21     Q.    Who would determine when and where you
22 would give a presentation where you were paid by
23 Performance Pipe?
24     MR. FITZPATRICK:  Objection to
25 foundation.

32



1    THE DEPONENT:  Primarily that would be
2  Wes Long.
3  BY MR. SHEEAN:
4    Q.    Was anyone else involved in that
5  decision-making process at Performance Pipe?
6    MR. FITZPATRICK:  Same.
7    THE DEPONENT:  Yes.  Karen Lively for
8  the -- I'm sorry.
9  BY MR. SHEEAN:
10    Q.    Anyone else?
11    A.    For the presentations that were -- was
12  your question specifically for fusible PVC or for all
13  presentations that I did?
14    Q.    For fusible PVC.
15    A.    For the fusible PVC, it was Wes and
16  Karen.
17    Q.    Would you send drafts of your PowerPoint
18  presentations and/or papers to anyone at Performance
19  Pipe for comments before you would submit them?
20    A.    It depends.  In some cases, yes, and
21  other cases, no.
22    Q.    Well, in some instances you did work
23  directly with individuals at Performance Pipe on
24  interactions of your presentations?
25    MR. FITZPATRICK:  Objection.  Form.

---

1    THE DEPONENT:  Not so much the
2  presentation.  More if Performance Pipe hired me
3  to write a paper using their data, then I would
4  review the draft with them.
5  BY MR. SHEEAN:
6    Q.    During the time that you were consulting
7  for Performance Pipe, you also performed consulting
8  services for other parties, correct?
9    A.    Yes.
10    Q.    It wasn't an exclusive relationship at
11  that time?
12    A.    Correct.
13    Q.    When you took on a new project for a
14  third party, would you have to run it by Performance
15  Pipe to make sure there was no conflict of interest?
16    A.    Never.
17    Q.    Okay.  When is the last time you
18  performed any services for Performance Pipe?
19    A.    I would say approximately two years ago.
20    Q.    And what was the project that you were
21  involved in two years ago?
22    A.    One of the presentations that I would
23  have given.
24    Q.    Do you recall who the audience was for
25  that presentation?

---

1    A.    No.  It was during -- the time was two or
2  three years ago that -- there was a shift between being
3  hired by Performance Pipe and being hired by the PE
4  Alliance, and I just don't remember when that shift
5  occurred.
6    Q.    Do you know why there was a shift from
7  you being hired by Performance Pipe to you being hired
8  by PE Alliance?
9    A.    Yes.
10    Q.    Why was that?
11    A.    Performance Pipe discussed the work that
12  I was doing, and they felt that rather than Performance
13  Pipe paying for everything that I did, that the cost
14  should be borne by the PE Alliance.
15    Q.    So Performance Pipe was looking to
16  distribute the costs more evenly amongst the different
17  PE manufacturers?
18    A.    Yes.
19    Q.    Now, I know you were the technical
20  director for Plastics Pipe Institute, correct?  You
21  told us about that when you left in '96?
22    A.    Yes.
23    Q.    After you left Plastic -- Plastics Pipe
24  Institute, did you later become a paid consultant for
25  them?

---

1    A.    No, not that I recall specifically.
2    Q.    So you've never been retained by PPI and
3  paid to give a presentation?
4    A.    There's two questions there.
5    Q.    Okay.  I'll ask a new question.  Since
6  you left the employee of PPI as its technical director,
7  have you ever been retained by PPI for any reason?
8    A.    I believe that I may have.  I'm trying to
9  recall now.  Possibly to either write a document or to
10  review a document.  I seem to recall doing something
11  for PPI along those lines.
12    Q.    And were you paid for that time?
13    A.    Yes.
14    Q.    But you can't recall, as you sit here
15  today, what that document was?
16    A.    No, I don't.
17    Q.    Do you recall approximately how long ago
18  that was?
19    A.    It wasn't recent.  So I would guess five
20  to 10 years ago.
21    Q.    And you mentioned a few moments ago the
22  shift from Performance Pipe to PE Alliance.  Is that
23  also known as The Alliance For Polyethylene Pipe?
24    A.    I have not heard that term.
25    Q.    APEP?  For the P -- so we'll call it the



McCorkle Litigation Services, Inc.
Chicago, Illinois  (312) 263-0052

PE Alliance, since that's what you're familiar with.
Okay?
    A.    Yes.
    Q.    For the PE Alliance, you have been
retained and -- by them to provide consulting services,
correct?
    A.    Yes.
    Q.    And you've been paid?
    A.    Yes.
    Q.    What type of services have you provided
to the PE Alliance?
    A.    Either giving a presentation at an
industry meeting or giving a presentation at a customer
location.
    Q.    Anything else that you can recall?
    A.    No.
    Q.    Paper submissions in conjunction with
those presentations?
    A.    Well, that's part of it.
    Q.    Who decided what presentations you would
give?
    A.    Primarily Peter Dyke.
    Q.    Did you ever make any suggestions or
recommendations for speaking opportunities to Mr. Dyke
or anyone at the PE Alliance?

37

    A.    I believe I did.
    Q.    And who at the PE Alliance would decide
what papers you would submit?
    MR. FITZPATRICK: Objection to form.
    THE DEPONENT: Initially it was Peter
    Dyke. And then he was replaced by someone else,
    but I can't remember that person's name.
BY MR. SHEEAN:
    Q.    Is it Steve Shur?
    A.    It might be, yeah. That rings a bell.
    Q.    Are you still performing services for the
PE Alliance?
    A.    No.
    Q.    What topics did you give presentations on
for the PE Alliance?
    A.    It was primarily on rapid crack
propagation in PVC pipe.
    Q.    Any other topics that you can recall?
    A.    Possibly on butt fusion PVC pipe. I
don't remember if it included that or not.
    Q.    Did you give any presentations on any
other types of pipe besides PVC for the PE Alliance?
    A.    No.
    Q.    When is the last time you performed any
services for the PE Alliance, to the best of your

38

knowledge?
    MR. FITZPATRICK: Objection. Asked and
    answered. Go ahead.
    DEPONENT: I believe the beginning of
    this year I wrote a paper that was to be presented
    at the 2015 ASCE meeting.
BY MR. SHEEAN:
    Q.    Were you paid for that work?
    A.    Yes, I was.
    Q.    Was that paper accepted for ASCE?
    A.    Yes, it was.
    Q.    Was it published?
    A.    I don't know if it was published. It was
not presented.
    Q.    Do you know why it wasn't presented?
    A.    Yes.
    Q.    Why was that?
    A.    The PE Alliance asked me not to present
it because they were -- they had received a number of
interrogatories from various legal cases, and they did
not want to continue paying legal fees to answer
interrogatories.
    Q.    So you withdrew your submission?
    A.    Yes, I did.
    Q.    Do you recall the topic of that paper

39

that you submitted at the beginning of 2015 for ASCE?
    A.    It was on rapid crack propagation, how to
design against rapid crack propagation in PVC pipe.
    MR. SHEEAN: Why don't we take a
    five-minute break.
    THE VIDEOGRAPHER: It's 8:59. We're
    going off the record.
    (The deposition was in recess.)
    THE VIDEOGRAPHER: The time is 9:24.
    We're now back on the record.
BY MR. SHEEAN:
    Q.    A couple of follow-up questions to some
we've been covering previously, Mr. Palermo. We were
talking about the Jana Labs research project that you
were involved in with P&F. Do you recall that?
    A.    Yes.
    Q.    Who selected Jana Labs?
    A.    My recollection is they reviewed the
testing with Bruce Papenhause and laboratories that
could be used, and Mr. Papenhause made the final
decision.
    Q.    Did you have any other suggestions
besides Jana for him?
    MR. FITZPATRICK: Objection. Form.
    Assumes facts.

40



1          THE DEPONENT: There were only two
2    laboratories that I was aware of in the US that
3    could actually do the ISO S4 test on 12-inch
4    pipe.
5    BY MR. SHEEAN:
6          Q.    That was Jana and GTI?
7          A.    Correct.
8          Q.    Did you also contact GTI and get
9    information about conducting the test there?
10         A.    I think Mr. Papenhause made the decision
11   which lab to use, and then they contacted the lab.
12         Q.    You indicated that there was testing done
13   on both butt fused PVC pipe as well as bell-and-spigot
14   pipe for ISO 13477 testing; is that right?
15         A.    Yes.
16         Q.    Were those both fusible PVC pipe
17   specimens?
18         A.    The butt-fused pipe was fusible PVC. Of
19   course, the bell-and-spigot pipe was not.
20         Q.    Why did you decide to test nonfusible PVC
21   pipe as part of your analysis or did you make that
22   decision?
23         A.    No, that was Mr. Papenhause's decision.
24   What he wanted to do was once we knew what the critical
25   pressure was, he wanted to conduct some tests above the

41

1    critical pressure to confirm that the running crack
2    went through a butt fusion and to confirm that the
3    running crack arrested at a bell-and-spigot joint.
4          Q.    To your knowledge, did anyone analyze
5    whether there were any material differences in the pipe
6    between the nonfusible PVC pipe and the fusible PVC
7    pipe?
8          MR. FITZPATRICK: Objection. Form,
9    material, ambiguous.
10         THE DEPONENT: I don't recall any
11   physical property tests that were done.
12   BY MR. SHEEAN:
13         Q.    Who set the testing parameters for those
14   Jana Labs tests that were conducted?
15         A.    What do you mean by test parameters?
16         Q.    Who selected the diameter of the pipe?
17         A.    That was Bruce Papenhause.
18         Q.    Who selected the length of pipe to be
19   used?
20         A.    That was based on the requirements of the
21   ISO test method.
22         Q.    Who ensured that the test was ISO
23   compliant?
24         A.    That was Jana Laboratories.
25         Q.    So they would have selected the medium to

42

1    be used for the various test points on the S4 testing
2    scale?
3          A.    They did.
4          Q.    And, to your knowledge, what was the
5    medium that used by Jana when it conducted the S4
6    testing on UGS sized fusible PVC pipe?
7          A.    It was done in air.
8          Q.    Is fusible PVC pipe, to your knowledge,
9    sold for gas distribution?
10         A.    There is no PVC pipe that's sold for gas
11   distribution in North America. PVC is used in other
12   countries. I don't know if fusible PVC is used for gas
13   outside the US.
14         Q.    So in the United States it's not used for
15   gas distribution; is that correct?
16         A.    In the United States it's not permitted
17   for use for gas distribution.
18         Q.    And yet Jana Labs tested it using air as
19   the medium, correct?
20         A.    Yes.
21         Q.    Doesn't ISO 13477 require that the test
22   be conducted using the medium that the pipe is designed
23   to convey?
24         A.    I don't know if it says requirement of
25   the test method.

43

1          Q.    It does specifically reference that in
2    the test -- in the ISO regulation, doesn't it?
3          A.    I don't recall.
4          Q.    Do you know how the critical pressure was
5    determined in that lab -- Jana Labs testing?
6          A.    The critical pressure was obtained by
7    conducting tests at a particular temperature. I
8    believe close to zero degrees C, and conducting the
9    test on various specimens with various internal
10   pressures and determining whether the crack arrested or
11   the crack propagated.
12         Q.    Does ISO 13477 require that the testing
13   be done at or near zero degrees Celsius?
14         A.    I believe the test method itself can be
15   done at any particular temperature. The conventional
16   temperature that's used is zero degrees C, but that's
17   not a requirement of the test method.
18         Q.    In fact, ISO 13477 specifically indicates
19   it can be anywhere between zero and 25 degrees Celsius,
20   doesn't it?
21         A.    I don't recall if that's what the test
22   method says, but I know that it can be done at various
23   temperatures.
24         Q.    We were talking before about some of the
25   investigations that you've been hired to conduct

44

McCorkle Litigation Services, Inc.
Chicago, Illinois   (312) 263-0052

```
 1   regarding pipe failures.  Do you recall that?
 2        A.    Yes.
 3        Q.    To your knowledge, did you ever conclude
 4   that the pipe -- the party that had retained you, the
 5   underlying client, was at fault or the cause of the
 6   pipe failure?
 7             MR. FITZPATRICK:  Objection.  Form.
 8             THE DEPONENT:  I -- I mean, there's been
 9        so many I've been involved in I don't recall.
10   BY MR. SHEEAN:
11        Q.    That's probably something you'd remember,
12   isn't it, if you had to go back to your client and say,
13   "Hey, I've get really bad news.  I've done my
14   investigation, and all signs point to you as the cause
15   of this failure?"  I mean, that's a -- that's a
16   conversation you'd probably remember, isn't it?
17             MR. FITZPATRICK:  Objection.  Form.  Is
18        there a question there?
19             MR. SHEEAN:  Yeah.
20             MR. FITZPATRICK:  Isn't it something you
21        would remember?
22             MR. SHEEAN:  Uh-huh.
23             MR. FITZPATRICK:  He just testified he
24        doesn't remember it.
25   BY MR. SHEEAN:
```
45

```
 1        Q.    You can answer.
 2        A.    Yeah, I'd have to go through the
 3   different cases I was involved in.
 4        Q.    Okay.
 5        A.    I don't remember right now.
 6        Q.    In regards to the PVC pipe investigations
 7   that you've been involved in, what percentage of those
 8   cases did you conclude were caused by contractor error?
 9        A.    There were two I can recall right
10   offhand.  One was an installation issue where the pipe
11   was subjected to or installed on rocks, and there was
12   another one that I recall where there was an
13   over-bending issue.
14        Q.    Do you recall the location where the
15   installation error occurred where it was installed on
16   rocks?  Which job was that?
17        A.    It was some place in Mexico.
18        Q.    Do you recall who the pipe manufacturer
19   was in that case?
20        A.    Yes.
21        Q.    Who was that?
22        A.    JM Eagle.
23        Q.    Was that fusible PVC pipe?
24        A.    No.
25        Q.    And how about the over-bending case, do
```
46

```
 1   you recall which job that was?
 2        A.    No.  I don't recall right now.
 3        Q.    Was that the Pittsburgh case?
 4        A.    Pittsburgh case?  Oh, it was not fusible
 5   PVC.
 6        Q.    Oh, okay.
 7        A.    It was also JM Eagle.
 8        Q.    So in the two investigations where you
 9   concluded contractor error that you can recall, those
10   both involved bell-and-spigot PVC pipe; is that right?
11        A.    For those two, yeah.  Those are two of
12   the ones that -- yeah.
13        Q.    And, to the best of your recollection, as
14   you sit here today, you can't recall any investigation
15   that you conducted where you concluded that the cause
16   of the failure of a fusible PVC pipe incident was
17   contractor error; is that right?
18        A.    Would you be more specific in your
19   question about what you mean by investigation that I
20   conducted?
21        Q.    Sure.  Maybe that's not the right word.
22   In every instance where you were retained as a
23   consultant to analyze a pipe failure involving fusible
24   PVC pipe, have you ever concluded that the cause of the
25   failure was contractor error?
```
47

```
 1             MR. FITZPATRICK:  Objection to form.
 2             THE DEPONENT:  I'm trying to recall the
 3        different ones, whether they be legal or didn't go
 4        to legal.  I'm sorry, could you repeat the
 5        question again?  Sorry.
 6   BY MR. SHEEAN:
 7        Q.    No problem.  Have you ever concluded in
 8   any case where you were retained to analyze the -- a
 9   pipe failure involving fusible PVC pipe, that it was
10   caused by contractor error?
11             MR. FITZPATRICK:  Chris, for clarity,
12        when you say "case", are you referring to
13        litigated matters?
14             MR. SHEEAN:  No.
15             MR. FITZPATRICK:  Okay.
16             MR. SHEEAN:  Let me ask it again.
17        Thanks.
18   BY MR. SHEEAN:
19        Q.    In any matter where you were retained to
20   analyze the cause of a pipe failure involving PVC pipe,
21   have you ever concluded that the cause of the pipe
22   failure was contractor error?
23             MR. FITZPATRICK:  Excluding the two that
24        he testified.
25             THE DEPONENT:  The two that I gave you
```
48



```
 1       were --
 2   BY MR. SHEEAN:
 3       Q.      Those were not fusible PVC pipe.
 4       A.      Your question was PVC.
 5       Q.      I'm sorry, let me try this for a fourth
 6   time.  Mr. Palermo, in every case -- strike that.
 7   Mr. Palermo, in every matter where you were retained to
 8   analyze a pipe failure involving fusible PVC pipe, have
 9   you ever concluded that it was caused by contractor
10   error?
11       A.      And, again, I guess it depends on what we
12   mean by the term "analyze".  I have reviewed the
13   analyses conducted by laboratories in the case of some
14   fusible PVC failures.
15               I have not actually been asked to
16   conduct, be the principal investigator, in any of the
17   fusible PVC failures that I can recall.
18       Q.      Okay.  In those instances where you were
19   retained to review prior reports, did you ever agree
20   with the findings of a third party that the cause of
21   the failure in a fusible PVC pipe incident was
22   contractor error?
23       A.      Yes.
24       Q.      Which ones?
25       A.      Well, for example, the fusible PVC
```

49

```
 1   failure that occurred in Collier County, the second one
 2   I'm referring to, which was a rock impingement failure,
 3   that would be operator cause because it was installed
 4   improperly on a rock.
 5               My recollection is I reviewed some of the
 6   failures that occurred in North Dakota, and those were
 7   due to bending of the pipe.  I think it was
 8   questionable whether that was within the allowable
 9   bending or not.  I'm not sure that has been decided
10   yet.
11               I was retained, let's see, for Dorchester
12   County.  That was a pressure test.  There was a
13   question as to whether the depth was exceeded, the
14   recommended depth.  It's, I believe, still in question.
15   If it was greater than the recommended depth, you know,
16   we could argue that was operator.  I believe the
17   operator doesn't believe that it is.
18               In the case of Jordan Valley, the cause
19   of the failure -- well, there were two of them.  One
20   was a pressure test.  That was not operator.  The
21   second one was during a pigging operation.  I don't
22   know if that would be considered operator error.
23               They were just simply doing a pigging of
24   the line.  I don't know if that was anything contrary
25   to what the pipe manufacturer recommended.
```

50

```
 1       Q.      What would you need to look at in order
 2   to know whether or not in the case of Jordan Valley the
 3   pressure test or the pigging operation were outside
 4   the parameters of what's recommended by the
 5   manufacturer?
 6       A.      For the pressure test case, I'm -- I'm
 7   not aware at this time of anything that was done wrong.
 8   I don't believe that was operator error.
 9               In the case of the pigging, there's some
10   question as to whether or not the debeading process had
11   anything to do with the actual future.  The debeading,
12   if improperly done, can cause notches on the inside of
13   the pipe, and that is possible that is what could have
14   led to the failure.
15               So whoever the operator was that did the
16   debeading, that would be an operator issue.  I -- I
17   don't recall the name of the company that actually did
18   the debeading process.
19       Q.      Any other incidents that you can recall
20   that were contractor error?
21       A.      Not offhand right now.  Oh, there was
22   one.  I believe there was an instance, I believe,
23   in -- it might have been Pittsburgh where there was
24   a -- roughly a 400-foot section of pipe in the parking
25   lot, and apparently the -- it was not under pressure,
```

51

```
 1   and the operator, I believe it was reported, exceeded
 2   the bending limit, and that bending stress caused RCP
 3   failure.  So that would be considered operator error.
 4       Q.      And where was that?
 5       A.      I don't recall.  It might have been
 6   Pittsburgh.  It was one of the -- one of the ones.
 7       Q.      Any others that you can recall?
 8       A.      There were some RCP failures that
 9   occurred as a result of a -- of a saw cut.  That's what
10   the laboratory investigation stated.  I don't recall if
11   it was improper sawing or just the sawing operation
12   itself.
13               There were some RCP failures that were
14   attributed to a tapping operation.  I'm not sure if the
15   tapping was done properly or improperly.  It was
16   reported done -- it was -- the cause of it was a
17   tapping operation, but I don't know if it was improper
18   tapping or not.
19       Q.      Do you recall where that was, the tapping
20   operation?
21       A.      There were a couple of them.  Some of the
22   early ones, as I recall.  I don't remember which city
23   it was.
24       Q.      Anything else?
25       A.      There's a number of them.  Those are some
```

52



McCorkle Litigation Services, Inc.
Chicago, Illinois  (312) 263-0052

1 main ones. I remember a tapping or cutting or bending
2 or leak testing. Those are some of the primary causes.
3     Q.    In any of the analyses that you were
4 retained to undertake involving fusible PVC pipe, did
5 you ever either conclude on your own or concur with a
6 third party's investigation where there was a finding
7 of material defect as the cause of an RCP event?
8     A.    My recollection is a couple of the early
9 RCP failures, the -- in their investigation, the
10 laboratory reported that the pipe may not have met the
11 requirements or the AWWA standard.
12        So I believe the quality or integrity of
13 the pipe was in question. Those are the only ones I'm
14 aware of where a material or a pipe defect was possibly
15 the cause.
16     Q.    Do you recall which -- which jobs those
17 involved where there may have been a material defect?
18     A.    It was some of the early ones.
19     Q.    You don't remember the names?
20     A.    I don't remember the names.
21     Q.    In those instances that you can recall,
22 was it a problem with the resin or with -- if you know?
23     A.    I don't know.
24     Q.    Was it a problem with the extrusion, if
25 you know?

53

1     A.    I don't know.
2     Q.    We talked a little while ago about cases
3 in which you were retained and you testified, and you
4 have a list of those somewhere, right?
5        MR. FITZPATRICK: Objection. Asked and
6     answered.
7 BY MR. SHEEAN:
8     Q.    I'm just confirming.
9     A.    Yes, I do.
10     Q.    Can you recall -- and I know I don't ask
11 you to bring it and you don't have it with you -- to
12 the best of recollection, the names of those cases?
13     A.    There's -- of the 15 cases where I
14 testified?
15     Q.    Yes.
16     A.    Yeah, I wouldn't remember all of them.
17     Q.    Can you remember any of them?
18     A.    Yes.
19     Q.    Which ones?
20     A.    Let's see, I testified -- I was deposed
21 for the P&F versus UGSI. I was deposed in a case
22 involving both polybutylene pipe failure in Arizona. I
23 was deposed in a case involving an HDPE gas pipe
24 failure. I was deposed in the case of a PEX tank
25 failure.

54

1     Q.    How do you spell that?
2     A.    P-E-X, all capital letters.
3     Q.    And where was that PEX tank --
4     A.    The PEX tank, that was in Norcross,
5 Georgia.
6     Q.    And how about the HDPE?
7     A.    That was in Las Vegas, Nevada.
8     Q.    Okay. Any others?
9     A.    Yes. Let me think. Medium-density or a
10 polyethylene gas pipe failure that occurred in Texas.
11 Another medium-density, squeeze-off failure that
12 occurred in Kentucky. How many is that?
13     Q.    I have six. Any other fusible PVC cases
14 that you testified in?
15     A.    Fusible PVC -- oh, yes, Dorchester
16 County.
17     Q.    Okay.
18     A.    Those are the only two that I can recall
19 for fusible PVC where I was deposed.
20     Q.    Okay. What were your conclusions in the
21 P&F litigation where you were retained as an expert?
22     A.    The litigation was primarily a battle of
23 words back and forth between two companies. Primarily
24 my expert report, as I recall, had to do with my
25 opinions about fusible PVC and rapid crack propagation

55

1 failures.
2     Q.    Have you reread your testimony from those
3 two days of deposition for the P&F case at any time
4 recently?
5     A.    No.
6     Q.    As you sit here today, are there any
7 conclusions that you rendered in the P&F case that you
8 now believe are incorrect?
9        MR. FITZPATRICK: Objection. Form.
10        THE DEPONENT: I'm not aware of any
11     conclusions that I drew that are incorrect.
12 BY MR. SHEEAN:
13     Q.    Okay. And then you were deposed in
14 Dorchester County last year; is that right?
15     A.    Yes.
16     Q.    Okay. What were the conclusions that you
17 reached in that case?
18     A.    My recollection is that there was a
19 long-running RCP crack that occurred, and as a result
20 of that RCP failure that occurred during the pressure
21 test, they were not able to -- to complete the
22 requirements of the pressure test because of the
23 failure.
24     Q.    Anything else?
25     A.    That was my conclusion.

56



| | |
|---|---|
| 1    Q.   Did you reach any conclusions as to the | 1    on behalf of Performance Pipe was a Texas water |
| 2   reason why they weren't able to complete their pressure | 2   company where there was a question about the resin |
| 3   test? | 3   that was used and its performance and how it |
| 4    A.   Because they had an RCP failure. | 4   should be pressure rated. |
| 5    Q.   Did you reach any conclusions as to the | 5   BY MR. SHEEAN: |
| 6   cause of that RCP failure? | 6    Q.   What -- what sort of pipe was that? |
| 7    A.   I don't believe the cause of the failure | 7    A.   That was an HDPE. |
| 8   has been determined, at least not that I'm aware of. | 8    Q.   Can you recall any of the customers that |
| 9    Q.   Have you reached any conclusions about | 9   you met with to give presentations regarding butt fused |
| 10   the cause? | 10   PVC pipe on behalf of Performance Pipe? |
| 11    A.   No. | 11    A.   I have not given any presentations to |
| 12    Q.   Does that -- strike that. Were you asked | 12   Performance Pipe customers. |
| 13   to reach any conclusions as to the cause of the RCP | 13    Q.   Can you recall any specific customers |
| 14   failure in the Dorchester County case? | 14   with whom you met to discuss fusible PVC pipe on behalf |
| 15    A.   I was -- my recollection is I was asked | 15   of the PE Alliance? |
| 16   my opinion on it, and because of the fact that the | 16     MR. FITZPATRICK: Objection to form. |
| 17   point of initiation or what they thought was the point | 17     THE DEPONENT: There was a customer that |
| 18   of initiation was either underground or underwater, it | 18   I had a conversation with at an industry meeting. |
| 19   was almost impossible to draw a conclusion as to what | 19   The name of that water company was Citizens or a |
| 20   was the actual cause. | 20   combination of water/gas company, and they asked |
| 21     MR. FITZPATRICK: I'm going to designate | 21   me a number of questions about fused PVC pipe. |
| 22   as confidential the last two questions concerning | 22     I had a discussion with them. Based on |
| 23   the expert analysis -- undisclosed expert analysis | 23   that, they asked me if I could come to their |
| 24   rendered in the Dorchester County litigation. | 24   location to give them a presentation. I proposed |
| 25   Keep that open until -- you're going to continue | 25   that to the alliance, and they agreed that I would |
| 57 | 59 |
| 1   with Dorchester? | 1   do that. And, therefore, I put a presentation |
| 2     MR. SHEEAN: No. | 2   together and gave the presentation to Citizens. |
| 3     MR. FITZPATRICK: Okay. Then just those | 3   BY MR. SHEEAN: |
| 4   two questions and answers. It's not to be used | 4    Q.   And did you bill the alliance for that |
| 5   outside of this litigation. | 5   time? |
| 6     MR. SHEEAN: I don't have an objection to | 6    A.   Yes, I did. |
| 7   your designating it as confidential, but I would | 7    Q.   And that presentation that you gave to, |
| 8   point out that he has been disclosed. I mean, | 8   you said, Citizens, is it Citizens Energy? |
| 9   he's been deposed already. So -- | 9    A.   Yes, Citizens something. |
| 10     MR. FITZPATRICK: Understood. | 10    Q.   That was in Michigan, if you recall? |
| 11     MR. SHEEAN: -- to the extent he's been | 11    A.   I don't recall. I don't think it was |
| 12   deposed and those questions have been asked, then | 12   Michigan. I don't recall. |
| 13   you can't tell -- | 13    Q.   In any case, that presentation that you |
| 14     MR. FITZPATRICK: Well, whatever | 14   give to Citizens involved butt fused PVC pipe and RCP? |
| 15   questions he was provided in that litigation, and | 15    A.   Yes, it did. That was their question. |
| 16   the answer is certainly out of the bag. But to | 16   They wanted information about it. |
| 17   use this deposition in that litigation is | 17    Q.   Okay. You testified previously about the |
| 18   restricted by its use. | 18   shift from your being a consultant for Performance Pipe |
| 19   BY MR. SHEEAN: | 19   to your being a consultant for the PE Alliance, right? |
| 20    Q.   We were talking before about your | 20    A.   Yes. |
| 21   presentations that were made on behalf of Performance | 21    Q.   What is your understanding of how your |
| 22   Pipe. Do you recall any of the customers specifically | 22   presentations on butt fused PVC pipe benefit the PE |
| 23   that you met with on behalf of Performance Pipe? | 23   Alliance members as a whole? |
| 24     MR. FITZPATRICK: Objection to form. | 24     MR. FITZPATRICK: Objection to |
| 25     THE DEPONENT: Presentations that I made | 25   foundation, form. Assumes facts. |
| 58 | 60 |



1      THE DEPONENT: I would put the
2 presentation together. My reason for putting the
3 presentation together is I felt it was important
4 for users to know that these failures had occurred
5 and what they could do to prevent these RCP
6 failures from occurring.
7      I feel it was to the benefit of the
8 industry to do that. The alliance agreed. So
9 they agreed to -- to pay me for that.
10 BY MR. SHEEAN:
11     Q.   Why did you feel it was a benefit to the
12 industry for you to give that presentation regarding
13 butt fused PVC pipe?
14      MR. FITZPATRICK: Objection to form.
15      THE DEPONENT: I'm a consultant for the
16 plastic piping industry. I have clients who
17 manufacture PVC and manufacture polyethylene,
18 manufacture polyamide, manufacture PEX, et cetera.
19      If there's a problem with PVC pipe, if
20 there's a failure in PVC pipe or if there's a
21 failure in polyethylene, a failure in plastic pipe
22 gives a bad name to plastic pipe. I like to
23 promote plastic pipe, all kinds of plastic pipe.
24      I believe there's -- there is a
25 propensity for butt fused PVC pipe to have these

61

1 RCP failures. I personally am concerned about
2 them. I believe it's a potential danger to the
3 operator and the public.
4      As a consultant to the industry, I want
5 to do what I can to help to prevent these failures
6 from occurring. I believe there's a way that the
7 operator can design to not have these failures
8 occur, and it's incumbent on me, I believe, as a
9 consultant to the plastic industry to do what I
10 can to prevent these failures from occurring.
11 BY MR. SHEEAN:
12     Q.   Okay. I want to follow up on that, but
13 first I'm not sure you answered the direct question
14 that I had, which was:
15      How in your prior answer does it benefit
16 the PE Alliance members for you to give these
17 presentations on butt fused PVC pipe?
18      MR. FITZPATRICK: Objection. Asked and
19 answered.
20      THE DEPONENT: I believe that was your
21 previous question. Your next question was a
22 different question. I answered it.
23 BY MR. SHEEAN:
24     Q.   I don't think you did answer it. I'll
25 ask it again. How do you believe your presentations on

62

1 butt fused PVC pipe benefit the PE Alliance members,
2 not the end-users, PE Alliance members?
3      MR. FITZPATRICK: Objection. Asked and
4 answered.
5      THE DEPONENT: I believe it helps the
6 overall plastic piping industry. I think whenever
7 there is a failure in -- in plastic, it helps the
8 plastics industry to prevent these failures.
9 BY MR. SHEEAN:
10     Q.   So your concern about the negative
11 perception of the plastic pipe industry as a whole, is
12 that right?
13     A.   Yes. I'm a consultant for the plastic
14 piping industry, yes.
15     Q.   Can HDPE 4710 have RCP?
16     A.   It depends on which grade of PE 4710 or
17 type of PE 4710. Most of them are bimodal, and testing
18 that has been done shows that the RCP resistance
19 is -- the critical pressure is very high. So it's very
20 unlikely that you would have an RCP failure in most PE
21 4710 pipes.
22     Q.   What if the inner layer of the 4710 pipe
23 has been degraded due to chlorine oxidative
24 degradation, does that increase the risk of an RCP
25 failure in that pipe?

63

1     A.   I don't --
2      MR. FITZPATRICK: Objection to form.
3 Calls for expert testimony.
4      THE DEPONENT: I don't know of any
5 testing that's been done to confirm or deny that.
6 BY MR. SHEEAN:
7     Q.   Have you ever told anyone that fused PVC
8 pipe is prone to RCP failure?
9     A.   I don't know if I specified
10 specifically -- what was the question?
11     Q.   Prone.
12     A.   Prone, but did you say PVC or butt fused
13 PVC.
14     Q.   Butt fused PVC pipe is prone to RCP
15 failure.
16     A.   Yes.
17     Q.   What is your definition of "prone" in
18 that instance?
19     A.   That it's more likely for it to occur
20 under certain situations.
21     Q.   How frequently in every 10,000 feet of
22 fusible PVC pipe would you expect an RCP event to occur
23 given your finding or belief that it's prone to RCP?
24      MR. FITZPATRICK: Objection to form.
25      THE DEPONENT: I'm not sure you can

64



| | |
|---|---|
| 1    answer that question when you say expected to | 1    Q.    You can answer. |
| 2    occur.  You never expect it to occur.  The | 2    A.    Yeah, I have not.  I have not seen |

BY MR. SHEEAN:
(The two-column layout transcribed in reading order below.)

--- Page 65 (left column) ---

1   answer that question when you say expected to
2   occur.  You never expect it to occur.  The
3   fact -- the facts are that it has occurred 30 to
4   40 times.
5           So, in my opinion, then it's -- it is
6   susceptible under certain situations to RCP
7   failures.
8   BY MR. SHEEAN:
9       Q.      But you can't quantify it within every
10  10,000 feet?
11      A.      Well, if you take the number of -- pick a
12  number of 40 failures and divide that by the number of
13  feet -- all I can go by are the facts, which is how
14  many have actually occurred.
15      Q.      Do you agree that PE -- strike that.  Do
16  you agree that PE pipe is prone to oxidative
17  degradation when exposed to chlorine?
18          MR. FITZPATRICK:  Objection to form,
19  relevance.  Expert testimony.
20          THE DEPONENT:  Studies have shown that,
21  again, it depends on the type of polyethylene and
22  the additive package.  Some of the early
23  generation polyethylene materials with certain
24  additive packages when tested show that they are
25  more prone to oxidative degradation.

65

--- Page 66 (bottom left column) ---

1           Some of the more modern polyethylene
2   materials with their additive package when tested
3   show that they are not as likely to have failures
4   from oxidative degradation.
5   BY MR. SHEEAN:
6       Q.      Would the critical pressure of PE pipe
7   drop if it's subject to oxidative degradation from
8   chlorine?
9           MR. FITZPATRICK:  The same:  Form,
10  foundation.  Calls for expert testimony.
11          THE DEPONENT:  I'm not aware of any
12  studies RCP testing that have been done on pipe
13  that has been purposely degraded from chlorine.  I
14  don't know how to answer that question.
15  BY MR. SHEEAN:
16      Q.      What about the critical pressure, though,
17  aside from RCP testing?
18      A.      Well, that is RCP testing.
19      Q.      So you have no opinion as to whether or
20  not the critical pressure of PE pipe would drop after
21  it has suffered oxidative degradation from chlorine?
22          MR. FITZPATRICK:  Same:  Form,
23  foundation.  Calls for expert testimony.
24  Misconstrues.
25  BY MR. SHEEAN:

66

--- Page 67 (right column top) ---

1       Q.      You can answer.
2       A.      Yeah, I have not.  I have not seen
3   any -- any studies whatsoever that would confirm or
4   deny that.
5       Q.      Are PE pipes with electrofused joints
6   prone to failure?
7           MR. FITZPATRICK:  Same, form.
8           THE DEPONENT:  The likelihood or
9   probability of failure of an electrofusion joint
10  is less than the probability of failure of a
11  standard heat-fusion joint because you've taken
12  more of a human element out.
13  BY MR. SHEEAN:
14      Q.      So you don't believe that it's prone to a
15  failure?
16      A.      Again, it depends on your definition of
17  "prone", but if your definition of "prone" is is it
18  likely to fail, the whole purpose of an electrofusion
19  joint is so that it would not fail.
20      Q.      Well, I'm using your definition of
21  "prone" based on your belief that fusible PVC pipe is
22  prone to RCP failure.  Okay?  So when I use the word
23  "prone", that's what I mean.  Okay?
24      A.      Okay.
25      Q.      Is PE 3408 prone to

67

--- Page 68 (bottom right column) ---

1   slow-graph -- slow-crack crack growth?
2           MR. FITZPATRICK:  Same, form.
3           THE DEPONENT:  Your question, again, was:
4   Is PE 3408 subject to or prone to slow-crack
5   growth?  It depends on which PE 3408.  There's
6   many different generations.
7           Some of the early generation PE 3408
8   materials had lower slow-crack growth resistance.
9   So the early generation polyethylene materials
10  would be more prone to slow-crack growth than the
11  modern 3408s, when they were called 3408s, which
12  have higher resistance to slow-crack growth.
13  BY MR. SHEEAN:
14      Q.      Is PE 4710 prone to slow-crack growth?
15          MR. FITZPATRICK:  Same objections.
16          THE DEPONENT:  Most PE 4710 materials are
17  bimodal, and they have very high resistance to
18  slow-crack growth.  So I would say, no, they're
19  not prone to slow-crack growth failures.
20  BY MR. SHEEAN:
21      Q.      Is PE pipe prone to pull out from
22  fittings if it's stretched too far during installation?
23      A.      It depends on what type of fittings
24  you're talking about.
25      Q.      Any fittings.

68



1     A.     Well, if it's a butt-fusion fitting, no,
2 it would not pull out. If it's a mechanical thing,
3 maybe. It depends on what type of mechanical fitting.
4     Q.     What types of mechanical fittings are
5 prone to suffer pullout with PE pipe if it's stretched
6 too thin during installation?
7     A.     A category 3 --
8     Q.     What's a --
9     A.     -- mechanical fitting.
10    Q.     What's a category 3 mechanical fitting.
11    A.     A category 3 mechanical fitting is a
12 mechanical fitting which has seal resistance, pressure
13 resistance, but no pullout resistance.
14    Q.     In your presentations to various groups
15 on behalf of the PE Alliance, why don't you warn people
16 about oxidative degradation in PE pipe?
17        MR. FITZPATRICK: Objection to form.
18        THE DEPONENT: Because that wasn't the
19    subject of the presentation.
20 BY MR. SHEEAN:
21    Q.     Have you -- have you ever made that the
22 subject of a presentation to any of the AWWA or MRA
23 groups that you've presented to?
24    A.     No, I have not.
25    Q.     What about the problems with pullout from

69

1 category 3 mechanical fittings in PE pipe, have you
2 ever made that the subject of a presentation to any of
3 the AWWA or other groups that you've presented to on
4 behalf of the PE Alliance?
5        MR. FITZPATRICK: Objection to form.
6    Misconstrues.
7        THE DEPONENT: Most of my experience with
8    polyethylene and use of mechanical fittings, et
9    cetera, is in the gas industry. These fittings
10   aren't used that much in the water industry.
11 BY MR. SHEEAN:
12    Q.     Have you ever given a presentation to any
13 of the AWWA or MRA groups to whom you've presented on
14 behalf of the PE Alliance involving problems with
15 pullout from fittings in general in PE pipe?
16    A.     No.
17    Q.     Have you ever presented to any AWWA or
18 MRA group on behalf of the PE Alliance regarding
19 slow-crack growth problems in PE pipe?
20        MR. FITZPATRICK: Objection to form.
21    Misconstrues.
22        THE DEPONENT: I don't recall.
23 BY MR. SHEEAN:
24    Q.     I should have done this before.
25 Mr. Palermo, have you -- strike that. In your

70

1 presentation we're about to get into you refer often to
2 butt fused PVC pipe, correct?
3    A.     Yes.
4    Q.     Okay. Are you aware of any company in
5 North America, other than Underground Solutions and its
6 licensee, that supplies butt fused PVC pipe in the
7 United States or Canada?
8    A.     My understanding is Underground Solutions
9 is the sole inventor of butt fused PVC pipe, and they
10 license that technology to a number of pipe
11 manufacturers.
12    Q.     Okay. So having said that, are you aware
13 of any other company besides UGSI or its licensees that
14 supplies butt fused PVC pipe in North America?
15    A.     No.
16    Q.     What is your definition of rapid crack
17 propagation or RCP?
18    A.     A crack that propagates rapidly in pipe.
19    Q.     Do you believe there's a minimum length
20 the crack has to run in order for it to qualify as an
21 RCP event?
22    A.     Yes.
23    Q.     What is that length?
24    A.     If the crack is less than 4.7 times the
25 outside diameter, it's a rapid crack arrest. If the

71

1 crack is more than 4.7 times the outside diameter, it's
2 a rapid crack propagation.
3    Q.     On what do you base that statement?
4    A.     That's the definition of a crack arrest
5 or a crack propagation in the ISO standard.
6    Q.     Which standard?
7    A.     13477.
8    Q.     Do you believe that RCP requires a source
9 of internal pressure in order to occur?
10    A.     No.
11    Q.     And what is the basis for that statement?
12    A.     In order for RCP to occur, you have to
13 have a stress which is greater than the resistance of
14 the pipe. Well, let me take that back. You first have
15 to have an initiation, and then once the crack is
16 initiated, the energy or stress has to be greater than
17 the resistance.
18    Q.     We've been talking a lot about ISO 13477,
19 but we also talked a little bit about 13478, right?
20 And that's the full-scale test?
21    A.     Those are the two test methods, yes.
22    Q.     And what is the definition of RCP in
23 13478?
24    A.     As I recall, 13478 doesn't have a clear
25 definition of a crack arrest or a crack propagation as

72

73

1  13477 does.
2      Q.    Is there a minimum pipe length that's
3  required in order to test under 13478?
4      A.    There's some wording with regard to crack
5  length that has to be greater than something or
6  another. I forget what it is, and when you have that
7  length, whatever that length is, for it to be
8  propagation, it has to be 90 percent of that length.
9      Q.    Don't you need a minimum of 40 feet of
10 pipe in order to conduct a single point of a full-scale
11 test on plastic pipe under ISO 13478?
12     A.    There is some minimum there. It's in
13 meters, but I forget what the number exactly is.
14     Q.    So based on the minimum pipe length
15 required for RCP testing under 13478 and the fact that
16 a crack has to be at least 90 percent of that, that's
17 really a different measurement of RCP then what's
18 available under 13477, isn't it?
19         MR. FITZPATRICK: Objection to form.
20         THE DEPONENT: Yeah, the 13477 is a
21     clearer definition of what's considered an arrest
22     propagate and a propagation. 13478, it's a little
23     bit different.
24 BY MR. SHEEAN:
25     Q.    But if you follow 13478, you come out

74

1  with a different and a longer measurement for what's
2  required for a minimum crack length; isn't that true?
3      A.    There is a minimum -- a minimum length of
4  the sample, but I don't recall if it's -- well, first
5  of all, it's in meters not feet. I don't recall what
6  the -- the minimum is.
7          There -- it's complicated because they
8  also in 13478 talk about a certain length of pipe that
9  you can have, which is less resistant to RCP in an
10 effort to get the crack to run through the less
11 resistant material first and then go into the pipe
12 that's being tested.
13         So it's -- and there's different lengths
14 that are involved there. So the actual length of the
15 pipe that's being tested could actually be less than, I
16 think, what you were saying.
17     Q.    When is the last time you read 13478?
18     A.    It's been a while.
19         (Exhibit 1 - UGSI00677-UGSI00739)
20 BY MR. SHEEAN:
21     Q.    All right. I'm going to hand you what
22 we've marked as Deposition Exhibit Number 1, which is a
23 document bates labeled UGSI00677 through UGSI00739.
24         It's entitled "Plastic Pipe For Water
25 Distribution - What You Need to Know About RCP and Butt

75

1  Fusion Integrity MRWA-3/20/13". Do you see that?
2      A.    Yes.
3      Q.    Have I accurately described Exhibit 1?
4      A.    Yes.
5      Q.    And in the bottom left corner it says,
6  "Dr. Gene Palermo, Palermo Plastics Pipe Consulting."
7  Is that right?
8      A.    Correct.
9      Q.    Okay. Did you prepare this PowerPoint
10 presentation?
11         MR. SHEEAN: And I'll submit for the
12     record this is the same PowerPoint presentation
13     that was attached to our complaint and our amended
14     complaint.
15         THE DEPONENT: This looks like the
16     PowerPoint that I prepared.
17 BY MR. SHEEAN:
18     Q.    Since we only have five minutes, I'm
19 going to run through these and introduce them, and then
20 we'll come back to Exhibit 1 in a second.
21         (Exhibit 2 - UGSI00591-UGSI00609)
22 BY MR. SHEEAN:
23     Q.    I'm going to hand you what's been marked
24 as Exhibit 2. This is entitled "Correlating Plastic
25 Pipe RCP Field Failures With RCP Critical Pressure For

76

1  Water Pipe Applications". It's UGSI00591 through
2  UGSI00609.
3  (Exhibit 3 - Characteristics of Butt Fusion Joints In
4  Thermal Plastic Pipe For Water Applications.)
5  BY MR. SHEEAN:
6      Q.    I'm going to hand you what we've marked
7  as Exhibit 3. I'm sorry, I should ask that. With
8  respect to Exhibit 2, did you prepare that document?
9      A.    This looks like the document that I
10 prepared, yes.
11     Q.    I'm going to hand you what we've marked
12 as Exhibit 3, which is titled Characteristics of Butt
13 Fusion Joints In Thermal Plastic Pipe For Water
14 Applications, dated March 7, 2012, presented at MRWA,
15 Illinois AWWA. Do you see that? And then it goes on,
16 and it has some additional presentations?
17     A.    Yes.
18     Q.    Is that a paper that you submitted in
19 conjunction with the presentations to -- on March 7,
20 March 21 and June 5, 2015 -- 2012?
21     A.    I don't recall if I presented the actual
22 paper or if it was the PowerPoint to that.
23     Q.    But this was the paper that would have
24 been submitted in conjunction with the presentation?
25     A.    Yes.



McCorkle Litigation Services, Inc.
Chicago, Illinois  (312) 263-0052

| | |
|---|---|
| 1    (Exhibit 4 - PowerPoint Presentation) | It's not bates labeled.  So I don't have the bates |
| 2  BY MR. SHEEAN: | range numbers of it. |
| 3    Q.    Okay.  I'm going to hand you what we've | MR. FITZPATRICK:  Do you have the fourth |
| 4  marked as Exhibit 4. | exhibit? |
| 5    MR. FITZPATRICK:  Is there a reason | THE DEPONENT:  The fourth exhibit is |
| 6  there's no bates on the third exhibit? | right here. |
| 7    MR. SHEEAN:  None that I can think of off | MR. FITZPATRICK:  Okay. |
| 8  the top of my head. | BY MR. SHEEAN: |
| 9    MR. FITZPATRICK:  Do you know if it was | Q.    Can I see that 5 again real quick? |
| 10  produced? | Sorry.  Thanks.  Sorry. |
| 11    MR. SHEEAN:  I don't know if it was or | A.    And I think there is a question pending. |
| 12  not. | You said, "Do you see that?"  And, yes, I do see that. |
| 13    THE DEPONENT:  I didn't see bates numbers | Q.    Does this appear to be a copy of the -- a |
| 14  on this one either, the first one. | black and white copy of the PowerPoint presentation |
| 15    MR. FITZPATRICK:  There's bates on the | that you made at the 2012 ASCE Pipelines Conference? |
| 16  first one.  That's 677 -- UGSI677 to 739. | A.    It does appear to be, yes. |
| 17    THE DEPONENT:  Oh, okay.  It's on your | (Exhibit 6 - UGSI00045-UGSI00066) |
| 18  copy, not mine. | BY MR. SHEEAN: |
| 19    MR. SHEEAN:  Oh, that's because he has | Q.    I'm handing you what we've marked as |
| 20  the color copy. | Exhibit 6, which is a paper bates labeled UGSI00045 |
| 21    MR. FITZPATRICK:  That's right. | through UGSI0066, entitled Proposal For Revision of |
| 22    MR. SHEEAN:  That's why I did that. | AWWA C605-AWWA PVC Committee November 27, 2012 |
| 23    MR. FITZPATRICK:  Let me take a minute. | Conference Call By Dr. Gene Palermo.  Do you see that? |
| 24    MR. SHEEAN:  Why don't we go ahead and | A.    Yes. |
| 25  change the tape now. | Q.    It's dated November 27, 2012? |

| | |
|---|---|
| 1    THE VIDEOGRAPHER:  We're going off the | A.    Correct. |
| 2  record at 10:24. | Q.    Does this appear to be a complete copy of |
| 3    (The deposition was in recess.) | that paper? |
| 4    THE VIDEOGRAPHER:  The time is 10:34. | A.    Yes. |
| 5  We're back on the record. | (Exhibit 7 - UGSI00067 through UGSI00110) |
| 6    MR. FITZPATRICK:  A point of clarity, | BY MR. SHEEAN: |
| 7  Chris.  I think you made a representation that | Q.    I'm handing you what we've marked as |
| 8  this first exhibit may have been attached to | Exhibit 7, which is bates labeled UGSI00067 through |
| 9  either the original complaint or the amended | 00110, and it's titled Proposal For Revision of AWWA |
| 10  complaint. | C605-AWWA PVC Committee, November 27, 2012 Conference |
| 11    I don't believe it was attached to either | Call.  Do you see that? |
| 12  of those pleadings, but it's really not -- I just | A.    Yes. |
| 13  wanted to -- | Q.    Does this appear to be a complete copy of |
| 14    MR. SHEEAN:  Okay. | the PowerPoint presentation for that conference call |
| 15    MR. FITZPATRICK:  -- inform the witness, | that you had on November 27, 2012? |
| 16  though. | MR. FITZPATRICK:  Objection.  Compound. |
| 17    (Exhibit 5 - PowerPoint Presentation) | THE DEPONENT:  This appears to be the |
| 18  BY MR. SHEEAN: | PowerPoint that I used. |
| 19    Q.    All right.  I've handed you 1 through 4. | (Exhibit 8 - UGSI00269-UGSI00306) |
| 20  I'm now going to hand you 5, which I'm going to go | BY MR. SHEEAN: |
| 21  ahead and -- Exhibit 5 is, for the record, a | Q.    Now, I'm handing what we've marked as |
| 22  presentation titled "ASCE Pipelines 2012 Conference | Exhibit 8, which, for the record, is titled How to |
| 23  Designed to Prevent Long-Running Cracks in Plastic Pipe | Design Against Long-Running Cracks in Plastic Pipe For |
| 24  For Water Applications By Dr. Gene Palermo Sponsored By | Warmer Applications.  It's bates labeled UGSI00269 |
| 25  Chevron Phillips Chemical Company".  Do you see that? | through UGSI00306.  Do you see that? |



| | |
|---|---|
| 1    A.    I see it, yes. | 1    ask you something about what we talked about a few |
| 2    Q.    And does this appear to be a complete | 2    minutes ago before the last break. |
| 3    copy of the PowerPoint presentation that you gave | 3         Specifically in response to some |
| 4    sometime, it looks like, in 2012 at some conference. | 4    questions about the word "prone", I asked you what you |
| 5    I'm not sure what that insignia in the bottom right | 5    meant by "prone". Do you recall what you testified? |
| 6    corner refers to. Do you know? Is that WatCon -- | 6    It's not a memory quiz. I just want to make sure I get |
| 7    A.    Water -- I think it's WaterCon. | 7    it accurately. |
| 8    Q.    2012? | 8    A.    I think I said something to the effect |
| 9    A.    Yes. It was one of the conferences. | 9    that prone means is likely to. |
| 10    Q.    Okay. | 10    Q.    Okay. Do you provide -- |
| 11    A.    I don't recall which one. | 11    A.    Susceptible to. |
| 12    Q.    I'm sorry, I don't know if I asked that. | 12    Q.    Okay. I'm sorry. Do you tell your |
| 13    I apologize. Does this appear to be a complete copy of | 13    audience members what you mean by "prone" when you |
| 14    the PowerPoint presentation that you gave at WaterCon | 14    describe to them that -- your belief that fusible PVC |
| 15    2012? | 15    pipe is prone to RCP? |
| 16    A.    It appears to be. | 16         MR. FITZPATRICK: Objection to form. |
| 17    Q.    Do you recall where that was? | 17    Assume facts not in evidence. |
| 18    A.    No, I don't. | 18         THE DEPONENT: I'm not sure I used the |
| 19    Q.    Do you recall the actual date in 2012? | 19    word "prone" that often myself. I think I used |
| 20    A.    I believe in one of the interrogatories | 20    the word "more susceptible to". |
| 21    that I submitted I had the dates for those, but offhand | 21    BY MR. SHEEAN: |
| 22    right now I don't recall the date. | 22    Q.    Okay. Have you -- but -- strike that. |
| 23    (Exhibit 9 - Correlating Plastic Pipe Field Failures | 23    You believe you may have used the word "prone" in past |
| 24    With RCP Critical Pressure For Water Pipe Applications) | 24    presentations regarding RCP. Wasn't that your |
| 25    BY MR. SHEEAN: | 25    testimony? |
| 81 | 83 |

| | |
|---|---|
| 1    Q.    All right. Last but not least, I'm | 1         MR. FITZPATRICK: Objection. |
| 2    handing you what we've marked as Exhibit 9, and there | 2    Misconstrues. |
| 3    is no PowerPoint. I downloaded it this morning from | 3         THE DEPONENT: That was the word that you |
| 4    your website. | 4    used. I don't recall if I actually used that word |
| 5         This appears to be Correlating Plastic | 5    or not or if I -- my recollection is I think I |
| 6    Pipe Field Failures With RCP Critical Pressure For | 6    used the word more that it's susceptible to. |
| 7    Water Pipe Applications Presented At the Florida AWWA | 7    BY MR. SHEEAN: |
| 8    12-3-13. Do you see that? | 8    Q.    Okay. So, as you sit here today, you may |
| 9    A.    Yes. | 9    have used the word "prone". You just don't recall ever |
| 10    Q.    And does this appear to be a complete | 10    using it? |
| 11    copy of the PowerPoint presentation that was given in | 11    A.    I don't recall, yeah. |
| 12    or around December 3, 2012 at the Florida AWWA? | 12    Q.    Looking at Exhibit 1, is there anything |
| 13    A.    Yes. I believe you initially said this | 13    contained within this exhibit that you now believe to |
| 14    does not seem to be the PowerPoint. I believe this is | 14    be inaccurate? |
| 15    the PowerPoint. | 15         MR. FITZPATRICK: Object to the form. |
| 16    Q.    Oh, if I said that, I apologize. And I | 16         THE DEPONENT: I think over the last |
| 17    will represent for the record that a couple of the | 17    couple of years as I've obtained more information |
| 18    slides got cut off on by the annoying footer at the | 18    about these incidents, I think there might be a |
| 19    bottom that's put on when you download documents off | 19    minor correction to some of the lengths. |
| 20    the internet. So with that caveat, this is a complete | 20         I know that's something that's always |
| 21    copy, right? | 21    very difficult to obtain. A lot of times the |
| 22    A.    It appears to be, yes. | 22    length is not accurately known. It's not known |
| 23    Q.    Okay. Thank you. I'm going to ask you | 23    until a long time later, and in some cases it's |
| 24    some questions about Exhibit 1 now, so if you could | 24    never really known for sure what the length is. |
| 25    pull that out. While you're pulling that out, let me | 25         So these are lengths that I would have |
| 82 | 84 |



| | |
|---|---|
| 1  recorded at the time, which I -- was based on the | 1      A.    I don't know if it was this one. |
| 2  information provided to me at the time which I | 2  There's -- there are two documents on my website. I |
| 3  felt was accurate.  Some of those may | 3  don't remember which one is actually the one that's on |
| 4  have -- numbers may have changed over the last | 4  there. |
| 5  couple of years as we gathered more information. | 5      Q.    Is it possible that this document was on |
| 6  BY MR. SHEEAN: | 6  your website for several months including prior to the |
| 7      Q.    Anything else in Exhibit 1? | 7  filing of this lawsuit? |
| 8          MR. FITZPATRICK:  Same objection. | 8      A.    Yes. |
| 9          THE DEPONENT:  Scanning through this, I | 9      Q.    Okay.  Please identify for me what on |
| 10  don't see anything else. | 10  page three tells the reader that the length of the RCP |
| 11  BY MR. SHEEAN: | 11  crack is approximate. |
| 12      Q.    Okay.  We'll go through these incidents | 12          MR. FITZPATRICK:  Objection to form. |
| 13  more carefully in a minute, but you just said that it's | 13  Misconstrues. |
| 14  often not known exactly what the length of the crack | 14          THE DEPONENT:  When I give the |
| 15  is.  You don't say approximate like the crack on page | 15  presentation to the audience -- and that's what |
| 16  three of Exhibit 1, do you? | 16  this is.  This is a PowerPoint given to an |
| 17          MR. FITZPATRICK:  Objection. | 17  audience, and I speak verbally to the audience. |
| 18  Misconstrues the testimony.  Go ahead. | 18          The intent of this slide when it's on the |
| 19          THE DEPONENT:  I say the length of the | 19  screen and I'm talking, I don't go into the |
| 20  crack, and I'm reporting what was reported to me | 20  specifics of the length of the crack or what |
| 21  was the length of the crack. | 21  caused the failure to occur. |
| 22          After further investigation, sometimes | 22          I simply refer to this as the number of |
| 23  these numbers are revised slightly.  So | 23  failures that have occurred, and that's -- that's |
| 24  it's -- this is the best number that I have at the | 24  really the only amount of time that I spend on |
| 25  time on what the length of the crack was. | 25  this slide. |
| 85 | 87 |

| | |
|---|---|
| 1  BY MR. SHEEAN: | 1  BY MR. SHEEAN: |
| 2      Q.    Where on slide three or anywhere within | 2      Q.    Is it your testimony that you advise the |
| 3  this document do you advise the reader that your report | 3  attendees of your PowerPoint presentations when they're |
| 4  of the length of the RCP crack is an estimate and is | 4  shown this slide that you tell them these are |
| 5  based on third-party reports that you haven't been able | 5  approximate lengths and that they are obtained from |
| 6  to independently verify? | 6  third-party reports? |
| 7          MR. FITZPATRICK:  Objection to form. | 7      A.    I don't recall going into that detail. |
| 8  Misconstrues. | 8      Q.    Okay.  And there's nothing on this page |
| 9          THE DEPONENT:  When I give the | 9  that tells a reader who downloads this off the internet |
| 10  presentation, I don't go through each one and | 10  that your reports of the length of crack are |
| 11  specifically say, "This is the length.  This is | 11  approximate and based on third-party reports? |
| 12  the length.  This is the length." | 12          MR. FITZPATRICK:  Objection to form. |
| 13          This is more intended when I give the | 13  BY MR. SHEEAN: |
| 14  presentation to be an overall capsule of the | 14      Q.    Isn't that true? |
| 15  number of failures that have occurred.  I don't | 15          MR. FITZPATRICK:  Form.  Misconstrues. |
| 16  really hone in on the exact pipe size or the exact | 16          THE DEPONENT:  Yeah, there's nothing on |
| 17  DR or the exact length of it. | 17  the slide itself which says that it's -- that's |
| 18          It's more to give the audience an | 18  it's approximate.  These are simply the numbers |
| 19  understanding of the quantity or the number of | 19  that I -- were reported to me, and these are the |
| 20  failures that have occurred. | 20  reports that I then report. |
| 21  BY MR. SHEEAN: | 21  BY MR. SHEEAN: |
| 22      Q.    Well, your answer reminds me to ask you | 22      Q.    Okay.  You indicated that you would make |
| 23  this: This document was on your website available for | 23  some minor corrections to some of the lengths.  Do you |
| 24  public downloading and viewing to anyone who went to | 24  recall which one of these 20 incidents you would |
| 25  PlasticsPipe.com, correct? | 25  correct the length measurement on? |
| 86 | 88 |



1     MR. FITZPATRICK: Objection. Form.

2     THE DEPONENT: Right offhand, no, I

3 don't.

4 BY MR. SHEEAN:

5     Q.    Okay. Have you ever done anything to

6 advise any individual who viewed your presentation that

7 you had erred in reporting the crack length on any of

8 these incidents?

9     MR. FITZPATRICK: Objection to form.

10 Misconstrues.

11     THE DEPONENT: I don't consider that I'm

12 erring in reporting them, but simply what was

13 reported to me. That may or -- that number may or

14 may not change later, but it was -- to the best of

15 my understanding and belief, that was a correct

16 number at the time that I reported it.

17 BY MR. SHEEAN:

18     Q.    Okay. Have you ever taken any action to

19 advise an attendee to one of your presentations that

20 the length of crack reported in your PowerPoint

21 presentation turned out to be in excess of what was

22 actually later discovered?

23     MR. FITZPATRICK: Same objections.

24     THE DEPONENT: It would be almost

25 impossible to do that. I have no idea who was in

---

1 the audience.

2 BY MR. SHEEAN:

3     Q.    So is that a no?

4     A.    That's a no.

5     MR. FITZPATRICK: Same objection.

6 BY MR. SHEEAN:

7     Q.    Thank you. Looking at Exhibit 1 as a

8 whole, is there anything in this document that you now

9 consider, as you sit here, to be untrue?

10     MR. FITZPATRICK: Objection. Asked and

11 answered. I mean, he's asking questions about 30

12 or 40 page documents. Anything in them -- and go

13 through every item in this document and take as

14 long as you need.

15     THE DEPONENT: And your question is: Is

16 there anything in here which I now believe to

17 be --

18 BY MR. SHEEAN:

19     Q.    Untrue.

20     A.    -- untrue?

21     Q.    My prior question was whether it was

22 inaccurate. Now my question is: Is it untrue? If you

23 consider those to be the same thing, then you can

24 answer based on that.

25     MR. FITZPATRICK: Objection to form.

---

1     THE DEPONENT: I mean --

2     MR. FITZPATRICK: Gene, go ahead. I

3 mean, you're asking to opine about --

4     THE DEPONENT: Right. I just want to

5 make sure I understand the question and to

6 formulate my answer.

7     I perceive a difference between the first

8 term you used "inaccurate" and the second term you

9 are now using, which is to be untrue. I perceive

10 those two to be different.

11 BY MR. SHEEAN:

12     Q.    Okay. What is the difference in them?

13     A.    Inaccurate I perceive to be if there's

14 something in the report which is a certain value and

15 then later it's deemed to be a different value, that

16 would be perhaps construed as being inaccurate.

17     If it's untrue, I perceive that as being

18 different from inaccurate. If it's not true, that

19 means that it's -- that it's simply wrong, and you're

20 now asking me is there anything here that's wrong or

21 untrue.

22     MR. FITZPATRICK: Is that a fair

23 assessment?

24     THE DEPONENT: I just want to understand

25 what his understanding is.

---

1     MR. FITZPATRICK: So what is he looking

2 for now? Untrue?

3     MR. SHEEAN: He already did inaccuracies.

4 Now he's doing untruth.

5     MR. FITZPATRICK: Untruth?

6     MR. SHEEAN: That's correct.

7     MR. FITZPATRICK: Objection to form.

8 Ambiguous. Vague.

9     THE DEPONENT: I believe there's some

10 question about the length of the crack. The first

11 one was in Jacksonville, Clay County. I believe

12 it's the same thing here on the third slide. So

13 that would come under the maybe inaccurate rather

14 than untrue.

15 BY MR. SHEEAN:

16     Q.    I'm sorry, was that the 600 foot crack

17 or 1,600 foot crack?

18     A.    The 600.

19     Q.    Okay.

20     A.    The same with the Dorchester County.

21 When -- when first reported, the contractor reported or

22 stated it was a -- about a 2,200 foot crack. Since

23 that time they have not been able to -- because a lot

24 of it is underwater, they don't know exactly if it was

25 that number or something less. So that's -- there's

---

89

90

91

92



McCorkle Litigation Services, Inc.
Chicago, Illinois  (312) 263-0052

Pages 89 to 92

| | |
|---|---|
| 1 some question about that number. | 1 you -- is there anything in Exhibit 1 that you consider |
| 2     I see in this slide I titled it Louisiana | 2 to be no longer applicable? |
| 3 Water Company, and then later I say Texas Water | 3     MR. FITZPATRICK: Objection to form. |
| 4 Company. When talking to the company directly, the | 4     THE DEPONENT: Having scanned it, |
| 5 water company directly, they asked me not to reveal the | 5     everything in here is -- I believe is accurate, |
| 6 name. | 6     and I still believe what's in here. |
| 7     They said use Texas or Louisiana, and I | 7 BY MR. SHEEAN: |
| 8 see that I actually used both names. It's correct, but | 8     Q.    Okay. Looking at slide -- or page three |
| 9 it's probably more -- more correct to say Louisiana | 9 of Exhibit 1, which is the known RCP field failures, do |
| 10 slash Texas Water Company. | 10 you see that? |
| 11     MR. SHEEAN: For the record, the witness | 11     A.    Yes. |
| 12     is referring to what's bates labeled USGI00716 on | 12     Q.    What is meant by the term "known" in that |
| 13     the bates label copy. I know your copy doesn't | 13 page? |
| 14     have any bates on it. | 14     A.    These are RCP failures that -- that I am |
| 15     MR. FITZPATRICK: What I recall what his | 15 aware of; meaning, they're known. They have been made |
| 16     question is: Identify things that you know to be | 16 known to me with the exception -- and I do not get into |
| 17     untrue within this document. | 17 that in the presentation, with the exception of |
| 18     THE DEPONENT: I think this would be | 18 approximately a half a dozen or so RCP failures that |
| 19     more -- more -- it would be more accurate to say | 19 were made known to me as part of the P&F versus UGSI |
| 20     Louisiana slash Texas Water Company than just the | 20 lawsuit. |
| 21     Louisiana. | 21     Subsequent to the settlement of that |
| 22     MR. FITZPATRICK: So -- | 22 lawsuit, that information became privileged by a |
| 23     THE DEPONENT: Would that be considered | 23 protective order, and I am not allowed to disclose that |
| 24     untrue or inaccurate or -- | 24 information. So -- and I do not state that to the |
| 25 BY MR. SHEEAN: | 25 audience. |
| 93 | 95 |

| | |
|---|---|
| 1     Q.    I'm basing it off of your understanding, | 1     So these are basically RCP field failures |
| 2 sir. | 2 that are known to me that I am aware of excluding the |
| 3     A.    Okay. | 3 ones that are known to me that are protected by the |
| 4     MR. FITZPATRICK: This is the problem. | 4 protective order. |
| 5 So -- | 5 BY MR. SHEEAN: |
| 6     THE DEPONENT: Right. So this should | 6     Q.    Do you point out to the audience members |
| 7     more correctly be Louisiana slash Texas Water | 7 in your presentations that what you mean by "known" is |
| 8     Company. You can decide which is the nomenclature | 8 that you are aware of these failures? |
| 9     better to correct that. | 9     A.    Yes. I say that these are the ones that |
| 10     MR. FITZPATRICK: For the record, | 10 I'm aware of. |
| 11     Mr. Sheean said Exhibit 9 was last but not least. | 11     Q.    Do you discuss in your presentations any |
| 12     I think we're going to hold him to that. | 12 efforts by you to verify the underlying information? |
| 13     MR. SHEEAN: Of the presentations, that's | 13     A.    No. Generally the presentation is maybe |
| 14     right. | 14 a half hour. I don't have time to do that. |
| 15     MR. FITZPATRICK: I don't remember that | 15     Q.    Each of the projects listed on this slide |
| 16     qualifier. | 16 involve fusible PVC pipe, correct? |
| 17     THE DEPONENT: Okay. I don't see | 17     A.    Yes, that's correct. |
| 18     anything here that off the top of my head right | 18     Q.    And, to your knowledge, did each of these |
| 19     now I could -- I could say that -- I would say is | 19 incidents involve pipe that was manufactured by |
| 20     untrue. | 20 Underground Solutions or one of its licensees? |
| 21 BY MR. SHEEAN: | 21     A.    That's my understanding. |
| 22     Q.    As you sit here today, is there anything | 22     Q.    And you were aware of that when you |
| 23 in Exhibit 1 that you consider to be misleading? | 23 prepared that slide, weren't you? |
| 24     A.    No. | 24     MR. FITZPATRICK: Objection. Form. |
| 25     Q.    Okay. As you sit here today, do | 25     THE DEPONENT: Yes. As we discussed |
| 94 | 96 |



```
1       earlier, UGSI is the only licensee for the
2       manufacture of fusible PVC pipe.
3  BY MR. SHEEAN:
4       Q.      What makes a crack in a pipe a field
5  failure?
6       A.      If it occurs in the field.
7       Q.      In your opinion, can a crack that occurs
8  when the pipe has not been installed correctly be
9  deemed an RCP failure -- a field failure?
10      A.      Yes.
11      Q.      So even though it hasn't been put into
12 service yet?
13      A.      Whether or not the pipe has been put into
14 service has nothing to do with whether it's a rapid
15 crack propagation.  In fact, most of the RCP failures
16 that have been known to occur in plastic pipe occur
17 during the pressure test, which is before it's placed
18 into service.
19      Q.      Do you believe that a long-running crack
20 in a pipe can be classified as a known RCP field event
21 even when the cause of the event was due to the failure
22 of the operator to follow the manufacturer's
23 instructions?
24      A.      Yes, to be defined as an RCP failure.  It
25 has nothing to do with how it was installed or how it

                                                    97

1       including when I give the presentation?
2       Q.      No, sir, I'm not.
3       A.      Okay.
4       Q.      I'm going to get -- that's my next
5  question.
6       A.      Okay.
7       Q.      You want it again?
8       A.      Yes.
9       Q.      Okay.  In Exhibit 1, do you anywhere
10 explain to the reader that the term "known RCP field
11 failure" includes long-running cracks that were caused
12 by the disregard of the manufacturer's instructions by
13 the operator?
14      A.      Yes.
15      Q.      Where?
16      A.      Well, you said explain to the reader.  I
17 explained verbally to the -- to the reader of the
18 PowerPoint.
19      Q.      But the beginning of the question was in
20 the document.
21      A.      In the document itself --
22      Q.      Yes, sir.
23      A.      -- in the PowerPoint that's on the screen
24 you're talking about?
25      Q.      That's correct.

                                                    99

1  was manufactured.  It's simply a rapid crack
2  propagation event by definition.
3       Q.      Do you ever explain in your PowerPoint
4  presentation that's Exhibit 1 that the cause of a crack
5  is irrelevant to your classifying it as an RCP field
6  failure?
7               MR. FITZPATRICK:  I'm going to object to
8       form.  Do you mean is that content within the
9       presentation itself or does he explain that as
10      part of the presentation?
11              MR. SHEEAN:  My question relates to this
12      PowerPoint that is Exhibit 1 right now.
13              MR. FITZPATRICK:  Is that --
14              MR. SHEEAN:  -- that's correct.
15              MR. FITZPATRICK:  Okay.
16              THE DEPONENT:  When I give the --
17 BY MR. SHEEAN:
18      Q.      That's not my question, sir.
19      A.      Okay.
20      Q.      My question is:  The document that's in
21 front of you, do you explain in that document anywhere
22 that your definition of RCP -- known RCP field failures
23 includes any event regardless of whether it was caused
24 by disregard of manufacturer's instructions?
25      A.      In answering that question, are you

                                                    98

1       A.      No.
2       Q.      And so if a reader were able to download
3  this off of your website, they would have no way of
4  knowing whether or not your definition of "known RCP
5  field failures" includes disregard of the
6  manufacturer's instructions, correct?
7               MR. FITZPATRICK:  Objection.  Form,
8       foundation.  Calls for speculation.
9               THE DEPONENT:  Yeah, I don't know what
10      the person who looks at this would understand.
11      The main thing I want them to understand is these
12      are known RCP field failures regardless of how
13      they occurred.
14 BY MR. SHEEAN:
15      Q.      How would the reader of Exhibit 1 who
16 downloaded this off the internet know that your
17 definition of "known RCP field failures" includes
18 instances where the operator has disregarded the
19 manufacturer's instructions?
20              MR. FITZPATRICK:  Same objections:  Form,
21      foundation.  Calls for speculation, and
22      misconstrues the testimony.
23              THE DEPONENT:  It doesn't matter how the
24      pipe was installed.  It's simply a list of field
25      failures, RCP field failures, that are known.

                                                    100
```



```
 1        MR. SHEEAN:  Can you read my question
 2   back?  I don't think Dr. Palermo understood it.
 3   (The record was read by the Court Reporter.)
 4        MR. FITZPATRICK:  The same objections.
 5        THE DEPONENT:  This is a list of known
 6   field failures.  I'm not saying anything about if
 7   it was installed properly, if it was installed
 8   improperly, if it was pressure tested properly, if
 9   it was put in the ground properly.  It's simply a
10   list of known field failures.
11   BY MR. SHEEAN:
12        Q.    I'll try it another way.  Is there
13   anything in Exhibit 1 that would inform the reader that
14   your definition of "known RCP field failures" includes
15   incidents where the operator failed to follow the
16   manufacturer's instructions?  It's a yes or no
17   question.
18        MR. FITZPATRICK:  However you want to
19   answer it you can, Gene.  He can't confine your
20   answer.
21        THE DEPONENT:  No.  I was simply going by
22   the dictionary definition of the word "known".
23   BY MR. SHEEAN:
24        Q.    So there's nothing in this document that
25   would advise the reader that your definition of "known

                                                      101
```

```
 1   RCP field failures" includes incidents where the
 2   operator failed to follow the manufacturer's
 3   instructions, correct?
 4        A.    That's correct because it's irrelevant.
 5        Q.    Okay.  You also believe -- strike that.
 6   Do you believe that a long-running crack that occurs
 7   during pressure testing of the pipe can be properly
 8   construed as a field failure?
 9        A.    If a long-running crack occurs in the
10   field, it is a field failure.
11        Q.    Even if it occurs during pressure
12   testing?
13        A.    That has nothing to do with whether it's
14   a field failure.
15        Q.    Does a failure that occurs during
16   pressure testing constitute a field failure, in your
17   opinion?
18        A.    Yes.
19        Q.    Thank you.  Do you explain anywhere in
20   Exhibit 1 to the reader who downloads this off the
21   internet that your definition of field failure includes
22   incidents that occur during pressure testing?
23        MR. FITZPATRICK:  During pressure
24   testing?
25        MR. SHEEAN:  That's right.

                                                      102
```

```
 1        MR. FITZPATRICK:  Take a moment, Gene,
 2   review the document.  He's referring to the entire
 3   Exhibit 1.
 4        THE DEPONENT:  Okay.  Repeat your
 5   question again.
 6   BY MR. SHEEAN:
 7        Q.    Does Exhibit 1, if downloaded off the
 8   internet, advise the reader anywhere that field
 9   failures from slide three includes failures that
10   occurred during pressure testing?
11        A.    Yes.
12        Q.    Where is that?
13        A.    On this slide here, actual field
14   experience Chatham, Illinois.  It specifically states
15   that the RCP failure occurred during the leak pressure
16   test, and also in the next slide for Dorchester County,
17   it states this occurred during the leak pressure test.
18        MR. FITZPATRICK:  Keep going.
19        THE DEPONENT:  I also under my
20   recommendation state, "The PVC pipe internal
21   pressure during both operation and leak pressure
22   testing shall be maintained below the PVC pipe
23   full scale RCP critical pressure."  That was one
24   of my recommendations.
25   BY MR. SHEEAN:

                                                      103
```

```
 1        Q.    Are you done?
 2        A.    Yes.
 3        Q.    Okay.  Sorry.  At the time you prepared
 4   Exhibit 1, you were paid by the alliance -- the PE
 5   Alliance; is that correct?
 6        MR. FITZPATRICK:  Objection to form.
 7        THE DEPONENT:  I developed the
 8   presentation to give the message that I wanted to
 9   give to the audience.  It was the presentation
10   that I wanted to give, and my expenses were
11   covered by the various clients.
12   BY MR. SHEEAN:
13        Q.    By the PE Alliance?
14        A.    That was one of them.
15        Q.    And not just your expenses, but your time
16   as well, correct?
17        A.    Correct.
18        MR. FITZPATRICK:  Objection to form.
19   BY MR. SHEEAN:
20        Q.    To clear up Mr. Fitzpatrick's objection,
21   your expenses and your time to prepare Exhibit 1 were
22   paid by the PE Alliance and other clients; is that
23   right?
24        MR. FITZPATRICK:  Same objection.
25        THE DEPONENT:  I know the alliance

                                                      104
```



McCorkle Litigation Services, Inc.
Chicago, Illinois  (312) 263-0052

1    covered my expenses and time for the presentation.
2    I don't recall if they paid or somebody else
3    covered the actual time to prepare the -- my
4    PowerPoint.
5    BY MR. SHEEAN:
6        Q.    So this was -- okay. I'm sorry, this was
7    given in March of 2013. What other clients would you
8    have billed for preparing a PowerPoint at that time
9    involving RCP and fusible PVC pipe?
10        MR. FITZPATRICK: Objection.
11    Misconstrues.
12        THE DEPONENT: By that time most of the
13    PowerPoint slides that I had prepared were
14    prepared prior to that time.
15    BY MR. SHEEAN:
16        Q.    So when you say they were paid for by
17    other clients, you were using slides that had
18    prepared -- been prepared previously when you were paid
19    by other clients?
20        A.    Which I prepared.
21        Q.    Right. Yes, yes.
22        A.    Yeah, I am the one that prepared the
23    slides to present the information that I wanted to
24    present. It was my PowerPoint presentation.
25        Q.    Right. And you were paid for that by

                                                    105

1    either PE Alliance or Performance Pipe; is that right?
2        MR. FITZPATRICK: Objection. Paid for
3    what?
4        MR. SHEEAN: His time.
5        MR. FITZPATRICK: His time in doing what,
6    make a presentation or preparing it because he's
7    already testified to both of those issues?
8        MR. SHEEAN: Yeah, I'm just
9    trying -- trying to wrap it all into one.
10        MR. FITZPATRICK: Well, let's be specific
11    about the time that we're referring to so we don't
12    muddy the record.
13        MR. SHEEAN: If you want to ask him
14    questions after 4:30, knock yourself out.
15        MR. FITZPATRICK: Well, just -- let's ask
16    some clear questions occasionally.
17        MR. SHEEAN: Okay. Try not to coach the
18    witness so much.
19        MR. FITZPATRICK: Asked and answered.
20    BY MR. SHEEAN:
21        Q.    Mr. Palermo, just to confirm, when you
22    prepared Exhibit 1, the time that you spent in
23    preparing the PowerPoint slides that make up that
24    presentation was compensated by either Performance Pipe
25    or the PE alliance; is that right?

                                                    106

1        MR. FITZPATRICK: Objection. Form.
2    Misconstrues.
3        THE DEPONENT: Or it could have been
4    possibly another one of my clients. When I spend
5    time doing something as a consultant, like any
6    consultant, I get paid for my time --
7    BY MR. SHEEAN:
8        Q.    Sure.
9        A.    -- to do something.
10        Q.    What other clients would you have billed
11    for preparing slides like these?
12        MR. FITZPATRICK: Same objection. Asked
13    and answered.
14        MR. SHEEAN: I didn't ask this one.
15        MR. FITZPATRICK: That's exactly --
16        THE DEPONENT: P&F Distributors.
17    BY MR. SHEEAN:
18        Q.    Anyone else?
19        MR. FITZPATRICK: The same.
20        THE DEPONENT: That's -- the best of the
21    my recollection, that would be it.
22    BY MR. SHEEAN:
23        Q.    Did you advise your audience in Michigan
24    when you presented Exhibit 1 that you were paid by the
25    PE Alliance to make that presentation?

                                                    107

1        A.    To the best of recollection, somewhere
2    from -- at the end of the presentation, someone from
3    UGSI asked me who sponsored the presentation, and I
4    answered the polyethylene industry.
5        Q.    Do you recall who that was from
6    Underground Solutions?
7        A.    No. Almost every presentation I give
8    someone from UGSI asks me who sponsored the work, and I
9    would always answer either Chevron Phillips or the
10    polyethylene industry.
11        Q.    If no one was there to ask you that
12    question at one of these presentations, would you
13    disclose that information unilaterally?
14        MR. FITZPATRICK: Objection. Form.
15    Incomplete hypothetical.
16        THE DEPONENT: In some of the
17    presentations I actually put on the front page who
18    it was sponsored by.
19    BY MR. SHEEAN:
20        Q.    Okay. If it's not on the front page,
21    would you make it a point to make sure that everybody
22    knew you were being paid by the PE industry?
23        MR. FITZPATRICK: Same objection.
24        THE DEPONENT: If somebody asks me that
25    question, I would certainly reveal.

                                                    108



BY MR. SHEEAN:
    Q.    What if they didn't ask the question and
it wasn't on the PowerPoint slide, would you advise the
audience that you were being paid by the PE industry?
    A.    If the question came up and no one had an
interest, no.
    Q.    And Exhibit 1 does not disclose anywhere
on it that you prepared this in sponsor -- strike that.
Exhibit 1 does not advise the reader that you were paid
by PE Alliance, Performance Pipe and/or P&F for -- for
the slide show that is Exhibit 1?
        MR. FITZPATRICK:  Objection.  Form.
    Misconstrues the testimony.
BY MR. SHEEAN:
    Q.    Is that right?
        MR. FITZPATRICK:  Objection to form.
    Misconstrues the testimony.  Go ahead.
        THE DEPONENT:  There's nothing on the
    front page that indicates that, correct.
BY MR. SHEEAN:
    Q.    Is there anything on any page that
indicates that?
    A.    No.
        MR. FITZPATRICK:  The same.
BY MR. SHEEAN:

                                            109

    Q.    Let's go back to page -- slide three.
    A.    Could you go back to that last question?
I just want to make sure I understood.  Have the last
question read again?
    (The record was read by the Court Reporter.)
        THE DEPONENT:  Okay.  I think it's
    important for me to state that -- and I think I
    said it before, that this is a PowerPoint
    presentation that I put together based on my
    belief.
        Now, I may have been compensated for,
    sponsored by other organizations, but it's -- it's
    my PowerPoint.  I put it together, and I'm stating
    what I believe to be factual information.  And
    it's something that I put together myself.  I just
    want to make sure we're clear on that.
BY MR. SHEEAN:
    Q.    Okay.  Just to be clear, you're not
changing your answer.  So I want to make sure that I
get the right question.
        Is there anything on any of the pages
that are -- have been marked as Exhibit 1 that would
advise the reader that you were paid by the PE
Alliance, Performance Pipe or P&F Distributors to
compile this information?

                                            110

        MR. FITZPATRICK:  The same objection.
    Misconstrues the testimony.  False predicate.
        THE DEPONENT:  My answer would be there's
    nothing on here that would tell the reader that,
    correct.
        MR. SHEEAN:  John, you can just object to
    form and save us all time?
        MR. FITZPATRICK:  If you can accept the
    answers and ask new questions.
BY MR. SHEEAN:
    Q.    All right.  Now we're going to go to page
three.  Thank you.  Looking at incident number one,
Winter Park, Florida, it says date of RCP failure,
2004; pipe size and DR, eight inch DR18; length of
crack, 200 feet; joined by butt fusion, Y.  Did I read
that correctly?
    A.    Yes.
    Q.    And joined by butt fusion, Y, that means
yes?
    A.    That's correct.
    Q.    What did you do to verify any of the
facts listed in line one relating to the Winter Park,
Florida RCP failure?
    A.    For all of these, it was either
photographs or I saw the information, reports where I

                                            111

saw the information.  Many times I was provided with
the phone number -- the name and phone number of a
contractor who was involved or the water company, and I
would call the contractor or water company to -- to get
that information.  So it was a variety of different
sources.
    Q.    I'm interested specifically in the Winter
Park, Florida incident.  I know you were sort of
lumping them together.  To your -- to your
recollection, what specific steps did you take to
verify the facts that you list in number one?
    A.    Specifically for number one, I don't
recall.
    Q.    What was the basis for your -- the
information in number one regarding the length of the
crack?
    A.    You just asked me where I got the
information.
    Q.    That was overall.  Now I'm asking
specifically about the length of the crack.
    A.    Well, it would be my same answer for
anything there.  I -- I don't recall the information
for the year, the size, the DR, the length.  I know
there were documents that I reviewed or phone calls
that I made, but I don't recall which -- where the

                                            112

| | |
|---|---|
| 1 source came from. | 1 MR. FITZPATRICK: Objection to form. |
| 2 Q. That page number three of Exhibit 1 does | 2 Calls for nonfact testimony. |
| 3 not advise the reader of the cause of the Winter Park | 3 THE DEPONENT: For any plastic pipe, you |
| 4 incident, does it? | 4 can certainly decrease the probability of failure |
| 5 A. No, it does not. | 5 if it's installed properly. |
| 6 Q. Why didn't you advise the audience of the | 6 BY MR. SHEEAN: |
| 7 cause of the incident in Winter Park? | 7 Q. You can avoid what you classify as |
| 8 A. Well, first of all, for many of these the | 8 a -- as an RCP event in Pittsburgh, Pennsylvania if |
| 9 cause is -- is not known. For some of them it is | 9 you -- if the contractor doesn't try to bend the pipe |
| 10 known. In my presentation and the purpose of the | 10 beyond the minimum bend radius in the parking lot, |
| 11 presentation is to advise the audience about the fact | 11 can't you? |
| 12 that these RCP field failures occurred, and I verbally | 12 MR. FITZPATRICK: Same. Form. |
| 13 tell the audience that they occur for a variety of | 13 THE DEPONENT: If the contractor didn't |
| 14 reasons. | 14 try to install it, yes, you -- you could avoid it. |
| 15 And I mention specifically that some are | 15 The point -- the important point is the fact that |
| 16 due to occur during the leak pressure test. Some are | 16 when it's installed under some conditions, this |
| 17 due to over -- over bending or over stressing. Some | 17 particular material is susceptible to RCP |
| 18 are due to an improper tapping operation. | 18 failures. |
| 19 I mentioned that verbally, but | 19 BY MR. SHEEAN: |
| 20 specifically going through each one and stating exactly | 20 Q. You've already testified that -- that you |
| 21 what the cause is, many times it's -- it's not known | 21 consider it part of the reason why you're giving this |
| 22 exactly what the cause is. | 22 presentation to improve the perception of the plastic |
| 23 Q. But where it is known, wouldn't it be | 23 pipe industry, right? |
| 24 helpful to the audience members to know? | 24 A. To improve the overall integrity of |
| 25 MR. FITZPATRICK: Objection. Form. | 25 plastic pipe that's installed, yes. |
| 113 | 115 |

| | |
|---|---|
| 1 THE DEPONENT: Well, I already answered | 1 Q. And in order to improve the perception of |
| 2 that I tell the audience it's due to a variety of | 2 the plastic pipe industry, wouldn't you want to advise |
| 3 causes. What causes the exact cause of the RCP | 3 the customers that in any of these instances where |
| 4 failure is not as important as the fact that it | 4 contractor error was the cause this was an avoidable |
| 5 occurred, and it occurs a number of times over and | 5 incident? |
| 6 over, which leads me to the belief that when PVC | 6 A. Well, I state in the presentation that a |
| 7 pipe, which is a known material to be susceptible | 7 number of these do occur as a result of over bending or |
| 8 to R -- to RCP failures, which it has many, many | 8 something that -- a rock impingement, et cetera. |
| 9 hundreds of thousands of times, and when it's butt | 9 Q. But, again, it's not listed anywhere on |
| 10 fused, that can lead to long lengths. | 10 page three of Exhibit 1 or anywhere else in terms of |
| 11 So it doesn't matter what the cause is. | 11 describing the specific cause of the -- of the -- of |
| 12 It's the fact that it occurs. These are known | 12 these failures, correct? |
| 13 failures, and they occur for very long lengths. | 13 A. You're correct in the fact that there's |
| 14 BY MR. SHEEAN: | 14 nothing here that describes the cause of the failure. |
| 15 Q. Would you agree that many of the | 15 The purpose of this chart is to summarize the RCP field |
| 16 instances that you've described already involving | 16 failures that have been known to occur. |
| 17 contractor error are preventable? | 17 Q. Wouldn't it help improve the overall |
| 18 A. Are you asking if the error is | 18 perception of the plastic pipe industry if your |
| 19 preventable? | 19 presentation informed the potential consumers of |
| 20 Q. Yes, sir. | 20 plastic pipe that the cause of these incidents is |
| 21 A. The error itself is preventable. I don't | 21 avoidable? |
| 22 know if you could say the RCP failure is preventable. | 22 MR. FITZPATRICK: Objection. Form. |
| 23 Q. So you can avoid a rock impingement if | 23 Calls for speculation. |
| 24 you follow the manufacturer's instructions and install | 24 THE DEPONENT: I think it would improve |
| 25 the pipe properly, can't you? | 25 the overall performance of this particular plastic |
| 114 | 116 |



McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052

```
 1      pipe if the audience that listened to my
 2      presentation read my recommendations and followed
 3      my recommendations.
 4  BY MR. SHEEAN:
 5      Q.    You didn't answer my question, sir. Let
 6  me try it again.
 7      A.    I thought I did.
 8      Q.    Would you agree that supplying the
 9  potential customers of plastic pipe with the
10  information that would allow them to avoid what you
11  deem to be RCP failures would improve the overall
12  perception of the plastic pipe industry?
13          MR. FITZPATRICK:  Again, form.
14          THE DEPONENT:  And if they follow my
15      recommendations, they would avoid --
16  BY MR. SHEEAN:
17      Q.    I'm not asking about your
18  recommendations. I'm -- I'm asking you if you had
19  described the cause and how to avoid that cause by
20  following the manufacturer's instructions, wouldn't
21  that help improve the overall reputation and perception
22  of the plastic pipe industry?
23          MR. FITZPATRICK:  The same, form.
24          THE DEPONENT:  These are failures that
25      occur as a result of installation.  When you have
```

117

```
 1      installation, you're going to have some operator
 2      error.  You're going to have some cases where it's
 3      over bent.  You're going to have some cases where
 4      it's installed on a rock.
 5          These are -- that's the real world.
 6      You're going to have that, and that's why it's not
 7      that critical what the actual or specific cause of
 8      the failure was.
 9          What's more important is the fact that
10      this particular pipe with that particular DR,
11      dimension ratio, is susceptible, prone or whatever
12      word you want to use to RCP failures and what can
13      the end-user do to prevent that.  And that's where
14      my recommendations come in.
15  BY MR. SHEEAN:
16      Q.    We're going to get to your
17  recommendations, but you still haven't answered my
18  question.  And that is -- you can disagree if you
19  want.
20          I just want -- you know, I want to
21  understand if you agree or disagree that supplying
22  potential customers with the cause of these field
23  incidents that are avoidable following the
24  manufacturer's instructions would help to improve the
25  perception of the plastic pipe industry as a whole?
```

118

```
 1          MR. FITZPATRICK:  Objection to form.
 2      Asked and answered.
 3  BY MR. SHEEAN:
 4      Q.    Do you agree with that or not agree?
 5      A.    If the pipe is installed with no rocks,
 6  if the pipe is never bent, if the pipe is never butt
 7  fused improperly, if the pipe is never tapped
 8  improperly, if the pipe is never cut improperly, if the
 9  pipe is never subjected to any of these potential
10  causes of RCP, then that would reduce the probability
11  of these failures occurring and would improve the
12  overall performance of the PVC pipe.
13      Q.    So you agree that advising consumers that
14  following the manufacturer's instructions to reduce the
15  risk of field failures would improve the perception of
16  the plastic pipe industry?
17      A.    Yes.
18      Q.    Thank you.
19      A.    And if I can follow up on that, that
20  would be true for -- for any product if you follow
21  the -- the proper instructions.
22          The issue here is that in the real world
23  sometimes the exact properly installation procedures
24  are not followed, and that can lead to failures.  And
25  that's what we're talking about here.
```

119

```
 1      Q.    With respect to incident number two on
 2  page three of Exhibit 1, Danville, California, what, if
 3  anything, did you do to verify the pipe size and DR?
 4      A.    The same answer as to number one.
 5      Q.    You don't recall?
 6      A.    Correct.
 7      Q.    What did you do, if anything, to verify
 8  the length of the RCP crack listed on page three of
 9  Exhibit 1 for Danville, California?
10      A.    I don't recall.
11      Q.    Did you personally inspect the pipe that
12  was the subject of the field failure in Danville,
13  California?
14      A.    I did not personally inspect any of
15  these.
16      Q.    Okay.  With respect to -- oh, sorry.  For
17  number two, do you know what the cause of that field
18  failure was?
19      A.    I don't recall.
20      Q.    With respect to number three, Collier
21  County, Florida in 2007, what did you do to verify the
22  length of the RCP crack?
23      A.    To the best of my recollection, I believe
24  that was in a report or a paper that I read about it
25  where it was reported to be that length.
```

120

| | | | |
|---|---|---|---|
| | | | |

**Page 121 (left column)**

1    Q.    Anything else?

2    A.    No.

3    Q.    Is that also how you verified the pipe

4    size and DR?

5    A.    As I recall, yes. That particular one, I

6    recall reading a report or an article about it.

7    Q.    Anything else?

8    A.    I believe that's it.

9    Q.    What was the cause of the --

10    A.    Oh, let me back that up. It may depend

11    on the -- because it also involved in that case -- and

12    there may have been -- again, I don't remember the

13    timing of it, but there may be additional information

14    that I obtained as a result of being involved with that

15    case that substantiated that information.

16    Q.    When you say "involved with that case",

17    what do you mean?

18    A.    I was hired by Hazen and Sawyer, I

19    believe, as an expert witness in the -- in the lawsuit

20    between Collier County and somebody else. Hazen and

21    Sawyer was part of that.

22    Q.    So in conjunction with your role as an

23    expert in that case, did you receive any additional

24    information besides the report that you previously

25    testified about?

121

**Page 122 (lower-left column)**

1    A.    I believe I may have.

2    Q.    Do you recall, as you sit here today,

3    what else you reviewed?

4    A.    No, just the fact that I had other

5    documents which substantiated it.

6    Q.    Did you testify in that case?

7    A.    No, I did not.

8    Q.    What was the outcome? Do you recall?

9    A.    My recollection is it was settled, but

10    the agreements of the settlement are not disclosed.

11    Q.    Do you have a recollection, as you sit

12    here today, as to what your understanding of the cause

13    of that incident was?

14    A.    This particular incident, as I recall,

15    occurred as a result of a leak pressure test.

16    Q.    De-pressure test?

17    A.    A leak pressure test, sorry.

18    Q.    Do you have any of that -- do you recall

19    any of the underlying details regarding the leak

20    pressure test in terms of was it done incorrectly

21    or --

22    A.    My recollection is that there was

23    some -- some discussion or question about the cap that

24    was used, and also there was some discussion about

25    perhaps -- especially in the areas where the pipe

122

**Page 123 (right column)**

1    shattered considerably, but there may have been quite a

2    bit of entrapped air there. And that's why it -- the

3    failure mode in that case was the shattering of the

4    pipe.

5    Q.    When you say "shattering", I mean, that

6    sounds different to the un -- the non-industry people

7    from a long-running crack. Is that different in your

8    mind?

9    A.    Yes. I can show you pictures --

10    Q.    Sure.

11    A.    -- of what I mean. Sometimes the crack

12    runs --

13    Q.    Is that the next page, page four?

14    A.    Yeah. Also here's a -- exactly. Yeah,

15    here's a couple of examples. In the first Clay County

16    one, you can see it's more or less of a straight line.

17        In the second Clay County one, again,

18    it's more or less of a straight line. Xenia, the same

19    thing. Baton Rouge, the same thing. In the rock

20    impingement failure, Collier County, it's more of a

21    straight line.

22        Sometimes it bifurcates. This one is

23    called bifurcating, when it splits into two. In the

24    case of this one --

25    Q.    And by "this one", you're referring, for

123

**Page 124 (lower-right column)**

1    the record, to --

2    A.    Yes.

3    Q.    -- UGSI00680 on the fourth page of

4    Exhibit 4 -- Exhibit 1?

5    A.    This is the first Collier County failure

6    I recall.

7    Q.    Right.

8    A.    Which failed as a result of the test

9    pressure.

10        MR. FITZPATRICK: Just a moment.

11        THE DEPONENT: I'm sorry.

12        MR. FITZPATRICK: Let's take a break.

13    I'm going to compare these two.

14        MR. SHEEAN: Can he finish his answer

15    while -- I just asked him about shattering. He

16    was talking about shattering.

17        MR. FITZPATRICK: Well, the problem is

18    that I think he's looking at an exhibit which is

19    different from the exhibit that --

20        MR. SHEEAN: We can correct that when

21    he's done with his answer.

22        MR. FITZPATRICK: Well -- all right. Go

23    ahead.

24        THE DEPONENT: What I mean by shattering

25    is the pipe breaking into small pieces.

124

Pages 121 to 124



BY MR. SHEEAN:
2    Q.    Is it still an RCP in your mind?
3    A.    Yes.
4    Q.    Okay.
5    A.    All of these are rapid crack propagation
6 failures.
7    Q.    I thought you'd say that, but I have to
8 ask.
9         MR. SHEEAN:  Now you want to take a
10 break?
11        MR. FITZPATRICK:  Yeah, let's take a
12 break.
13        THE VIDEOGRAPHER:  11:44.  Going off the
14 record.
15        (The deposition was in recess.)
16        THE VIDEOGRAPHER:  The time is 11:59.  We
17 are back on the record.
18 BY MR. SHEEAN:
19    Q.    All right.  Doctor, we were going through
20 the items listed on page three of Exhibit 1, UGSI00679
21 for the record, and I want to move on to number four on
22 that page, which is Greencastle, Indiana.  Do you see
23 that?
24    A.    Yes.
25    Q.    What, if anything, did you do to confirm

125

1 the pipe size and DR referenced on that page for
2 Greencastle, Indiana?
3    A.    I reviewed documents that I saw, reports.
4    Q.    What documents or reports did you see
5 involving the Greencastle, Indiana incident?
6    A.    I -- I don't recall now.  I just recall
7 seeing documents about it.
8    Q.    Did you have any photos of that incident?
9    A.    I believe the documents had photos, yes.
10    Q.    Where did you get those documents from?
11    A.    I don't recall.
12    Q.    And is that also where you got the
13 information regarding the length of the -- the alleged
14 length of the RCP crack?
15    A.    Yes.
16    Q.    What was the cause of the Greencastle,
17 Indiana incident, if you know?
18    A.    My recollection is it may have been a
19 cutting operation or a tapping operation, something of
20 that nature.
21        THE VIDEOGRAPHER:  Pardon me, sir.  Could
22 you put your microphone back on?  I could hear you
23 fine.
24        THE DEPONENT:  Oh, sorry.
25        THE VIDEOGRAPHER:  You're picking up off

126

1 the other one.
2        THE DEPONENT:  It's way down here.  Sorry
3 about that.
4        THE VIDEOGRAPHER:  Not a problem.
5 BY MR. SHEEAN:
6    Q.    Do you disclose the details of that cause
7 anywhere in Exhibit 1?
8    A.    No.
9    Q.    And with respect to incident number five,
10 Greencastle, Indiana (2), where did you obtain the
11 information for that incident?
12    A.    The same thing.
13    Q.    Does that include the 43-foot crack
14 length?
15    A.    Yes.
16    Q.    And in your mind does that 43-foot crack
17 constitute an RCP incident?
18    A.    For 10-inch pipe, yes.
19    Q.    What was the cause of that failure?
20    A.    I believe it was also a cutting operation
21 or a tapping or something of that nature.
22    Q.    Did you disclose anywhere in Exhibit 1
23 your understanding of the cause of incident number
24 five, the second Greencastle, Indiana incident?
25    A.    No.

127

1    Q.    Number six is Pittsburgh, Pennsylvania,
2 2007; is that right?
3    A.    Yes.
4    Q.    And you listed it as a 24 inch DR 25,
5 correct?
6    A.    Correct.
7    Q.    A 160 foot length of RCP crack, that's
8 what you report?
9    A.    That's correct.
10    Q.    Where did you get the details for that
11 incident?
12    A.    I don't recall.  It could have been a
13 report that I read, a document that I read.  I don't
14 recall.
15    Q.    Did you personally inspect the pipe that
16 was involved in that incident?
17    A.    As I stated before, I did not personally
18 inspect any of these failures.
19    Q.    Did you do anything else to verify the
20 facts stated regarding the Pittsburgh, Pennsylvania
21 incident on page three of Exhibit 1?
22    A.    Other than reviewing the reports,
23 documents about this incident, no.
24    Q.    What was the cause of that incident?
25    A.    I believe -- I'm not positive.  That one

128



| | |
|---|---|
| 1 may have been a bending failure. | 1 bending. |
| 2     Q.   Do you indicate anywhere in Exhibit 1 | 2     Q.   Do you advise the reader anywhere in |

---

1 may have been a bending failure.
2     Q.   Do you indicate anywhere in Exhibit 1
3 that the cause of the Pittsburgh, Pennsylvania incident
4 listed on page three was a bending failure?
5     A.   No, I do not.
6     Q.   Did you ever have the opportunity to
7 ascertain which party was responsible for that
8 incident?
9     A.   What do you mean by "which party"?
10     Q.   The contractor, the subcontractor, the
11 municipality, God.
12     MR. FITZPATRICK: Object to form. Go
13 ahead.
14     THE DEPONENT: My recollection it was
15 whoever was doing the installation.
16 BY MR. SHEEAN:
17     Q.   Do you advise the reader anywhere in
18 Exhibit 1 that you understood the installer to be the
19 party at fault regarding the incident that occurred in
20 Pittsburgh, Pennsylvania?
21     A.   No.
22     Q.   Seven and eight are two separate
23 references to Clay County, Florida. I know we've seen
24 a picture, and we'll get into those pictures in a
25 little bit.

129

---

1     But with respect to the first one, what,
2 if anything, did you do to verify the facts listed,
3 specifically 20 inch DR 18, 600 foot alleged RCP crack?
4     A.   Again, it was photos, documents, reports
5 that I had regarding that.
6     Q.   Where did you get the photos and
7 documents that you reviewed?
8     A.   They were sent to me or I asked for them.
9 I don't recall where I got them from. I just recall
10 reading them and reviewing them.
11     Q.   Is that also true for number eight, the
12 second --
13     A.   Correct for both of those.
14     Q.   Did you do anything besides reviewing
15 those documents to verify the alleged length of the
16 cracks in seven and eight?
17     A.   No. The numbers came from the documents.
18     Q.   Were you able to make a determination as
19 to the cause of incident number seven in Clay County,
20 Florida?
21     A.   I knew at one time. I don't recall now.
22     Q.   How about number eight?
23     A.   Same for both. I don't remember whether
24 if it was over bending or a saw cut. I don't think it
25 was a tapping operation. It was either a saw or a

130

---

1 bending.
2     Q.   Do you advise the reader anywhere in
3 Exhibit 1 of your understanding of the cause of the
4 incident in number seven or number eight?
5     A.   No. I did not review the cause of any of
6 these.
7     Q.   But you don't identify the cause of seven
8 or eight anywhere in Exhibit 1; is that right?
9     A.   That's correct. For all of these, it's
10 the fact that the RCP field failure occurred is what I
11 discussed.
12     Q.   Number nine, Xenia, Iowa, 2008, 20 inch
13 DR 18, 1,100 foot crack you say; is that right?
14     A.   Yes.
15     Q.   What, if anything, did you do to verify
16 those facts?
17     A.   I believe the information is on the
18 photograph that was sent to me.
19     Q.   Was that the only document that you
20 received was the photograph that we'll get to in a
21 little bit?
22     A.   No. There was another one that I saw.
23     Q.   Another what?
24     A.   Another document, sorry.
25     Q.   Was it a report? Was it a photograph?

131

---

1 Was it --
2     A.   It may have been a report. I don't
3 remember now.
4     Q.   Newspaper article?
5     A.   I don't recall. Some of these were quite
6 a while ago. I just don't remember.
7     Q.   Did you ever determine the cause of the
8 incident at Xenia, Iowa?
9     A.   No.
10     Q.   Ten is Tampa, Florida, an incident in
11 2009, eight inch DR 25, 200 feet. What, if anything,
12 did you do to verify those facts?
13     A.   I reviewed documents that were sent to
14 me.
15     Q.   Where did you get those documents?
16     A.   I don't recall.
17     Q.   Did -- for any of these first 10, did you
18 get the documents from Performance Pipe?
19     A.   Some I obtained from Performance Pipe.
20 Some I obtained from Bruce Partington. Some I obtained
21 from the utility or the contractor because they
22 provided me phone numbers.
23     Q.   I'm sorry, who was that second, Bruce
24 Partington?
25     A.   I'm sorry.

132



McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052

1    Q.    Papenhause?
2    A.    Papenhause.  Bruce Partington is a
3  colleague of mine in Canada.  Yeah, Bruce Papenhause,
4  sorry.
5    Q.    And for the ones that came from
6  Performance Pipe, would that be Wes Long?
7    A.    It could have been Wes Long or Paul
8  Drayer or Karen or anybody from Performance Pipe that
9  it may have come from.  There are a number of people
10  that were gathering information.
11    Q.    Did you have any meetings with any of
12  those people at Performance Pipe or Bruce Papenhause
13  regarding ongoing efforts to collect information
14  regarding these long-running crack incidents?
15    A.    No, never had any meeting or anything of
16  that nature.
17    Q.    How about correspondence, did you ever
18  correspond back and forth with them to the effect that
19  we should continue to canvas the industry to find any
20  incidents involving fusible PVC pipe in long-running
21  cracks?
22    A.    There are many times that either Bruce
23  would send me information or somebody from Performance
24  Pipe would send it to me or somebody from ISCO would
25  send it to me.

133

1    So various people knew that I was
2  gathering information on RCP incidents in PVC pipe, and
3  when these incidents would occur or information about
4  the incidents was available, they would send the
5  information to me.
6    Q.    Did you also receive information
7  regarding HDPE failures from Performance Pipe?
8    A.    Well, I helped them with some failures
9  that had occurred in their system with their direct
10  customers, yeah.
11    Q.    How about the alliance for -- the PE
12  Alliance, did you ever receive reports from the PE
13  Alliance involving HDPE failures?
14    A.    Not that I recall.
15    Q.    So you weren't actively gathering
16  information regarding HDPE failures in order to
17  continue to advise potential customers to improve the
18  perception of plastic pipe?
19    MR. FITZPATRICK:  Objection to form.
20  BY MR. SHEEAN:
21    Q.    Is that right?
22    A.    Yeah.  The paper that I wrote or
23  presentations that I gave were primarily for the RCP
24  failures that were occurring in butt fused PVC pipe.
25  There were RCP failures occurring in polyethylene.

134

1    Q.    Are you -- do you consider yourself
2  sufficiently knowledgeable to be able to investigate
3  and render an opinion about HDPE failures?
4    A.    Which type of failures are you referring
5  to?
6    Q.    Any type.
7    A.    Yes.
8    Q.    But you have chosen to focus on the PVC
9  related RCP failures; is that right?
10    MR. FITZPATRICK:  Objection to form.
11    THE DEPONENT:  When you submitted an
12    abstract to an industry conference meeting and so
13    forth, normally your time is restricted.  Your
14    subject matter is restricted.  You have to submit
15    an abstract, and the abstract has to clearly state
16    what your specific topic is about.
17    I could give a five-hour presentation on
18    a lot of the information that I know, but you have
19    to restrict it -- to certain areas.  I have
20    given presentations about RCP and polyethylene
21    about the standards for rapid crack propagation,
22    et cetera.
23    I've given presentations on RCP in PVC.
24    I've given presentation on failures that have
25    occurred, butt fusion failures that have occurred,

135

1  in polyethylene.
2    So at various organizations or meetings I
3    have given such presentations.  This particular
4    one happened to be about RCP in PVC pipe.
5  BY MR. SHEEAN:
6    Q.    What percentage of your presentations
7  would you say over the last eight years involved PVC
8  pipe?
9    A.    It would be a low number, on the order of
10  maybe 5 or 10 or 15 percent in that --
11    Q.    On PVC?
12    A.    On PVC, yes.
13    Q.    And the rest is on what?
14    A.    On polyethylene, on crosslight
15  polyethylene, on polyamide, on RTP, reinforced
16  thermoplastic pipe.
17    Q.    How come you don't post any of those
18  reports on the Plastics Pipe website because I've been
19  on that website many, many times, and I've never seen
20  anything about HDPE or any of the other forms of
21  plastic pipe other than PVC?
22    A.    It's on my website because I had a number
23  of requests for it when I gave presentations, and so I
24  thought the simplest thing would be just to put it on
25  the website.

136



```
 1      Q.      So people aren't interested in HDPE
 2  failures?
 3      A.      Well, I didn't have any requests to put
 4  it on there.
 5      Q.      Okay.  When is the last time you gave a
 6  presentation on an HDPE failure?
 7      A.      You mean other than the HDPE failure that
 8  I had discussed in the presentation at Florida AWWA?
 9  That would have been in December of 2013.
10      Q.      Okay.  Was that in conjunction with the
11  presentation that we have here?
12      A.      Yes.
13      Q.      And that presentation is primarily about
14  PVC pipe, isn't it?
15      A.      Yes, but I do show a failure in
16  polyethylene.
17      Q.      Okay.  When is the last time you gave a
18  presentation that focused exclusively on HDPE
19  failures?
20      A.      Probably 2000 -- or 2013, I believe, I
21  gave a presentation on polyethylene failures in the gas
22  industry.
23      Q.      To whom did you give that presentation?
24      A.      The American Gas Association.
25      Q.      When was that meeting?  What month?

                                                    137
```

```
 1      A.      The operations conference is usually in
 2  May.
 3      Q.      Where was it?
 4      A.      That I don't remember.
 5      Q.      It used to always be in Canada.
 6      A.      No, it's usually not in Canada.  It's
 7  usually in the US.
 8      Q.      What was the title of that presentation?
 9      A.      That had to do with pipe failures in the
10  gas industry.
11      Q.      Other than that presentation at AGA in
12  May of 2013, when was the -- the next most recent time
13  you gave a presentation on HDPE?
14      A.      I'd have to look.  I give a lot of
15  presentations.  I just don't remember offhand.
16      Q.      What was the last presentation you gave?
17      A.      The last presentation I gave was at the
18  AGA Plastic Materials Committee meeting about two weeks
19  ago in Amelia Island, Plantation in Florida.
20      Q.      What was your presentation?
21      A.      PE 100 RC.
22      Q.      All right.  With respect to incident 11
23  and 12 on page three of Exhibit 1, Baton Rouge,
24  Louisiana, what, if anything, did you do to verify the
25  facts listed on those incidents?

                                                    138
```

```
 1      A.      Reports that I received.  And I don't
 2  remember who I talked to, but a gentleman with the
 3  water company who provided me with photographs of the
 4  failures.
 5      Q.      How did you get in contact with the
 6  gentleman from the water company?
 7      A.      It was either somebody from ISCO or
 8  somebody from Performance Pipe that provided me the
 9  contact information.
10      Q.      What is ISCO?
11      A.      ISCO is a distributor of plastic pipe.
12      Q.      What kind of plastic pipe?
13      A.      Primarily polyethylene.  I don't know if
14  they distribute other -- I think they may distribute
15  other types of plastic also.  They're a very large
16  distributor.
17      Q.      Do they distribute PVC?
18      A.      I don't know for sure if they do or not.
19      Q.      Do they distribute fusible PVC?
20      A.      No.
21      Q.      Are they a member of the PE Alliance?
22      A.      I don't think distributors are.  I think
23  it's resin manufacturers and pipe manufacturers.
24      Q.      Anything else that you did to confirm the
25  facts listed for 11 and 12?

                                                    139
```

```
 1      A.      No.
 2      Q.      Did you -- were you able to determine the
 3  cause of the first Baton Rouge incident, the 300-foot
 4  crack?
 5      A.      I think I knew at one time.  And I saw
 6  the photos and talked to the person there, but
 7  I -- right now I don't recall who it was.
 8      Q.      Is that the same for --
 9      A.      For both.
10      Q.      -- the second one?  Okay.  Exhibit 1 does
11  not identify anywhere for the reader the cause of the
12  two incidents in Baton Rouge, Louisiana, does it?
13      A.      It does not.
14      Q.      Now, number 13 is a -- the next Collier
15  County, Florida incident.  It's from 2010, 30 inch DR
16  25 and an RCP crack of 750 is listed.  Do you see that?
17      A.      Yes.
18      Q.      What, if anything, did you do to verify
19  those facts?
20      A.      That's a case that I was actually
21  involved in, and also a lot of the information was in
22  the Malcolm Pirnie report.
23      Q.      How were you involved in that case?
24      A.      As an expert witness initially for Hazen
25  and Sawyer and then also a witness on behalf of

                                                    140
```



| 1 | Reynolds. |
| 2 | Q. Who was Reynolds? |
| 3 | A. The contractor. |
| 4 | Q. Did you develop a -- strike that. |
| 5 | Anything other than the materials you received as an |
| 6 | expert provide you with information that you listed for |
| 7 | incident number 13? |
| 8 | A. All the information you need to know is |
| 9 | in the Malcolm Pirnie report. |
| 10 | Q. How did Malcolm Pirnie verify the length |
| 11 | of that crack? |
| 12 | A. I don't know how they verified it. It |
| 13 | was in the report. |
| 14 | Q. Did the report make any sort of a |
| 15 | conclusion as to the cause of the incident? |
| 16 | A. Yes. |
| 17 | Q. What was the cause? |
| 18 | A. The report claimed that the cause of the |
| 19 | incident was a rock impingement failure. |
| 20 | Q. Did you agree with that conclusion? |
| 21 | MR. FITZPATRICK: Objection to form. |
| 22 | THE DEPONENT: This was an in-service |
| 23 | failure that occurred after -- I don't remember, a |
| 24 | year or two years in service. In PVC pipe there |
| 25 | have been hundreds, thousands of rock impingement |

141

| 1 | failures in ball-and-spigot PVC. |
| 2 | So rock impingement failures are a very |
| 3 | common motor failure in the PVC pipe. The fact |
| 4 | that this one failed from rock impingement, they |
| 5 | concluded -- I didn't argue with because it's a |
| 6 | very common occurrence. |
| 7 | BY MR. SHEEAN: |
| 8 | Q. Did you indicated anywhere in Exhibit 1 |
| 9 | that the cause of the Collier County incident was a |
| 10 | rock impingement? |
| 11 | A. No, I did not. |
| 12 | Q. You have said a couple of times today |
| 13 | there have been hundreds of thousands of rock |
| 14 | impingement failures in PVC pipe, particularly in the |
| 15 | bell and spigot variety. What is the basis for that |
| 16 | statement? |
| 17 | A. Just talking to people. I mean, it's |
| 18 | well-known that there's been so many of them. |
| 19 | Q. Is there any recognized authority that |
| 20 | gathers and catalogues that information? |
| 21 | A. Not really because so many times, you |
| 22 | know, a water company has a rock impingement failure in |
| 23 | PVC pipe, and the crack runs 75 feet. They just go in |
| 24 | there and repair it, and they're done. |
| 25 | It's not really reported all the time, |

142

| 1 | but in -- in discussions that I've had with numerous |
| 2 | people we know that they happened a lot. Many of them |
| 3 | occur all the time. |
| 4 | Q. So your statement that there are hundreds |
| 5 | of thousands -- |
| 6 | A. Hundreds or thousands. |
| 7 | Q. Oh, I'm sorry. Hundreds or thousands? |
| 8 | A. Hundreds or thousands. Yeah, I'm sorry, |
| 9 | I didn't say hundreds of thousands, but, you know, it's |
| 10 | several hundred or, you know, a couple, two, 3,000. |
| 11 | You know, it's a high number, whatever it is. |
| 12 | Q. That's based exclusively on anecdotal |
| 13 | reports? |
| 14 | A. Yes. Yeah, just talking to water |
| 15 | companies. I mean, I'm -- I was personally involved |
| 16 | with a water company in -- what I mentioned earlier, |
| 17 | the one in Mexico, that they had 15 rock impingement |
| 18 | failures in a one-year period. There was a company in |
| 19 | Tennessee that contacted me that had like 20 or 30 |
| 20 | rocks impingement failures. |
| 21 | The paper by Fran Shulton that was |
| 22 | presented at a plastics pipe conference mentioned they |
| 23 | had -- what was the number he said? It was several |
| 24 | rock impingement failures in the last few years in the |
| 25 | Netherlands. So it's, you know, all over. Rock |

143

| 1 | impingement failures are common in PVC pipe. That |
| 2 | occurs. |
| 3 | Q. How many specific incidents have you been |
| 4 | involved in where you personally inspected pipe that |
| 5 | was damaged by rock impingement? |
| 6 | A. If you're including polyethylene in that |
| 7 | question, then my answer would be like several. |
| 8 | Q. Okay. Well, let's -- let's start -- let |
| 9 | me limit it then to how many inspections of PVC pipe |
| 10 | that was damaged and resulted in an RCP of PVC pipe |
| 11 | have you been involved in? |
| 12 | A. Well, the water company I mentioned in |
| 13 | Mexico, they had 15. |
| 14 | Q. Did you inspect all 15? |
| 15 | A. The photographs of them. |
| 16 | Q. Okay. So you never actually personally |
| 17 | went out and -- |
| 18 | A. No, I did not. I chose not to fly to |
| 19 | Mexico to personally inspect them. I had somebody else |
| 20 | do that. |
| 21 | Q. Who did you have do that? |
| 22 | A. Dwayne Priddy. |
| 23 | Q. Who is Dwayne Priddy? |
| 24 | A. He's a colleague of mine who has a |
| 25 | laboratory. He agreed to fly out there and inspect |

144



1  them and wrote a report. That's P-r-i-d-d-y.
2      Q.    Any other incidents that you were able to
3  personally witness of PVC rock impingement RCP
4  failures?
5      A.    Not personally witness. I've talked to
6  people about them. They've told me about them, but I
7  have not personally witnessed any of them.
8      Q.    Okay. And then you said you've
9  personally been involved in several PE rock impingement
10  investigations as well?
11      A.    Yes.
12      Q.    Okay. How many of those?
13      A.    Hundreds?
14      Q.    Hundreds? So rock impingement is a fact
15  in plastic pipe failure across the board?
16      A.    Yes.
17      Q.    Number 14 is Chatham, Illinois. What, if
18  anything, did you do to verify the facts listed for
19  incident number 14?
20      A.    There were some documents for all of
21  these, also a number of discussions with the contractor
22  that installed the pipe, I believe something like EBI
23  Drilling, something like that.
24            This was the contractor that was directly
25  involved in the -- the installation, and he told me

145

1  exactly what went on, what occurred.
2      Q.    Did you interview anyone else in
3  conjunction with that incident?
4      A.    No, just the contractor that was directly
5  involved.
6      Q.    And what did he tell you?
7      A.    He told me about the three attempts that
8  he personally had in trying to install the fusible PVC
9  horizontal directional drill application.
10      Q.    Based on your discussions with the
11  driller, the contractor, did you reach any conclusions
12  as to the cause of that incident?
13      A.    Yes. The cause of the incident was the
14  leak pressure test. It was held at a -- I have it
15  right here some place. It was held at a certain
16  pressure. There it is.
17            At 60 psig they were intending to do the
18  leak pressure test. I think they were planning to go
19  up to 150 psig. And when the pressure reached about
20  100 psig, the RCP failure occurred, and the crack ran
21  800 feet.
22      Q.    Did you discover anything in discussing
23  this with the contractor about difficulties that he had
24  with the horizontal drilling in terms of the nature of
25  the existing broken pipe that he was trying to feed the

146

1  new pipe into?
2      A.    I recall he mentioned it was -- it was
3  difficult. They did it the first time, and then it
4  failed. He told me they tried it a second time, and it
5  failed. It cracked. He tried it a third time, and it
6  cracked and then -- and then they eventually used
7  polyethylene pipe.
8      Q.    Why didn't you try to discuss the
9  incident with any of the other entities that were
10  involved to get their side of the story?
11      A.    Because the contractor was right on site
12  and was right there when it happened.
13      Q.    Doesn't he have a vested interest to tell
14  his side of the story and spin the facts to his
15  benefit?
16            MR. FITZPATRICK: Objection. Foundation,
17      form.
18            THE DEPONENT: I mean, I found most
19      contractors to be reliable. They're right there
20      on the job site, and they know exactly what
21      happened.
22  BY MR. SHEEAN:
23      Q.    Did you ever become aware of any reports
24  that contradicted your findings regarding the Chatham
25  situation?

147

1      A.    No, I'm not aware of any.
2      Q.    You didn't personally inspect the pipe
3  involved in Chatham, right?
4      A.    No. I saw photographs that they sent me,
5  and I had the discussions with the contractor.
6      Q.    I asked you what the cause of the failure
7  was of Chatham, and you said it failed during the leak
8  test. But you didn't really identify what caused the
9  pipe to crack. Do you have any knowledge, as you sit
10  here today, what caused the pipe to crack?
11      A.    I don't know what caused the initiation
12  of it.
13      Q.    And you don't list in here on either page
14  UGSI00704 or the third page of the exhibit, 00679, that
15  you were unable to determine the cause of the
16  initiation of the crack, do you?
17      A.    No, just -- I just mentioned it occurred
18  during the leak pressure test.
19      Q.    The next incident, number 15, is Fremont,
20  California, 2011, allegedly a 2,000 foot crack. What,
21  if anything, did you do to verify the facts there?
22      A.    My recollection is this is information I
23  obtained from Bruce Papenhause, who was there in
24  California and obtained the information.
25      Q.    Who's Bruce Papenhause?

148

Pages 145 to 148



McCorkle Litigation Services, Inc.
Chicago, Illinois   (312) 263-0052

```
1        A.      Bruce Papenhause is the owner of P&F
2   Distributors.
3        Q.      P&F Distributors is the same company that
4   was involved in a lawsuit in 2012 -- 2011 and 2012 with
5   UGSI, right?
6        A.      That's correct.
7        Q.      Okay.  Besides speaking with
8   Mr. Papenhause regarding the incident, what else did
9   you do to verify the facts?
10       A.      Just the -- the e-mails that I had with
11  him.  They're going out and gathering the information
12  and providing me the information.
13       Q.      So that's all still Mr. Papenhause?
14       A.      Yes.
15       Q.      Did you speak with anyone besides
16  Mr. Papenhause regarding the incident?
17       A.      No.  This particular one I forget the
18  reason, but it was a very sensitive situation.  And so
19  not many people were talking about it.
20       Q.      Okay.
21       A.      I don't recall why at this time.
22       Q.      Did you ever develop an understanding as
23  to the cause of the Fremont incident?
24       A.      No.
25       Q.      And nowhere in Exhibit 1 do you indicate
```

149

```
1   that you have no knowledge of the cause of the
2   initiation of that crack, correct?
3        A.      Correct.
4        Q.      Number 16, Green Bay, Wisconsin, where
5   did you obtain the facts that you identify for the
6   Green Bay, Wisconsin incident?
7        A.      For that one, I believe it was
8   information provided to me by Performance Pipe, and
9   then eventually there were -- a report or some kind of
10  document that I reviewed where I got the information
11  about the 300 feet.
12       Q.      Do you recall what document you received?
13       A.      No, just a report, I think, about it.
14       Q.      Do you recall who the author of the
15  report was?
16       A.      No, I don't.
17       Q.      Any other information that you received
18  regarding Green Bay, Wisconsin?
19       A.      No.
20       Q.      Were you ever able to independently
21  verify the length of the crack for Green Bay,
22  Wisconsin?
23       A.      No.
24       Q.      Were you ever able to reach a conclusion
25  in your mind as to the initiating cause of that crack?
```

150

```
1        A.      I don't recall for that one.
2        Q.      17 and 18, Salt Lake City, Utah, are two
3   incidents, a 350-foot incident and 3,300-foot incident;
4   is that correct?
5        A.      That's correct.
6        Q.      Are these the incidents involving the
7   Jordan Valley Water Conservation District?
8        A.      They are.
9        Q.      What, if anything, have you reviewed to
10  learn the facts listed on pages -- I'm sorry, incidents
11  17 and 18?
12       A.      Initially it was information provided to
13  me by Jason Bennie.  I think it's B-e-n-n-i-e, with
14  COP, all capital letters, Construction.  He contacted
15  me directly after the first failure.
16               According to Jason, the first failure
17  occurred during a leak pressure test.  The 350 feet
18  number came to me from Jason, and he also sent me
19  photographs of it.
20               Subsequent to that failure, there
21  were -- they experienced another -- Jason called me to
22  tell me that they experienced another RCP failure
23  during a pigging operation, and the number 3,300 feet,
24  that number came from Jason.  They -- he was a
25  contractor.
```

151

```
1                Subsequent to those conversations, he put
2   me in touch with the lawyers representing COP, which
3   are Babcock & Babcock.  Subsequent to that, I've been
4   in touch with the -- the law firm representing Jordan
5   Valley.  And I've had discussions with them, but that
6   would be privileged.  So I can't get into what those
7   discussions were about.
8        Q.      Have you been disclosed as an expert in
9   that case?
10       A.      I don't know if they have disclosed me or
11  not.  I don't know.  You'd have to ask other people.  I
12  don't know if they disclosed me.  I would assume so,
13  but I don't know.  I'm supposed to write a -- or an
14  expert report.  So I imagine I have been.
15       Q.      Are you familiar with any of the problems
16  that were experienced on phase one of the Jordan Valley
17  Byproduct Pipeline?
18       A.      What do you mean by "phase one"?
19  Obviously, the first phase, I guess --
20       Q.      There's -- there was a predecessor
21  project involving PE pipe that was named the Jordan
22  Valley Byproduct or Bypass Line.
23               MR. SHEEAN:  Is it Byproduct?
24               MR. STANCZAK:  Byproduct.
25  BY MR. SHEEAN:
```

152

Q. Byproduct Pipeline. Are you familiar
with that at all?
A. No.
Q. Okay. Are you aware that there were
multiple coupled fusion failures during pressure
testing?
A. In the PVC pipe?
Q. In the PE pipe, sir. I'm talking about
the byproduct of the pipeline.
A. I'm not sure of that.
Q. Okay. Does the fact that that occurred
in the coupled fusion joints cause you concern
regarding coupled fusions in HDPE?
         MR. FITZPATRICK: Objection to form.
   Assumes facts.
         THE DEPONENT: Could you explain to me
   what you mean "coupled fusion"? Are you talking
   about socket couplings? Are you talking -- no,
   this is large diameter.
         Are you talking about mechanical
   couplings? I'm not sure what you mean by "coupled
   fusion". You said coupled fusions or --
BY MR. SHEEAN:
Q. Coupled fusions.
A. I'm not sure what you mean by the term

153

"coupled fusion".
Q. Okay. We'll come back to it. Have you
reached any conclusions as to the cause of the first
incident in Salt Lake City, Utah, the 350 foot?
A. My understanding is that occurred during
a leak pressure test.
Q. What was the initiating cause of the
crack?
A. I -- I don't know yet.
Q. Okay. And with respect to --
         MR. FITZPATRICK: I designate those last
   two questions as confidential limited to this
   litigation.
BY MR. SHEEAN:
Q. With respect to the second incident
listed on line number 18, have you developed an
understanding -- well, let me stop with that. Let me
back up for a second.
         When you prepared this exhibit in March
of 2013, did you have an understanding of the cause of
the first Jordan Valley incident?
A. Yes. Jason Bennie had -- well, he told
me it was -- occurred during a leak pressure test. The
actual cause why it initiated and propagated I don't
know, but it occurred duration a leak pressure test.

154

Q. And as of March 2013 when you presented
this, did you have an understanding of the cause of the
3,300 foot crack, the initiating cause?
A. Again, it was information that Jason gave
me that occurred during the pigging operation to clean
the line, but what caused it to initiate, we had some
discussion that it may have been due to the debeading
process that was used on the inside. But I don't think
at that time it was concluded exactly what the cause
was.
Q. Have you -- okay. At that time did you
have an understanding of the amount of air that was in
the pipeline during the attempted pigging operation?
A. I knew that there was some air. I don't
know if they knew what the exact quantity or
percentage.
Q. Do you know whether or not there was any
deviation by the operator from the manufacturer's
specifications in running a pigging operation on
fusible PVC pipe when that incident occurred?
A. I don't recall.
Q. Did you -- strike that. Do you identify
anywhere in Exhibit 1 the fact that you don't
understand the cause -- you don't know the cause of
incidents 17 and 18 as of the time you prepared this

155

exhibit?
A. No.
Q. Number 19 is Dorchester County, South
Carolina. What, if anything, did you do to verify the
information there as of March 2013?
A. For this particular one, I was contacted
directly by the contractor, WH something. I forget the
name. I should remember that. I don't remember. I
don't remember the name. I'm sorry.
Q. Okay.
         MR. FITZPATRICK: I'm going to designate
   this question and answer and all further testimony
   regarding Dorchester County as confidential.
BY MR. SHEEAN:
Q. Is this your first -- strike that. Is
that when you first heard any information regarding the
Dorchester County incident?
A. I believe I had heard from someone about,
"Hey, there's a long crack that occurred in South
Carolina." I didn't know any of the details, and
then -- then they contacted -- Moore, I think H. Moore
or something like that I believe is the name.
Q. Who -- did you reach out to them first or
did they --
A. They reached out to me.

156



| | |
|---|---|
| 1    Q.    How did they get your name? | 1    but, at any rate, he contacted me, gave me the details |

1    Q.    How did they get your name?
2         MR. FITZPATRICK: Objection. Foundation.
3         THE DEPONENT: I don't know. You'd have
4    to ask them.
5         THE VIDEOGRAPHER: Sir, I've got about
6    five minutes left on the DVD, just a heads up.
7         MR. SHEEAN: I'll try to make the most of
8    it.
9    BY MR. SHEEAN:
10   Q.    Had -- at the time that you prepared this
11   incident, did you have an understanding of the cause of
12   the initiating crack for Dorchester County?
13   A.    It occurred during a leak pressure test,
14   as I stated over here.
15   Q.    Yeah.
16   A.    It was held at a pressure of 90 psig for
17   a while.
18   Q.    What caused the crack?
19   A.    The -- the pressure test caused the crack
20   to initiate and propagate.
21   Q.    Was there any other -- I mean -- strike
22   that. Previously you testified that it's your
23   understanding that there's -- even in a leak pressure
24   test there's something that triggers the crack to
25   start?

157

1    but, at any rate, he contacted me, gave me the details
2    of the failure, when it occurred, the pipe size, the DR
3    and the length of the crack.
4    Q.    What, if anything, did you do to verify
5    the information that Mr. Zirk provided?
6    A.    It was primarily the information that he
7    gave me, and then he also provided me with a report
8    that a laboratory had conducted.
9    Q.    Do you recall the name of that
10   laboratory?
11   A.    I do not.
12   Q.    Did you have an understanding of what the
13   cause of the initiating crack for that event was?
14        MR. FITZPATRICK: Objection to form.
15        THE DEPONENT: My recollection is it had
16   something to do with bending stress.
17   BY MR. SHEEAN:
18   Q.    Do you inform the reader anywhere in
19   Exhibit 1 that your understanding of the cause of the
20   incident in number 20, Watford City, North Dakota, was
21   a bending incident?
22   A.    No.
23        MR. SHEEAN: We can go off.
24        THE VIDEOGRAPHER: Time is 12:48. We're
25   going off the record.

159

1    A.    Yes. Something initiated it, yeah.
2    Q.    Do you know what that is?
3    A.    I don't know if anybody knows what that
4    is.
5    Q.    Okay. That's all -- that's what I wanted
6    to know.
7    A.    Okay. Thank you.
8    Q.    Do you indicate anywhere in Exhibit 1
9    that you don't know what initiated the crack in
10   Dorchester County, South Carolina?
11   A.    On Exhibit 1 I mentioned that it occurred
12   when the leak pressure was increased for the leak
13   pressure test, but not what specifically caused the
14   initiation.
15   Q.    The last one is Watford City, North
16   Dakota.
17        MR. FITZPATRICK: Cease the designation
18   confidential.
19   BY MR. SHEEAN:
20   Q.    What, if anything, did you do to discover
21   the facts regarding Watford City, North Dakota?
22   A.    On this one I was contacted by the
23   contractor on site. His name is Rick Zirk, I believe,
24   Z-i-r-k. He -- he got my name from EBI Drilling.
25   He -- I don't remember if he called me or e-mailed me,

158

1         (The deposition was in recess.)
2         THE VIDEOGRAPHER: The time is 1:37.
3    We're back on the record.
4    BY MR. SHEEAN:
5    Q.    Mr. Palermo, in reference to the
6    investigation -- I'm sorry, in reference to the
7    incidents that we were discussing on page three of
8    Exhibit 1, when you investigate an event that you
9    include in your presentations, do you maintain any
10   records that confirm the source of your information?
11   A.    I probably had some notes. Some were by
12   e-mail. So I probably have copies of those. A lot of
13   them were quite a while ago. I may not have those
14   anymore.
15   Q.    Do you keep records of what actions you
16   took to corroborate the facts that are discussed in
17   your report -- or in your presentation?
18   A.    No.
19   Q.    Did you produce to -- in this litigation
20   any records that you have remaining regarding your
21   confirmation of the information that's displayed in
22   your presentations?
23   A.    The e-mails that I still had, I believe I
24   did produce those.
25   Q.    Do you still have any of the notes that

160



```
1    you kept?
2         A.    Probably not, no.
3         Q.    Did you look to see if you had any notes
4    regarding any of these incidents?
5         A.    I mean, they would have been handwritten
6    notes.  I probably don't have those.  I don't think I
7    do have those.
8         Q.    Did you look for them?
9         A.    I don't even know where I would look for
10   them.
11        Q.    Okay.  Do you agree that the information
12   you provide in your presentations may effect -- may
13   effect adversely the purchasing decisions of potential
14   customers of fusible PVC pipe?
15             MR. FITZPATRICK:  Objection.  Form,
16        foundation.
17             THE DEPONENT:  What I'm hoping for in my
18        presentation is that when people purchase fusible
19        PVC, they will be made aware of the fact that RCP
20        failures are possible, and they can be proactive
21        and take actions to prevent those RCP failures
22        from occurring.
23             My intention isn't so much that they not
24        purchase it, but when they do purchase it, that
25        they be made aware of it.  In fact, that's -- one

                                                      161
```

```
1    of my recommendations is how to design so that the
2    RCP failures won't occur.
3    BY MR. SHEEAN:
4         Q.    Let's talk about your recommendations.
5         A.    Okay.  I don't have page numbers on here.
6         Q.    It's -- it's 32 and 33.
7         A.    But I don't have page numbers.
8         Q.    I understand.  I understand.  So
9    before --
10        A.    Oh, here we go.  This one.
11        Q.    It's before you get to the butt fusion.
12        A.    The following requirements?  There we go.
13        Q.    No, it's before that because you're in
14   the butt fusion recommendations.  You need to be in the
15   RCP --
16        A.    This is the RCP.
17        Q.    Oh, yeah, you're right.  You're right.
18   Okay.  Sorry.  Yeah, so that page and the next page.
19        A.    Yes.
20             MR. FITZPATRICK:  What's the bates
21        reference?
22             MR. SHEEAN:  It's 708 and 709.
23   BY MR. SHEEAN:
24        Q.    On the second page of those
25   recommendations, you say, "The following requirements

                                                      162
```

```
1    should be added to the industry standards for butt
2    fused PVC pipe:
3             The PVC pipe internal pressure during
4    both operation and leak pressure testing shall be
5    maintained below the PVC pipe full-scale RCP critical
6    pressure."  Do you see that?
7         A.    Yes.
8         Q.    That's one of your recommendations?
9         A.    Yeah.  My first recommendation is that
10   the testing be done to determine what the critical
11   pressure is, and then in order to prevent an RCP
12   failure from occurring, then the operator, the user,
13   should keep the pressure below that critical pressure
14   point.
15        Q.    Now, with respect to the last
16   recommendation, you say, "In the event that PVC pipe
17   RCP critical pressure data are not available, then the
18   DR of the butt fused PVC pipe shall be DR 13 or
19   lower - e.g. DR 11 or DR9."  Is that right?
20        A.    Yes.
21        Q.    Are you aware of any commercially
22   available fusible PVC pipe that's DR 13 or lower?
23        A.    I don't know all the DR sizes.  There
24   may, but this -- this DR number or this recommendation
25   actually is the -- a recommendation from Dr. Pat

                                                      163
```

```
1    Leevers.
2         Q.    That's not my question, sir.  Are you
3    aware --
4         A.    No, I know not.
5         Q.    Do you know of any installation that
6    exists in North America of fusible PVC pipe where DR 13
7    or lower was used?
8         A.    I'm not aware.
9         Q.    Okay.  Do you know if it's economically
10   feasible to manufacture and sell fusible PVC pipe DR 13
11   or lower?
12             MR. FITZPATRICK:  Objection.  Form,
13        foundation.
14             THE DEPONENT:  I have no knowledge at all
15        about the economics of manufacturing PVC pipe.
16   BY MR. SHEEAN:
17        Q.    Did you make these recommendations part
18   of a recommendation to the AWWA to modify C900
19   involving fusible PVC pipe?
20        A.    Yes.  I believe it was initially C605,
21   and then I believe I also recommended it for C900.
22        Q.    And what was the result of those
23   recommendations with the AWWA?
24        A.    It was not accepted.
25        Q.    The vote was 17 to 2; is that right?

                                                      164
```



McCorkle Litigation Services, Inc.
Chicago, Illinois  (312) 263-0052

```
 1     A.    Vote?
 2     Q.    The vote on the recommendations for
 3  the --
 4     A.    Oh, you're talking about the conference
 5  call. Is that what you're talking about?
 6     Q.    I'm talking about the vote.
 7     A.    Yeah, the vote was taken during a -- it
 8  was an informal vote during a conference call.
 9     Q.    Okay. And of the two people that voted
10  in favor of your recommendations, you were one of them,
11  right?
12     A.    Yes, I was.
13     Q.    So given the fact that you're not aware
14  of any DR 13 or lower being commercially available for
15  fusible PVC pipe, isn't it, in fact, true that your
16  recommendation is essentially that purchasers of water
17  pressure pipe purchase PE pipe and not fusible PVC
18  pipe?
19         MR. FITZPATRICK: Objection. Form,
20     argumentative.
21         THE DEPONENT: No, that's not what I'm
22     saying at all.
23  BY MR. SHEEAN:
24     Q.    Okay. What PVC pipe -- strike that.
25  We've already established that DR 13 or lower is not
```

165

```
 1  commercially available. So, therefore, what
 2  fusible --
 3     A.    Excuse me, we didn't establish that. I
 4  said I didn't know. It could -- that means it could be
 5  available. I just don't know.
 6     Q.    Okay. Assuming for purposes of this next
 7  question that fusible PVC pipe is not commercially
 8  available at DR 13 or lower, what other option does a
 9  potential customer for water-filled pressure pipe have
10  based on your recommendations other than to purchase
11  high-density polyethylene pipe?
12     A.    To request the pipe manufacturer to make
13  that DR.
14     Q.    Regardless of the cost?
15     A.    Well, if it helps -- if that increase in
16  cost is significantly less than the cost to replace
17  2,000 feet of the fusible PVC, then, yes, that's an
18  economically wise decision by the water company.
19     Q.    Even if the -- strike that. Are you
20  aware of the changes in the utility of fusible PVC pipe
21  when it's made at DR 13 or lower?
22     A.    I'm not sure what you mean by "the
23  utility".
24     Q.    I'm talking about the band radius of DR
25  13 or lower fusible PVC pipe.
```

166

```
 1     A.    No, I'm not familiar with that.
 2     Q.    Okay. What about the weight of DR 13 or
 3  lower of fusible PVC pipe, would it be impacted as
 4  compared to --
 5     A.    -- certainly, a thicker wall.
 6     Q.    So would it then be more cumbersome to
 7  work with for the contractors?
 8     A.    It might be during the installation, but,
 9  again, these are things that a water company needs to
10  weigh. A water like Jordan Valley I'm sure had to
11  spend a lot of money to replace 3,000 feet of pipe.
12         It might be more economically prudent for
13  the water company to -- to specify a thicker wall pipe,
14  make sure they don't have RCP failures and make sure
15  they don't have to go replace it all.
16     Q.    But if that pipe is not commercially
17  available, then they're requesting something that
18  doesn't exist, right?
19     A.    Well, maybe it should be commercially
20  available.
21     Q.    But it's -- but you've established that
22  you're not aware --
23     A.    I said I don't know. I don't know if
24  they're making it or not. It's certainly feasible.
25     Q.    But you have no basis for the statement
```

167

```
 1  that it's economically feasible; is that right?
 2     A.    Well --
 3         MR. FITZPATRICK: Objection. Form.
 4         THE DEPONENT: Yeah, I didn't make the
 5     recommendation based on the economic feasibility.
 6     I made the recommendation, which comes directly from the
 7     recommendation, which comes directly from the
 8     research that Dr. Pat Leevers did.
 9  BY MR. SHEEAN:
10     Q.    Well, we're going to get to Dr. Leevers'
11  research in just a moment. Turn back to the fourth
12  page of Exhibit 1 -- actually, the fifth page, sorry,
13  Jackson County. Where did you get this photograph
14  from?
15     A.    I don't remember.
16     Q.    Does this photograph actually show a
17  600-foot crack?
18     A.    No, this itself is not a 600-foot crack.
19  It's hard to tell actually how long it goes, but --
20     Q.    You can't tell from the photo?
21     A.    Yeah, how long --
22     Q.    Right. On the seventh slide, the Xenia,
23  Iowa slide, where did you get this photograph from?
24     A.    I believe I've seen this photograph a
25  number of times. The very, very first time that I saw
```

168

1 it it came from Wayne Coral.
2 Q. Who is Wayne Coral?
3 A. Wayne Coral at that time worked for a
4 piping manufacturer known as Polytubes in Canada.
5 Q. Can you tell from the photograph whether
6 or not the RCP crack is 1,100 feet long?
7 A. It's obviously not a close-up picture of
8 the crack.
9 Q. The next page, Baton Rouge, Louisiana,
10 where did you get the picture from?
11 A. From the water company in Baton Rouge.
12 They e-mailed it to me.
13 Q. And how did you get in contact with that
14 company?
15 A. I was provided the information by -- I'm
16 not sure. It either would have been Bruce Papenhause
17 or Wes Long. And I contacted them and asked them for
18 photographs of their failures, and they sent me a
19 number of photographs. This happens to be one of them.
20 I selected this one because to shows the crack going
21 through a butt fusion.
22 Q. Does this show 850 feet of cracked pipe?
23 A. Obviously not.
24 Q. Okay. How were you able to conclude that
25 it was 850 feet?

169

1 A. They confirmed it for me.
2 Q. Do you know whether or not this pipe was
3 under pressure at the time of the crack?
4 A. I do not know that.
5 Q. Would that matter, for purposes of your
6 analysis, as to whether or not it was an RCP event?
7 A. No. As I stated before, a rapid crack
8 propagation is simply a crack that propagates rapidly
9 and has enough energy to drive the crack. That energy
10 can come from pressure or it could come from bending
11 stresses or other forms of stresses.
12 Q. Turn to the Dorchester County 2,200 foot
13 RCP slide, which is 687. This says that it's a 2,200
14 foot crack. Obviously there's -- this is not a picture
15 of 2,200 feet of crack, right?
16 A. Obviously not. This is one of the
17 photographs that RH Moore, I believe, the contractor,
18 sent to me, and this was taken from an internal camera
19 that went inside the pipe. There are a number of them.
20 I just happened to pick this one.
21 Q. How far was the internal -- the camera
22 able to determine that the crack had run?
23 A. I believe -- on the one end I believe
24 they went a distance of around 400 and something feet.
25 And then it was underwater, and it was not practical to

170

1 go any farther. And I seem to recall they also either
2 went in or attempted to go in on the other end, but I
3 don't recall how far that was.
4 Q. Do you believe it's potentially
5 misleading to list a 2,200 foot crack for this project
6 when you were unable to verify that the crack was, in
7 fact, 2,200 feet?
8 MR. FITZPATRICK: Objection. Form.
9 THE DEPONENT: At the time I gave the
10 presentation, the information I was given was that
11 the crack was 2,200 feet. That was the belief at
12 the time.
13 BY MR. SHEEAN:
14 Q. Have you corrected that information
15 since?
16 MR. FITZPATRICK: Same, form.
17 THE DEPONENT: I have not given any
18 presentations or distributed articles to anyone in
19 the last couple of years. So, no.
20 BY MR. SHEEAN:
21 Q. Did you ever come to learn that a portion
22 of the pipe in Dorchester County was damaged by a
23 bullet hole prior to installation?
24 A. Yes, I'm aware of the pipe that had a
25 bullet hole, and it was documented in the reports that

171

1 I read that that was a totally separate section of the
2 pipeline. It had absolutely nothing to do with the
3 section of the pipe that had the long-running crack.
4 Q. Were you able to independently verify
5 that there were no bullet holes in any portion of the
6 pipe that was damaged during the RCP event?
7 A. The only bullet holes that I'm aware of
8 in the several documents that I read with Dorchester
9 County all indicated that the bullet holes were in a
10 totally separation section of the pipeline.
11 Q. Were you able to independently verify
12 that there were no bullet holes in any of the section
13 that you had referenced as a 2,200 foot RCP crack?
14 A. The documents that I reviewed said
15 nothing about a bullet hole in this particular section
16 of pipeline.
17 Q. Were you able to verify that there was no
18 bullet hole in any of the 2,200 foot section that you
19 allege had an RCP crack in it?
20 A. I verified that the documents stated that
21 there were no bullet holes in this section.
22 Q. The documents stated there were no bullet
23 holes in this section?
24 A. There were documents that I read that
25 talked about the two sections of pipe, and the one

172

1 document I remember reading very clearly said the
2 bullet holes were in a separate section of pipe. There
3 were no bullet holes in this section of pipe.
4   Q.   Did you personally inspect the pipe to
5 determine whether or not there were bullet holes in the
6 other section?
7   A.   No.
8   Q.   Do you know whether or not RH Moore or
9 anyone for RH Moore conducted an investigation to
10 confirm that none of that other span of 2,200 feet of
11 pipe had any bullet holes in it?
12   A.   Only the document that I read which
13 specifically talked about the two sections of pipe.
14 And it mentioned there were bullet holes in the one
15 section of pipe, and it didn't say whatever was
16 observed. They didn't talk about any bullet holes in
17 this section of the pipe.
18   Q.   Would you agree to a potential customer
19 of water pressurized -- or pressure pipe for water
20 distribution that a chart showing a 2,200 foot RCP
21 crack is far more alarming than a chart showing a
22 450-foot crack?
23        MR. FITZPATRICK: Objection to
24 foundation.
25        THE DEPONENT: It all has to do with cost

173

1 to repair. It's pretty expensive to repair 400
2       feet, but it certainly would be more expensive to
3       repair 2,000 feet.
4 BY MR. SHEEAN:
5   Q.   So it would be alarming to the potential
6 customer?
7        MR. FITZPATRICK: Same, foundation.
8        THE DEPONENT: It depends on your
9       definition of "alarm".
10 BY MR. SHEEAN:
11   Q.   Well, 450 versus 2,200?
12   A.   Yeah, it's more costly, right.
13   Q.   On your slide that starts with Salt Lake
14 City, Utah, at the bottom you say, "They will replace
15 all 13 miles of fused PVC pipe." Do you see that?
16   A.   Yes.
17   Q.   Is there, in fact, 13 miles of pipe being
18 replaced in Jordan Valley?
19   A.   I don't know how many miles were actually
20 replaced. My understanding in talking with COP
21 Construction was I think they were looking initially at
22 13 miles. I don't know for sure how many miles were
23 replaced.
24   Q.   Did you ever correct that statement or
25 advise the people who reviewed this document that it

174

1 wasn't 13 miles of fused PVC pipe that were replaced?
2        MR. FITZPATRICK: Objection to form.
3        Assumes facts.
4        THE DEPONENT: I don't know for a fact
5       that it wasn't 13 miles.
6 BY MR. SHEEAN:
7   Q.   Have you done anything independently to
8 verify the actual length of pipe that was replaced?
9   A.   Well, like I said, I haven't done
10 anything in giving presentations or anything for the
11 last two years. So there was no need for me to.
12   Q.   If you assume -- well, strike that. Do
13 you know how many people downloaded this document from
14 the website?
15   A.   I have no idea.
16   Q.   Do you know how many people saw the
17 presentation when you gave it?
18   A.   I -- I would estimate there might have
19 been 40 or 50 people in the audience, something like
20 that.
21   Q.   Have you used this slide in any other
22 presentations?
23   A.   Very likely I did, yeah. Previous ones,
24 yeah.
25   Q.   Do you have any estimate --

175

1   A.   This is one of the last ones that I gave,
2 2013, yeah.
3   Q.   Do you have any estimate as to how many
4 people would have seen this slide regarding Salt Lake
5 City, Utah?
6   A.   Well, certainly people at the
7 presentation.
8   Q.   And anybody who looked at it --
9   A.   And then --
10   Q.   -- on the web?
11   A.   Yes.
12   Q.   And any other presentations where you
13 used this slide?
14   A.   Yes.
15   Q.   If Jordan Valley only replaced six and a
16 half miles of fused PVC pipe and not 13 miles of pipe,
17 don't you think that exaggeration by a factor of two is
18 misleading to a potential customer?
19        MR. FITZPATRICK: Objection. Form.
20        Misconstrues the document.
21        THE DEPONENT: I mean, seven miles, 13
22       miles, it's still a lot of pipe to be replacing.
23 BY MR. SHEEAN:
24   Q.   It's double the cost, isn't it, to
25 replace 13 miles instead of six and a half miles?

176



McCorkle Litigation Services, Inc.
Chicago, Illinois  (312) 263-0052

```
 1      A.    It's still a significant number.
 2      Q.    But wouldn't you find that to be a
 3   misleading exaggeration?
 4            MR. FITZPATRICK:  Objection.  Form.
 5            THE DEPONENT:  With the word
 6      "misleading", if you're saying "misleading", it's
 7      almost like you're doing it on purpose, and I
 8      certainly didn't do it on purpose.
 9            When I gave this presentation, when I
10      wrote down the 13 miles, that's what I understood
11      to be the number of miles that were going to be
12      replaced.
13   BY MR. SHEEAN:
14      Q.    Since you wrote this down, you've done
15   nothing to verify whether or not there were, in fact,
16   13 miles of fused PVC pipe replaced, correct?
17      A.    That's correct.
18      Q.    Do you believe that you have an
19   obligation to be truthful in these presentations when
20   you present them to potential customers of pressurized
21   pipe?
22      A.    I believe that I have been truthful with
23   the information that has been provided to me and the
24   information that I have gathered from researching and
25   reading the various documents.

                                              177
```

```
 1      Q.    And you agree that it's important to be
 2   truthful in these presentations?
 3      A.    Absolutely.
 4      Q.    And in order to be truthful, you should
 5   take whatever steps are necessary to verify the
 6   accuracy of the information you're providing to these
 7   potential customers, right?
 8            MR. FITZPATRICK:  Objection.  Form.
 9            THE DEPONENT:  When I put the information
10      down, in my opinion, to my knowledge, it was
11      accurate.
12   BY MR. SHEEAN:
13      Q.    And you would agree with me that you
14   should take whatever steps are necessary to verify the
15   accuracy of the statements in this presentation in
16   order to make sure that they are accurate, right?
17            MR. FITZPATRICK:  The same, form.
18            THE DEPONENT:  And at the time I put this
19      together I believe that was accurate.
20   BY MR. SHEEAN:
21      Q.    That's not my -- that's not my question.
22   My question is:  Would you agree with me that as a
23   presenter to potential customers of pressurized pipe,
24   it was imperative that you take whatever steps are
25   necessary to ensure the accuracy of the statements in

                                              178
```

```
 1   this document?
 2            MR. FITZPATRICK:  Objection to form.
 3            THE DEPONENT:  And when I put the
 4      document together, I did --
 5   BY MR. SHEEAN:
 6      Q.    That's not what I'm asking you.  I'm not
 7   asking you if you thought you did it.  I'm asking you
 8   if you agree that you had an obligation to make sure
 9   that what you were telling these potential customers
10   was accurate?
11            MR. FITZPATRICK:  Objection to form.
12            THE DEPONENT:  I believe I had --
13   BY MR. SHEEAN:
14      Q.    I'm not asking what you did.  I'm asking
15   you --
16            MR. FITZPATRICK:  Can he finish his
17      answer?
18            THE DEPONENT:  I believe, and you cut him off.
19            MR. FITZPATRICK:  He's saying -- he said,
20      "I believe," and you cut him off.
21            MR. SHEEAN:  Yeah.
22            MR. FITZPATRICK:  So why don't you let
23      him answer the question.  If you give -- if he
24      gives an answer you don't like, then redirect him,
25      ask him another question.

                                              179
```

```
 1            MR. SHEEAN:  That's what I'm doing.
 2            MR. FITZPATRICK:  You're cutting him off
 3      in the middle of his answer, and then you're
 4      complaining about the --
 5            MR. SHEEAN:  When we have to bring this
 6      witness back for more -- for more time at
 7      deposition --
 8            MR. FITZPATRICK:  Because you asked the
 9      same question 25 --
10            MR. SHEEAN:  Because he won't --
11            MR. FITZPATRICK:  Let him answer the
12      question.  "I believe," and then you cut him off;
13      is that fair?
14            MR. SHEEAN:  Let me know the next day
15      that he's available for deposition.
16            MR. FITZPATRICK:  Just let him answer the
17      damn question, and we won't have this problem.
18   BY MR. SHEEAN:
19      Q.    Dr. Palermo --
20            MR. FITZPATRICK:  No.  There's a pending
21      question --
22            MR. SHEEAN:  I'll ask --
23            MR. FITZPATRICK:  -- and he's answering
24      it.
25            MR. SHEEAN:  I withdraw the question.

                                              180
```

Pages 177 to 180



McCorkle Litigation Services, Inc.
Chicago, Illinois  (312) 263-0052

1       MR. FITZPATRICK: All right.

2       MR. SHEEAN: I'm going to ask a new

3  question.

4 BY MR. SHEEAN:

5    Q.   Dr. Palermo, would you agree with me that

6 as a presenter of information to potential customers of

7 pressurized pipe for water distribution that it was

8 imperative that you make sure that the information that

9 you're conveying to these customers is accurate and

10 truthful?

11       MR. FITZPATRICK: Objection. Form,

12  compound. Assumes facts.

13       THE DEPONENT: I believe it's imperative,

14  important, and I believe that I did that.

15 BY MR. SHEEAN:

16    Q.   Thank you. The slide that has at the top

17 rapid crack propagation, it's 00691. At the bottom it

18 says, "Considerable RCP research has been conducted in

19 Europe on several plastic pipe materials (HDPE, MDPE,

20 PVC, PA11, PA12) to determine the critical pressure."

21 Do you see that?

22    A.   Yes.

23    Q.   Okay. As of March 2013, what

24 considerable RCP research had recently been conducted

25 in Europe?

181

1    A.   The -- I'm sorry, your question relates

2 to the PVC?

3    Q.   Correct.

4    A.   The research that had been conducted by

5 Dr. Pat Leevers and the work that was going on at KWA

6 on the PVC pipe.

7    Q.   But the work that was done on KWA was not

8 completed until April of 2013, correct?

9    A.   Yeah. The work was going on.

10    Q.   But you didn't have any information based

11 on that -- those studies yet. It hadn't even been

12 complete, let alone released?

13       MR. FITZPATRICK: Objection to form.

14       THE DEPONENT: But I was aware it was

15  going on. It had not been published yet, but I

16  knew it was going on.

17 BY MR. SHEEAN:

18    Q.   So the only published research that you

19 were aware of regarding RCP and PVC pipe was the

20 research that was done by Greenshields and Leevers,

21 correct?

22    A.   Well, your question is published report,

23 but that's not what I'm saying here.

24    Q.   I understand. I asked you a different

25 question.

182

1    A.   Okay. So for your question what was

2 published, the only thing that was published, that I'm

3 aware of, was the work by Dr. Leevers.

4    Q.   Thank you.

5    A.   Oh, can I -- can I correct that?

6    Q.   Sure.

7    A.   I just remember speaking to Phillip Von

8 Spraybrook (phonetic), and he also informed me that he

9 had been doing quite a bit of testing and research on

10 PVC pipe at Visitel (phonetic). Sorry, I just

11 remembered that.

12    Q.   But that hadn't been published as of

13 March of 2013, correct?

14    A.   Again, it wasn't published --

15    Q.   Right.

16    A.   -- because it was work that they did for

17 their client. So they would not be publishing it, but

18 it was -- as I state here, it's research that was done.

19 It was conducted.

20    Q.   All right. Can you turn to page 20,

21 which is the ISO13477. This is 696. Can you please

22 explain to me -- well, for starters, what are the

23 numbers on the left side of the page on the Y-axis

24 relate to? Is that bar pressure?

25    A.   This is a box in the ISO test method on

183

1 the -- the Y-axis is the length of the crack, and the

2 X-axis is the internal pressure of the pipe.

3    Q.   Okay. And then what is the line where

4 it says "A" at the bottom going up vertically

5 signifying?

6    A.   I believe that's signifying the critical

7 pressure.

8    Q.   And what is the -- you're not sure if

9 that's the critical pressure?

10    A.   Well, I'm trying to remember the -- the

11 definition of critical pressure is the highest pressure

12 tested at which -- I can't remember whether you have

13 propagation or arrests.

14    Basically these are all arrests, and

15 these are propagation. As you can see, there's a very

16 sharp increase, and so the critical pressure is drawn

17 here.

18    Q.   What is the line at the second from the

19 top that says one, the number one with the arrow?

20    A.   I'm not sure.

21    Q.   Okay. How about the second line with the

22 number two and the arrow on the right-hand side of the

23 page? See the number two?

24    A.   Yeah, but I'm not exactly sure what

25 they're drawing there.

184

Q.   Okay.  You know what I'm going to ask you next.  What's number three?

A.   Apparently it's 0.7, whatever that is. Let's see, all of the arrest numbers are above that. This might be the actual length of the crack just from the impingement, and then this is the length of the crack that it -- that it grew, which is just a very short amount and then arrested.

And then the data points up here are the length of the crack at the higher pressures, which went almost the full length of the pipe, essentially the length of the pipe.

Q.   So when you gave your presentations and you showed this slide, what would you tell your audience members?

A.   Basically this was a plot taken from the ISO test method.  It's a plot of the length versus internal pressure.  I show them the arrests, what the data points are, the propagation, and the critical pressure is that pressure above what you can have propagation and below what you have arrest.

Q.   What sort of pipe is being tested in the graph that's depicted on this page, if you know?

A.   I don't think the ISO test method states what type of pipe it is.

185

Q.   So is this diagram taken directly out of ISO --

A.   Yes.

Q.   -- 3.93477?

A.   I believe it is, yes.  I think that's where I got it from.

Q.   On the next page, the S4/FS correlation equation, the last bullet point on the page says, "The ISO correlation factor is conservative and material suppliers may develop their own correlation between S4 and Full Scale."  Do you see that?

A.   Yes.

Q.   What is meant by the word "conservative" in that sentence?

A.   The number 3.6 was obtained from doing a lot of testing on polyethylene pipe, approximately a dozen or so data sets where they did both full scale and S4.

The actual number based on the actual testing varied from three point something to nine.  The RCP experts selected to use the number 3.6 because it was based on certain gas loss, and that number is quite conservative.

So as a pipe manufacturer, you have the option of doing the full-scale test and get the real

186

answer or you have the option of doing the S4 test using this correlation equation, which is applicable to plastic materials, and then that's how you determine your full scale critical pressure.

Q.   So is it fair to say that whatever critical pressure you yield utilizing this correlation equation is going to be lower, most likely, than what you would find in a full-scale test?

MR. FITZPATRICK:  Objection to form.

BY MR. SHEEAN:

Q.   That's what you meant by "conservative", right?

A.   Perhaps, yes, uh-huh.  Yeah, it does depend.  Like from the case of polyethylene, there's a wide range, and it was conservative there.

Q.   All right.  The next page is the -- it says "S4 Critical Pressure-PVC*", and at the bottom it says, "C.J. Greenshields and P.S. Leevers, "The effect of air pockets on rapid crack propagation in PVC and PE water pipe", Plastic, Rubber and Composites Processing and Applications 24(1995)."  Is that right?

A.   Yes.

Q.   And that citation at the bottom, that's what you're relying upon for this slide, correct?

A.   This slide came from that paper, yes.

187

Q.   And your calculations on critical pressure for PVC pipe throughout this entire presentation stems from this calculation that was done by Greenshields and Leevers, right?

A.   Partly.

Q.   What else is it from?

A.   From the S4 critical pressure calculation that was conducted by Jana Laboratories on the 12 inch fusible PVC pipe, and they also obtained a value of 1.6 bar, which is exactly consistent with the data from Dr. Leevers.

Q.   Okay.  Have you read the report that you cite at the bottom of this page in its entirety?

A.   At one time I read it in its entirety, yes.

Q.   Do you recall whether or not -- well, strike that.  This slide specifically indicates that for the first data point, which shows a critical pressure somewhere in the neighborhood of 3.8 bar, that's for essentially water-filled pipe or maybe two percent water-filled pipe -- two percent air-to-water-filled pipe; is that right?

A.   Yes.

Q.   Okay.  Do you know -- well, strike that. The remaining data points, of which there are four,

188

1 involve a greater percentage of air, correct?
2   A.   That's correct.
3   Q.   ISO13477 requires that the test be
4 conducted on a medium that the pipe was intended to
5 convey; is that correct?
6   A.   I'm not sure if that's a requirement or
7 if that's a recommendation.
8   Q.   Well, if it is a requirement, would you
9 agree with me that the only data point that would be
10 in compliance with ISO13477 would be the first data
11 point?
12       MR. FITZPATRICK: Objection. Form.
13   Incomplete hypothetical.
14       THE DEPONENT: No.
15 BY MR. SHEEAN:
16   Q.   Why not?
17   A.   Because in the real world there are a
18 number of times when actual water pipes have air in
19 them.
20   Q.   But if the standard calls for -- I know
21 you're not sure if it does or not, but I'm -- but
22 I'm -- in this hypothetical, if the standard calls for
23 the test to be conducted solely using the medium that
24 the pipe was intended to convey and that's water, then
25 the only data point that has essentially 100 percent

189

1 water is the first data point, right?
2   A.   I would disagree with that.
3   Q.   Why?
4   A.   Because the pipe may be intended to carry
5 100 percent water, but if, in fact, there are times
6 that the pipe has, for example, 10 percent water, then
7 you would do the test with 90 percent water and 10
8 percent air.  And that would be more indicative of the
9 actual field situation.
10       So doing this test at various levels of
11 air is perfectly appropriate to determine what the
12 effect of the air is on the critical pressure.
13   Q.   Regardless of what ISO13477 says?
14       MR. FITZPATRICK: Objection. Form.
15       THE DEPONENT: Well, you have to remember
16   that ISO13477 is a test method, and when you do
17   research, you use that test method in order to
18   find out certain effects.  And the purpose of the
19   study was to determine the effect of air in the
20   water pipe.
21 BY MR. SHEEAN:
22   Q.   Okay.  The test results that were
23 depicted in slide 698 -- 00698 that we're looking at
24 right now, this was done in 1995 on UK manufactured PVC
25 pipe, correct?

190

1   A.   Yes, that's correct.
2   Q.   Would you agree that the UK manufactured
3 pipe in 1995 is known to be deficient in certain key
4 material qualities when compared to modern-day feasible
5 PVC pipe?
6       MR. FITZPATRICK: Objection to form.
7       THE DEPONENT: It certainly is different.
8   I would agree to that, yes.
9 BY MR. SHEEAN:
10   Q.   The UK manufactured pipe that was used by
11 Greenshields and Leevers had a lower HDB based pressure
12 rating than pipe of a similar dimension ratio
13 manufactured in accord -- in accordance with current
14 AWWA C900 standards, correct?
15   A.   I don't know it was ever tested for the
16 HDB rating.  When it was pressure rated by Dr. Leevers,
17 the pressure rating that he obtained was based on the
18 MRS system, the ISO system.
19   Q.   Do you know what the British standard for
20 the pressure rating was for the UK test -- UK
21 manufactured pipe that was used by Greenshields and
22 Leevers?
23   A.   No.
24   Q.   Has anyone ever told you that the UK
25 manufactured pipe used in the tests described on

191

1 UGSI698 and 699 had a pressure rating of 174?
2   A.   Was that the calculated pressure rating
3 base converted from the --
4   Q.   The British standard.
5   A.   The British standard or the -- I think
6 Dr. Leevers also had the pressure rating of the pipe
7 based on the ISO system in his paper, if I recall.
8   Q.   Did you ever do the conversion to see
9 what it would be from the ISO standard to --
10   A.   No.  They are totally different pressure
11 ratings using a totally different data set.  If you're
12 referring to the calculation that I made on the next
13 page, if that's what you're getting to --
14   Q.   No.
15   A.   Okay.
16   Q.   No.  I'm talking about the British
17 standard that was in place --
18   A.   Yes.
19   Q.   -- in 1995 when Greenshields and Leevers
20 performed this test.  Are you aware of what -- that the
21 pressure rating under the British standard for UK
22 manufactured pipe was 174?
23   A.   Yes, and I'm aware that's different from
24 the pressure rating that's used in the US.
25   Q.   For US made pipe?

192



McCorkle Litigation Services, Inc.
Chicago, Illinois   (312) 263-0052

```
  1       A.    No.  I said from the pressure rating
  2  method used in the US, which is different from the
  3  pressure rating method used in ISO.
  4       Q.    Do you know whether or not the pipe that
  5  was used by Professors Greenshields and Leevers in 1995
  6  met the current AWWA C900 standards?
  7       A.    No, I don't know that.  And that's why I
  8  felt it was important when I made this calculation
  9  to -- to base it on the information which I knew was
 10  based on actual fusible PVC pipe made in accordance
 11  with AWWA C900 and the value of 1.6 bar that I obtained
 12  from that study, which, of course, is under the
 13  protective order and I can't speak about it in public.
 14  But I know that the value of the AWWA C900 pipe had a
 15  value of 1.6 bar.
 16            I'm using in the presentation the data
 17  from Dr. Leevers, which, yes, it is on European pipe.
 18  It was made according to British standard and not the
 19  AWWA standard, but it still had the same value of 1.6.
 20            When I give the presentation to an
 21  audience, I'm stating it's based on the 1.6 bar, but I
 22  know for a fact that in addition to being based on this
 23  number, the value of 1.6 bar is also based on the test
 24  results done on fusible PVC pipe 12 inch DR18 where the
 25  exact same value of 1.6 bar was obtained.

                                                    193

  1       Q.    You keep saying 1.6 bar.  Go back to this
  2  slide on S4 critical pressure.  Draw a line up to the
  3  10 percent air plot.
  4       A.    You mean this line here?
  5       Q.    No, sir, 10 percent air, right here on
  6  the Y -- on the -- on that axis.  Here, come up.  No,
  7  no, no.  Here's the plot right here, the dot.  Not the
  8  line that's drawn down here, but the dot.  What is --
  9       A.    Well, the dot is the data point.
 10       Q.    Yes.  What is that data point?
 11       A.    Well, the data point always goes above or
 12  below our regression line.  I'm basing it on the
 13  regression line.
 14       Q.    Okay.  And at 10 percent air, where does
 15  the regression line fall?
 16       A.    Well, it's -- what I'm going to is
 17  the -- where this straight line ends.
 18       Q.    Well, you're curving it --
 19       A.    Which is --
 20       Q.    -- to the right then?
 21       A.    Which is approximately 10 percent.
 22       Q.    Approximate -- okay.  So now it's
 23  approximately.  Where in this report do you say that
 24  you're extrapolating and approximating --
 25       A.    Right here.

                                                    194

  1       Q.    -- the bar?
  2       A.    Where it says the PV -- the S4 critical
  3  pressure is equal to 1.6 --
  4       Q.    No, this states equal to, not --
  5            MR. FITZPATRICK:  Can he finish -- can he
  6  finish his answer?
  7            THE DEPONENT:  Equal to or greater than.
  8            MR. FITZPATRICK:  You just want him
  9  to --
 10            THE DEPONENT:  Equal to or greater than
 11  10 percent air.  What I'm saying is that it is 1.6
 12  bar when it is equal to or greater than 10
 13  percent.
 14  BY MR. SHEEAN:
 15       Q.    Okay.  Well --
 16       A.    The 10 percent is an approximation based
 17  on looking at the graph.
 18       Q.    The term "equal to or greater than" would
 19  require the finding that 10 percent air yields that
 20  finding, and 10 percent air on this data plot comes up
 21  with a number of 2.3 bar, not 1.6.  If you use 2.3 bar,
 22  you come up with a drastically different critical
 23  pressure, don't you?
 24            MR. FITZPATRICK:  Objection.  Form.
 25  Assumes facts.

                                                    195

  1            THE DEPONENT:  This number -- the 10
  2  percent is a rounded number based on the
  3  regression line.  If you want to be more exact,
  4  you might say 10.9 or 11 percent, but it's
  5  not -- anybody that looked at this graph and says
  6  where this regression line is linear, you look at
  7  a graph and say, "Oh, from 10 percent and above."
  8            That's what a reasonable person looking
  9  at the graph would say, that the linear regression
 10  line is 10 percent and above.
 11  BY MR. SHEEAN:
 12       Q.    The data point at 10 percent air is 2.3?
 13       A.    I'm not --
 14       Q.    I'm asking you another question now,
 15  Doctor.  Please listen to my question and try to answer
 16  it.
 17       A.    Okay.  Yes.
 18       Q.    Focus.
 19       A.    All right.
 20       Q.    At 10 percent --
 21            MR. FITZPATRICK:  It's a statement, not a
 22  question, but go ahead.
 23  BY MR. SHEEAN:
 24       Q.    At 10 percent air the data point, would
 25  you agree, is at 2.3?

                                                    196
```

Pages 193 to 196



| | |
|---|---|
| 1    A.    No. | 1    A.    Because the -- |

1    A.    No.
2    Q.    The data point, the point above your
3  regression line, where would you say that's at?
4    A.    Well, the data point is not at 10
5  percent. It's a little bit less than 10 percent.
6    Q.    Okay. Where is that data point at?
7    A.    I don't know. It's probably around nine
8  point something.
9    Q.    Where is that plot on the Y-axis, the
10  third data point?
11    A.    It's at about two point something bar.
12    Q.    2.3 bar?
13    A.    Roughly, yeah.
14    Q.    If you take that data point as the basis
15  for your calculation, what is the critical pressure of
16  that pipe at 9.99 percent air?
17    A.    I'm not taking that data.
18    Q.    I'm asking you another question.
19    A.    Totally unrelated to what I did and
20  calculated?
21    Q.    That's correct.
22    A.    Okay. You could take this data point.
23  You could take -- you could take any data point.
24    Q.    I'm asking about the third data point
25  that's shown on the Greenshields and Leevers chart.

197

1    A.    Because the --
2        MR. FITZPATRICK: Objection. Form.
3        THE DEPONENT: I am not allowed to state
4    publically that it's based on the Jana Labs
5    critical pressure determination. I'll wait until
6    you're finished.
7  BY MR. SHEEAN:
8    Q.    So are you using --
9        MR. FITZPATRICK: Well, hold on.
10  BY MR. SHEEAN:
11    Q.    -- the knowledge that's --
12        MR. FITZPATRICK: Hold on.
13        THE DEPONENT: I was --
14        MR. FITZPATRICK: He was not --
15        THE DEPONENT: I was trying to be polite
16    and wait until you were done so you could listen
17    to me.
18  BY MR. SHEEAN:
19    Q.    Sorry.
20    A.    That's all right. I cannot state
21  publically this calculation is based on the 1.6 bar
22  value from Jana Labs obtained on fusible PVC, the 12
23  inch DL 18.
24        I can't publically state that, but I know
25  for a fact that it is. And that's why I have

199

1    A.    If you were to ignore the regression line
2  and take that data point, then at nine point something
3  percent air that data point has a critical pressure of
4  about 2.3 bar.
5    Q.    2.3 bar is going to yield a significantly
6  higher critical pressure than the 121 psig that you
7  find on the next slide, correct?
8    A.    As would this data point or as would that
9  data point, yes, that's correct. They're all above
10  this linear regression line.
11    Q.    Which falls somewhere between 10 and 11,
12  right?
13    A.    Yes. It's approximately 10 percent.
14    Q.    Just as this data point at 2.3 is at
15  approximately 10 percent?
16    A.    Right. And the point that I'm making
17  from the graph is that at approximately 10 percent and
18  above the critical pressure is 1.6 bar, and that's the
19  number I'm using for the calculation. And another
20  reason for using the 1.6 bar is because that is the
21  exact number that was obtained by Jana Labs on fusible
22  PVC pipe.
23    Q.    But you're not allowed to report on Jana
24  Labs. So this report, is it fair to say, does not rely
25  upon the Jana Labs findings?

198

1  confidence in this calculation because I know that 1.6
2  bar was obtained on fusible PVC pipe.
3    Q.    So you're using information that is
4  barred under a protective order from disclosure or use
5  of any kind by you to rationalize the statements that
6  are in this presentation?
7    A.    Yeah. I cannot publically state that,
8  that's correct. I'm prohibited from stating that.
9    Q.    But if you're relying upon it to make a
10  public statement, isn't that the same thing?
11        MR. FITZPATRICK: Objection. Form.
12        THE DEPONENT: No. I'm relying on it to
13    give myself confidence. The calculation I'm using
14    is the calculation from Dr. Leevers. But I know
15    personally and privately, and that gives me more
16    confidence in that number because I know it also
17    is the same as a critical pressure obtained on the
18    fusible PVC pipe.
19        I can't tell people that, but for me
20    personally and privately it gives me comfort in
21    knowing that it's the same number.
22  BY MR. SHEEAN:
23    Q.    And, again, the pipe that you obtained
24  for that Jana Labs research, where did it come from?
25    A.    It was 12 inch DR 18 fusible PVC pipe

200



1 that Mr. Bruce Papenhause purchased from a distributor.
2     Q.    Which distributor?
3     A.    I don't know.  You could ask him, and he
4 could tell you.
5     Q.    Did -- how do you know that it was
6 authentically created fusible PVC pipe?
7     A.    Because I think I said it on the --
8     Q.    Well, I mean, you weren't involved in the
9 purchase.  So that's why I'm asking.
10     A.    No.  I mean, Mr. Papenhause purchased --
11     Q.    What --
12     A.    -- 12 inch DR 18 pipe.
13     Q.    And how do you -- strike that.  Who did
14 the fusion of the joints for that pipe?
15     A.    First of all, you have to understand the
16 pipes that were used to obtain the critical pressure
17 had no joints in them.  They were just straight pieces
18 of pipe.
19         In a subsequent test after the critical
20 pressure was determined, then they selected -- the
21 laboratory selected a test pressure above the critical
22 pressure so they knew the crack would run the length of
23 pipe and then did testing on pipe of the butt fusion
24 joint, pipe with a bell-and-spigot joint, to confirm
25 what was observed in the field.

201

1         And that is that the running crack goes
2 through a butt fusion, but the running crack does not
3 go through a bell-and-spigot joint.
4     Q.    What was the air/water mixture used for
5 the Jana Labs testing?
6     A.    I believe I already told you that it was
7 100 percent air.
8     Q.    So --
9     A.    And if you --
10     Q.    Sorry.
11     A.    If you look at the plot from Dr. Leevers,
12 what he showed was that -- and going from air filled to
13 10 percent air, it's the same critical pressure.
14     Q.    But you can't confirm from the Jana Labs
15 test that a 10 percent air-filled pipe would have a 1.6
16 bar critical pressure, can you, because you never ran
17 that test?
18     A.    That's correct.  You cannot -- we have to
19 make that assumption.  What I can do, however, is look
20 at the actual failures in fusible PVC that have
21 occurred and look at the actual pressure where the RCP
22 occurred.
23         We know what the actual pressure was,
24 either an installed pressure or a test pressure.  We
25 know what the internal pressure was.  By definition,

202

1 the calculated -- the critical pressure has to be below
2 that, and as I showed in the two examples here, the
3 calculated critical pressure from this calculation was
4 just below the actual pressure at which the RCP failure
5 occurred.  So that confirms that the critical pressure
6 is very close to that value.
7     Q.    So now you're relying upon the anecdotal
8 evidence that you have from engineers and operators
9 that we've already talked about in this report of leak
10 pressure testing failures that have occurred, right?
11         MR. FITZPATRICK:  Objection.
12 Mischaracterizes, form.
13         THE DEPONENT:  Anecdotal?
14 BY MR. SHEEAN:
15     Q.    You weren't present when these leak test
16 failures occurred, correct?
17     A.    That's correct.
18     Q.    And they weren't done under laboratory
19 conditions that are controlled so that you can
20 accurately measure all of the conditions and the
21 results, correct?
22     A.    The actual test pressure was not in a
23 laboratory.  The actual test pressure was in the field,
24 and that was the pressure that was recorded.
25     Q.    And, again, you weren't present?

203

1     A.    I was not present, but I talked to a
2 person that was present.
3     Q.    So that's what I mean when I say
4 "anecdotal".  You weren't there.  You didn't record it,
5 and you didn't rely upon a laboratory scientist to
6 record the information?
7     A.    Yes, it was not done in a laboratory.  It
8 was done in the field in the real world.
9     Q.    And you don't know what percent of air
10 was in those pipes when those leak pressure test
11 incidents occurred, do you?
12     A.    No.  We know that -- from the studies
13 that Dr. Leevers has done, we know that air will reduce
14 the critical pressure.  That's what his studies have
15 shown, and it was, I believe, corroborated in the paper
16 that Tom gave based on Dr. Choy's data.
17         He obtained the same thing; that as you
18 increase the percent of air, that you decrease the
19 critical pressure.  We know that the -- that
20 the -- what the pressure was at the time of the RCP
21 failure.  So we know the critical pressure has to be
22 below that.
23     Q.    Okay.  Let me ask you this:  Do you have
24 any corroborating evidence other than the Greenshields
25 and Leevers chart that we were looking at that provides

204

```
1   you with an understanding of what the critical pressure
2   would be for DR 19 fusible PVC pipe at a 10 percent
3   air/water mixture?
4        A.    First of all, I don't know if UGSI makes
5   DR 19.  I think they make DR 18.  I don't know if they
6   make DR 19 or not.  I think they make DR 21 and 18, but
7   I don't think they make DR 19.  Would you want to
8   restate your question?
9        Q.    Does your analysis of the critical
10  pressure of fusible PVC pipe vary based on the DR
11  rating of the pipe?
12       A.    The -- the pressure will vary based on
13  the -- based on the DR of the pipe.  Yeah, the critical
14  pressure will vary based on the DR of the pipe.
15       Q.    And so if Dr. Leevers used DR 19 --
16       A.    Right.
17       Q.    -- in your Jana Labs tests, you used DR
18  18?
19       A.    18, right.
20       Q.    Other than Dr. Leevers analysis of the DR
21  19 --
22       A.    Uh-huh.
23       Q.    -- do you have any corroborating evidence
24  to support your position that the critical pressure for
25  DR 18 would be 1.6 bar at 10 percent air?
```

205

```
1        MR. FITZPATRICK:  Objection.  Form.
2        THE DEPONENT:  I have Dr. Leevers data.
3   BY MR. SHEEAN:
4        Q.    I said besides that.
5        A.    Right.  I have Dr. -- the Jana Labs data.
6   Both of them are very close, and if you look at that
7   calculated critical pressure and compare that to the
8   known pressures where RCP has actually occurred,
9   pressure has to be -- critical pressure has to be below
10  that, and the numbers come out very, very close.  So I
11  think the real world corroborates that.
12       Q.    Other than the Greenshields and Leevers
13  test, none of the other examples that you gave involved
14  10 percent air/water mixture, did they?
15       MR. FITZPATRICK:  Objection to form.
16       THE DEPONENT:  It's very possible
17  that -- just listen to what I'm saying.  Okay?
18  It's very possible that the -- see, I view the
19  real world as a research lab.  Okay?  Because it's
20  data point.  It's experiments.  It's things that
21  happen in the real world.  Okay?
22       It's very possible that these RCP
23  failures that are occurring have 10 percent or
24  more air.  They have been reported to have high
25  volumes of air.  It's very possible that they did
```

206

```
1   have 10 percent.
2        Something must have happened to reduce
3   the critical pressure.  We know the RCP failure
4   occurred.  We know the critical pressure has to be
5   below the RCP pressure where the RCP failure
6   occurred.  Something had to have lowered that
7   critical pressure.
8        The most logical thing to have lowered
9   the critical pressure is the air in there because
10  we know from Dr. Choy's data and Dr. Leevers' data
11  that as you increase the pressure, you decrease
12  the critical -- excuse me, as you increase the air
13  content, you decrease the critical pressure.
14  BY MR. SHEEAN:
15       Q.    And that's true in HDPE pipe too, isn't
16  it?
17       A.    Of course.  The data showed --
18       Q.    -- pipe too, isn't it?
19       A.    Yes, exactly.  Here's the -- you see the
20  exact same thing.
21       Q.    So, Doctor, I -- I -- I am not interested
22  in what's possible, what could be happening out there.
23  I'm talking about -- I mean, you've got a Ph.D.
24       You had to stand up in front of your
25  dissertation committee and have verifiable, accurate
```

207

```
1   data in order to stand behind your dissertation, right?
2        A.    Yeah, and I stand behind what I'm saying
3   here.
4        Q.    So in -- in the -- in terms of
5   what's --
6        A.    Uh-huh.
7        Q.    -- demonstrable as a scientist --
8        A.    Yes.
9        Q.    -- the only instance where a -- an
10  experiment was run.  The only example that you have of
11  10 percent air and fusible PVC pipe is the data point
12  that was done by Greenshields and Leevers in 1995; is
13  that right?
14       MR. FITZPATRICK:  Objection.  Asked and
15  answered.
16       THE DEPONENT:  Well, I believe as a
17  scientist and in giving this presentation I have
18  that data point.  I have the corroborating
19  evidence from the Jana Lab study, and I have those
20  two, which I believe correlate very well with the
21  real world RCP failures that have occurred.  As a
22  scientist, as a researcher, I can put those
23  altogether.
24  BY MR. SHEEAN:
25       Q.    You're not answering my question, sir.
```

208



McCorkle Litigation Services, Inc.
Chicago, Illinois  (312) 263-0052

| | |
|---|---|
| 1    A.    I thought I was. | 1    MR. FITZPATRICK: -- for five minutes? |

209

1    A.    I thought I was.

2    Q.    No, you're not.

3    A.    I'm sorry. Okay.

4    Q.    I'm asking you a very straightforward

5  question. Let me break it down for you smaller.

6    A.    Okay.

7    Q.    You've given me a couple of different

8  instances. Jana Labs tests were done at 100 percent

9  air, correct?

10    A.    Correct, which is, according to

11  Dr. Leevers, equivalent to 10 percent air and water.

12    Q.    That's not 10 percent air and water,

13  though, right? It's 100 percent air?

14    A.    Which is equivalent it 10 percent air and

15  water.

16    Q.    That's not my question, sir. Please

17  follow --

18    A.    I'm giving you the answer.

19    Q.    No. The question is: The tests that you

20  did or that you read --

21    A.    Uh-huh.

22    Q.    -- from Jana Labs involved 10

23  percent -- or 100 percent air, correct?

24    A.    Correct.

25    Q.    Okay. The instances that occurred in the

209

1  field that you're referring to of what you perceived to

2  be rapid crack propagation during leak pressure

3  testing, you have no way of knowing exactly what the

4  percent air content was in those pipes, do you?

5    A.    The actual RCP failures which occurred in

6  the field have some air content. They reported to have

7  air. We don't know the actual air content.

8    Q.    Thank you.

9    MR. FITZPATRICK: Go ahead.

10    THE DEPONENT: I was done.

11    MR. FITZPATRICK: Let's take a break.

12  We've been going an hour and a half.

13    MR. SHEEAN: We've been going not even an

14  hour. We didn't --

15    MR. FITZPATRICK: I have to go to the

16  restroom. I'll be back in five minutes. If you

17  want to take 20 minutes with your colleagues here

18  like you did the last time, that's what we'll do.

19    MR. SHEEAN: On the record, this

20  deposition will not finish today, and I'm going to

21  be seeking leave to continue the deposition

22  after --

23    MR. FITZPATRICK: Because I have to go to

24  the bathroom --

25    MR. SHEEAN: No.

210

1    MR. FITZPATRICK: -- for five minutes?

2    MR. SHEEAN: No, because we're -- I'm

3  having to ask the question five times to get a

4  straight answer. Off the record.

5    THE VIDEOGRAPHER: It's 2:38. Going off

6  the record.

7    (The deposition was in recess.)

8    THE VIDEOGRAPHER: It's 2:42. We're back

9  on the record.

10  BY MR. SHEEAN:

11    Q.    Mr. Palermo, do you know the outside

12  diameter of the pipe that was tested by Greenshields

13  and Leevers?

14    A.    It might have been around 110, maybe,

15  milliliters.

16    Q.    What does that equate to in inches?

17    A.    Probably around four -- four or five

18  inches.

19    Q.    Okay. What was the outside diameter of

20  the pipe that was tested at Jana Labs?

21    A.    The 12 inch.

22    Q.    So is there a difference in terms of

23  critical pressure that you would expect between a four

24  inch outside diameter and a 12 inch outside diameter

25  pipe?

211

1    A.    I don't think there's been sufficient

2  testing on PVC pipes to make that determination.

3    Q.    Generally speaking with pipe, is that

4  true, that the greater the outside diameter the

5  critical pressure would change?

6    A.    It's really more wall thickness

7  dependent. In the case of polyethylene, that

8  relationship has been established. I don't believe

9  that relationship has been established for PVC.

10    Q.    Did you conduct multiple tests on

11  different outside diameter fusible PVC pipes with Jana

12  Labs in order to make that determination?

13    A.    No. We selected 12 inch for two reasons.

14  Number one, it was the -- the largest pipe that Jana

15  could actually test that had equipment for, but also 12

16  inch at least was in the range of the various sizes

17  that -- where RCP had fully occurred in the field. I

18  believe the smallest diameter was eight inch, and, of

19  course, the largest was around 30 inches.

20    Q.    Did you coordinate directly with Jana

21  Labs on the specific parameters of the testing that was

22  done?

23    A.    No. We basically asked Jana Labs to

24  follow the -- the ISO test method and to determine the

25  critical pressure, and then once they obtained the

212



McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052

```
 1  critical pressure, to select a pressure above the
 2  critical pressure and then to test the -- pipe at
 3  the joints.
 4      Q.   Why didn't Jana Labs try to replicate
 5  what was done by Greenshields and Leevers in terms of
 6  modifying the water and air pressure mixture?
 7      A.   I don't believe they were set up to test
 8  in water.  They were set up to test in air.
 9      Q.   So there was a limitation in the
10  laboratory?
11      A.   At the time, yes.
12      Q.   Okay.  Would you agree that in order to
13  try and verify the testing that was done by
14  Greenshields and Leevers, it would be better evidence
15  to have replicated the air/water mixture in those data
16  points?
17          MR. FITZPATRICK:  Objection.  Form.
18          THE DEPONENT:  It's always better to have
19      more data.  We were basically at the time trying
20      to, at least, get some data on actual fused PVC
21      pipe because there was no data at the time and
22      then also to confirm that the crack would go
23      through the butt fusion joint and stop at the
24      bell-and-spigot joint.
25  BY MR. SHEEAN:
                                                    213
```

```
 1      Q.   Have you ever contacted Greenshields and
 2  Leevers regarding this slide and the information that's
 3  provided in it?
 4      A.   I have spoken to Dr. Leevers many times.
 5  I've never met Mr. Greenshields.
 6      Q.   Have you spoken with Leevers regarding
 7  this specific slide?
 8      A.   Yes.
 9      Q.   What have you and Pat Leevers discussed
10  about that?
11      A.   Well, exactly what the data showed, that
12  both for polyethylene and PVC it showed that you as you
13  increase the amount of air that the critical pressure
14  decreases.
15      Q.   Did Dr. Leevers tell you that the data
16  points -- all but the last data point, the four data
17  points to the left on UGSI698, involved testing that
18  was done with the baffles completely sealed against the
19  inside of the pipe?
20      A.   I don't believe we discussed about the
21  baffle situation.
22      Q.   Were you aware of that?
23      A.   No.
24      Q.   Would you agree -- have you ever seen a
25  document that specifically states that the baffles on
                                                    214
```

```
 1  the testing to the first four points was done with
 2  the baffles sealed completely to the inner wall of the
 3  pipe?
 4      A.   I don't recall any discussion on baffles
 5  other than a discussion I had with Dr. Leevers in front
 6  of Shulton when they're doing testing with the 100
 7  percent water, and their belief is when you have 100
 8  percent water, that you don't even need the baffles.
 9      Q.   Do you know what ISO 13477 says about how
10  the baffles should be placed inside the pipe walls?
11      A.   I'm -- I'm sure I read it one time.  I
12  don't have it memorized.
13      Q.   Would you be surprised to see that it
14  does not allow for the baffle to be completely sealed
15  against the inside wall of the pipe?
16      A.   If that's what you're saying it says,
17  that's what the test method says.
18      Q.   Wouldn't that surprise you?
19      A.   No.  I'm sure what Dr. Leevers was doing
20  was using the test method, and actually at the time he
21  did this study I don't think it was an ISO test method.
22  He had developed the S4 test method and was doing
23  research on it, and part of the research was to
24  determine the effected air.
25      Q.   Do you believe that -- assuming baffles
                                                    215
```

```
 1  were sealed against the inside pipe walls for the four
 2  left most data points on UGSI698, that having the
 3  baffles completely sealed would have changed the
 4  critical pressure of the pipe?
 5          MR. FITZPATRICK:  Objection.  Form.
 6          THE DEPONENT:  I don't know.  All I know
 7      is what the data shows.  The data correlates with
 8      the Jana data and air.  And all -- what I do is I
 9      then take those data and compare it to the real
10      world, the actual failures that have occurred, and
11      what I see is a very good correlation.
12  BY MR. SHEEAN:
13      Q.   What are the baffles -- what's your
14  understanding of what the baffles do inside of the
15  pipe?
16      A.   The full-scale test requires a large
17  reserve of air in order to get the crack to -- to
18  propagate.  My understanding is the baffles have -- in
19  effect allow you to -- to run the same kind of
20  experiment but with a much shorter section of the pipe,
21  and it's because of the baffles then that you have to
22  have the correlation equation.
23      Q.   So the baffles allow for you to use a
24  much shorter piece of pipe --
25      A.   Yeah.  It has to do with the velocity of
                                                    216
```



McCorkle Litigation Services, Inc.
Chicago, Illinois  (312) 263-0052

the crack.

Q. It slows down the crack?

A. Exactly.

Q. And if the baffles are completely sealed against the inside wall, it's going to change the -- the outcome, right?

A. It could be. I don't know exactly what Dr. Leevers did or why he did it. Being the inventor of the test, I'm assuming he knew what he was doing.

Q. In fact, if the baffles had been used in compliance with ISO 13477, that would have allowed the pressure to release more rapidly than using the sealed baffles, correct?

A. Perhaps. Again, I don't believe that Dr. Leevers' test back at this time and era were in conformance with the ISO standard test method because I don't think it actually existed then.

Q. And if the pressure would have been able to release more rapidly than using sealed baffles, that would have resulted in a higher critical pressure, correct?

MR. FITZPATRICK: Objection. Form. Calls for speculation.

THE DEPONENT: I don't know. Again, all I go by is the actual data that he published.

217

BY MR. SHEEAN:

Q. Do you have an opinion as to how much air should be allowed in a properly operated water pressurized pipeline during operation?

A. If you talk to the pipe manufacturer, I think their position is there should be no air whatsoever. If you talk to a contractor that installs pipe, they'll tell you there are times that there's always going to be some air in there.

They always try to get rid of the air, but in the real world the practicality is there's always some -- some air in there.

Q. But aren't there pressure release valves that can allow the air to escape?

A. Yes. It depends on how good those valves are working and so forth. Like I said, ideally you have no air, but there are times that you do have air in them.

Q. Do you know if there's a standard in place that dictates what the allowable air pressure -- percent of air is in a properly operated water pipeline?

MR. FITZPATRICK: Objection. Form.

THE DEPONENT: If there were a requirement, it would be probably in EWA C605 or

218

maybe the M23 manual. I don't know if there is or not.

BY MR. SHEEAN:

Q. Now, the next slide that you're looking at now, which is UGSI699, all of the calculations on this slide, as you say, are based on equal to or greater than 10 percent air, correct?

A. Correct.

Q. And that's this 1.6 bar, the --

A. The linear regression.

Q. The linear regression line that you're referring to that -- why does this line come to a point and then extrapolate as opposed to a curve like you typically see in a linear regression line?

A. Because what Dr. Leevers did was to draw the linear regression line through the points. That's a straight line. That's how --

Q. But the next point down here, it's not a straight line to this line?

A. Right. That's how he chose to draw the regression line through the points.

Q. But is that -- is this typical for a regression line?

A. For a regression line, yes. A line is a straight line usually.

219

Q. Well, how about a --

A. You can see the -- if you look at this chart here, you can see that it's four data points here. A three data -- that pretty well defines the line through those data points. That's the regression line through the data points.

Q. So all of the assumptions on slide 23, which is 699, again, rely upon the assumption that you're operating a water pressurized pipeline at equal to or greater than 10 percent air, correct?

A. As I so state here, correct.

Q. But you're using the 10 percent -- I'm sorry, the 1.6 bar. Although, we already established that even under the regression line that's beyond 10 percent where it starts?

A. It's about 11 percent maybe.

Q. Okay. Do you know where the pipe that was tested by Greenshields and Leevers was manufactured?

A. No, I do not.

Q. Do you know to what standard it was manufactured?

A. It might have been a British standard, but I don't know that for a fact.

Q. Did you ever ask Dr. Leevers what the

220



| | |
|---|---|

1 British standard that the pipe was manufactured to
2 was?
3     A. No.
4     Q. Is it listed in this paper?
5     A. It might be.
6     Q. On this slide in the bottom left you say
7 that for DR 19 PVC pipe the corresponding HDB base
8 pressure rating is 222 psig. Do you see that?
9     A. Yes.
10     Q. Where did you get that number from, 222?
11     A. From the equation pressure ratings equal
12 to two times the HDB times zion (phonetic) factor
13 divided by the DR minus one.
14     Q. Where did you get the HDB number that you
15 used in that calculation?
16     A. I used the standard HDB value of 4,000
17 psi for pressure rated PVC.
18     Q. You yourself have never conducted any S4
19 pressure tests on fusible PVC pipe in order -- in
20 accordance with ISO13477, correct?
21     A. I personally have not conducted the test.
22 I requested that Jana Laboratories conduct the test on
23 fusible PVC pipe in accordance with ISO13477.
24     Q. And you yourself have never attempted to
25 conduct any test to determine the critical pressure of

221

1 water pressurized fusible PVC pipe, correct?
2     A. That's correct.
3     Q. Would you agree that there is no
4 scientific basis on which to claim that the correlation
5 factor derived from testing HDPE pipe using 100 percent
6 air as the medium is conservative when applied to PVC
7 pipe testing using water as the medium?
8     MR. FITZPATRICK: Objection. Form.
9     THE DEPONENT: The equation is based on a
10 gas law, which is independent of material, and the
11 ISO standards specifically state that the
12 correlation equation is independent of material,
13 meaning it's applicable to plastic pipe
14 materials.
15     The one exception to that is a polyamide
16 because of the fact that polyamide absorbs
17 moisture, and it has been found that the -- using
18 the correlation equation results in extremely low
19 values compared to full scale.
20     So based on that, the ISO standards for
21 polyamide pipe require that the -- only the
22 full-scale test be used because the S4 results are
23 so low.
24 BY MR. SHEEAN:
25     Q. I'm going to ask you about the incidents

222

1 where there was RCP in Dorchester and Chatham. For
2 Dorchester, you don't know, do you, whether or not
3 there was actually 30 percent air in the pipe at the
4 time of the incident, do you?
5     A. You said 30 percent?
6     Q. Correct.
7     A. I don't know what the percentage of air
8 was.
9     Q. It could have been 40 percent air?
10     A. It could have been 40. It could have
11 been 10. I don't know.
12     Q. It could have been 50 percent air?
13     A. It's possible. I don't know.
14     Q. And the same thing with Dorchester, you
15 don't know what the actual --
16     A. That was Dorchester.
17     Q. I'm sorry, Chatham. The same thing for
18 Chatham, you don't know what the actual percent air was
19 in the pipeline at the time of the incident, correct?
20     A. That is correct.
21     Q. It could have been 20 percent air?
22     A. I do not know what the percent was.
23     Q. It could have been 50 percent air?
24     A. That's the same as not knowing what's in
25 there.

223

1     Q. Using the 4,000 PSI HDB that you did for
2 slide 23 in Exhibit 1 assumes that the British pipe has
3 the same HDB as the AWWA pipe, correct?
4     A. Yes. It assumes that it's PVC pipe and
5 it would have an HDB of 4,000 PSI, which is what
6 pressure rated PVC pipe has.
7     Q. Have you ever tried to confirm that the
8 British pipe does, in fact, have the same HDB?
9     A. I've seen hundreds of data sets for
10 pressure rated PVC pipe, and they all have -- from
11 Europe and the US, and they have 4,000 PSI HDB.
12     Q. I'm not sure you answered my question.
13 Have you ever tried to independently confirm that
14 British pipe does, in fact, have the same HDB?
15     A. That particular lot of DR 19 pipe that
16 was tested, no. I know that there are many lots of PVC
17 pipe, both European and US, that I have seen that all
18 have an HDB of 4,000 PSI.
19     Q. Manufactured before 1995?
20     A. It's been around -- PVC has been around
21 for a long time, yes. Ever since the '60s, PVC has had
22 an HDB of 4,000.
23     Q. I'm going to talk about butt fusion
24 failures now. Look at slide 36, UGSI712. Did you
25 prepare this slide, sir?

224



```
 1      A.    I did.
 2      Q.    What -- what did you do to confirm that
 3 the information that's displayed in this slide?
 4      A.    The same thing: The information that was
 5 provided to me, photos that were provided to me,
 6 reports that I read, et cetera.
 7      Q.    Did you save the records that you
 8 compiled to generate this chart?
 9      A.    I have some of the information. I'm not
10 sure I have all of it.
11      Q.    Has whatever information that you have in
12 your possession regarding the information that you used
13 to create this chart been produced to us in
14 litigation -- in this litigation?
15      A.    Yes.
16            MR. FITZPATRICK: Objection to form. Go
17 ahead.
18            THE DEPONENT: I'm sorry. Any e-mails
19      that I had related to this I have produced.
20 BY MR. SHEEAN:
21      Q.    I wasn't asking -- limiting my question
22 to e-mails.
23      A.    I'm sorry.
24      Q.    Have you produced all of the records that
25 you have that you believe support the facts that you've
```
225

```
 1 set forth in UGSI712?
 2            MR. FITZPATRICK: Objection. Form.
 3            THE DEPONENT: Most of the information,
 4      the records that I would have, would be in the
 5      e-mails and the attached documents, reports that
 6      the documents would have.
 7 BY MR. SHEEAN:
 8      Q.    Have you produced all of the documents
 9 that you have regarding the incidents that are
10 displayed in slide 36, UGSI712, beyond the e-mails and
11 the attachments?
12            MR. FITZPATRICK: Objection. Form.
13            THE DEPONENT: I believe that I have. I
14      can't be positive that I have.
15 BY MR. SHEEAN:
16      Q.    What do you need to do to confirm that
17 you've produced all of the records that you have
18 regarding this?
19      A.    See if there's any other documents that I
20 have, but I'm just not sure where I would have kept
21 those because this is a lot of information that I put
22 together, you know, a few years ago. I may or may not
23 have those documents anymore.
24      Q.    This litigation has been pending for two
25 years. So I assume you haven't thrown anything away
```
226

```
 1 relating to this case since the case started, correct?
 2      A.    Hopefully not.
 3      Q.    Well, I would just ask that you confirm
 4 with your counsel that whatever you have relating to
 5 specifically Exhibit 1, but any of the presentations,
 6 confirm that it's been produced.
 7            What did you do to -- I'm sorry, I
 8 already asked that question. Do you know which of
 9 these alleged butt fusion failures occurred in service?
10      A.    No. Well, do I know which ones? I -- I
11 believe the ones in London, Ontario were in service. I
12 spoke to the engineer that works for the water company
13 there.
14            The Haynesville Shale, Louisiana, that's
15 the Texas/Louisiana. I believe those were in service,
16 and I spoke to a number of people there. Collier
17 County, I believe that one was in service. The rest of
18 them I'm not sure.
19      Q.    Don't you think that your audience
20 members would be interested to know which one of these
21 incidents occurred while the pipe was in service?
22            MR. FITZPATRICK: Objection. Foundation.
23            THE DEPONENT: No. I think they're more
24      interested in the fact that the butt fusion
25      failure occurred.
```
227

```
 1 BY MR. SHEEAN:
 2      Q.    How many joints were involved in these
 3 projects, if you know?
 4      A.    My recollection is that for these 18
 5 cities a total number of butt fusion failures was
 6 approximately 50.
 7      Q.    And how many joints were there on those
 8 jobs total?
 9      A.    I don't know.
10      Q.    And how many -- I already asked that.
11 You don't know how many of those were in-service
12 failures versus testing failures, correct?
13      A.    I listed the ones that I knew for sure
14 were in service. The others could have been or could
15 have failed right after the fusion was made. I don't
16 know.
17      Q.    If UGSI had over 150,000 joints in
18 service as of the end of 2012 and only three incidents
19 of in-service failures, that would be a pretty
20 remarkable rate, wouldn't it?
21            MR. FITZPATRICK: Objection. Form.
22            THE DEPONENT: I have a total of 50,
23      actually.
24 BY MR. SHEEAN:
25      Q.    That's not my question, sir. You need to
```
228



```
 1   try to answer my question.
 2       A.    I think there were more than three in
 3   service.
 4       Q.    Okay.  But in my question --
 5       A.    Okay.
 6       Q.    -- only three in-service failures from
 7   150,000 joints, that would be a remarkable record,
 8   wouldn't it?
 9           MR. FITZPATRICK:  The same objection.
10           THE DEPONENT:  I'm not sure what you mean
11   by "remarkable", but it would be a good record.
12   BY MR. SHEEAN:
13       Q.    What's the failure rate of HDPE butt
14   fusion joints?
15       A.    I don't know.
16       Q.    Have you ever done a chart like this of
17   known HDPE BF failures?
18       A.    No.
19       Q.    Why not?  I mean --
20       A.    I have not gone to -- I have not prepared
21   a paper on that.
22       Q.    If the rate of failure of butt fusion
23   joints in HDPE is comparable to or greater than the
24   rate of failure in PVC butt fusion joints, wouldn't
25   your audience be just as interested to know about those

                                                    229
```

```
 1   failures?
 2           MR. FITZPATRICK:  Objection.  Foundation.
 3       Incomplete hypothetical.
 4           THE DEPONENT:  Well, first of all,
 5       polyethylene has been around since the '60s and
 6       have been butt fused since the '60s.  The butt
 7       fusion of PCV is relatively new.
 8           We are just now adding the butt fusion of
 9       PVC to the standard like AWWA, and so it's because
10       of its novelty or relative novelty that I was
11       preparing this.
12   BY MR. SHEEAN:
13       Q.    Yeah, you had said there were 50 joint
14   failures on this page.  I see 18 projects listed.
15   Where did -- how did you come up with 50?
16       A.    Like I said, my recollection is that
17   there were 18 cities.  Some of these cities had more
18   than one butt fusion failure, and if you took at the
19   total number of butt fusion failures, that number would
20   be above 50.
21       Q.    And how do you know that?
22       A.    Because on another chart that I had I
23   kept a record of the number of failures for each city,
24   and I recall that that total number was around 50.
25       Q.    Have you produced that chart to us?

                                                    230
```

```
 1       A.    It might be in one of the papers.  I
 2   don't remember.
 3       Q.    I can tell you I haven't seen it.  So in
 4   terms of coming up with the number 50, did you ever go
 5   inspect any of these field -- any of these butt fusion
 6   joints to see of any failures?
 7       A.    No, for none of these that I physically
 8   laid my eyes on or hands on any of the butt fusion
 9   failures.
10       Q.    How many of these did you receive a
11   report from an independent inspector or investigator?
12       A.    There were a number of these that I read
13   reports on.
14       Q.    I'm sorry, from independent inspectors?
15           MR. FITZPATRICK:  Objection.  Form.
16           THE DEPONENT:  I don't remember who
17       authored the reports.
18   BY MR. SHEEAN:
19       Q.    You said a number.  What number?
20       A.    I'm sorry?
21       Q.    You said for a number of these you read
22   reports.  So I'm asking if you know specifically what
23   number of these 18 incidents did you read reports on
24   the butt fusions failures?
25       A.    I don't recall now.

                                                    231
```

```
 1       Q.    Do you have any of those reports
 2   anywhere?
 3       A.    I don't recall.
 4       Q.    If you have any such reports, would they
 5   have been produced in the course of discovery?
 6           MR. FITZPATRICK:  Objection.  Form.
 7           THE DEPONENT:  Again, some of the reports
 8       I would have had would have been attached with the
 9       e-mail, and I produced e-mails.  And, of course,
10       the reports would also have been attached to them.
11   BY MR. SHEEAN:
12       Q.    Please confirm with your counsel after
13   today's deposition that you've produce all of the
14   reports, records, and documents that you have in your
15   possession that support your statements in this
16   document.
17           Did you ever make the following statement
18   to Robert Walker of Underground Solutions, quote, I
19   will no longer provide negative information about butt
20   fusion of PVC pipe.  I believe that Underground
21   Solutions has conducted significant testing to develop
22   the proper butt fusion procedure for PVC pipe, and your
23   field failure rate is very low?
24       A.    Yes.
25       Q.    And since you made that statement to

                                                    232
```



1  Mr. Walker, have you attempted to contact anyone to
2  whom you previously presented information
3  regarding -- on slide 36 through 42 of Exhibit 1 to
4  advise them you believe UGSI's butt fusion procedure is
5  proper?
6          MR. FITZPATRICK: Objection. Form.
7          THE DEPONENT: No. What I believe I said
8      to Mr. Walker was that I would no longer give any
9      presentations about the butt fusion integrity of
10     PCV butt fusions.
11 BY MR. SHEEAN:
12     Q.  And I understand that, but my question
13 is: Did you take any overt action to try and correct
14 the record that was created by Exhibit 1 of butt fusion
15 failures in fusible PVC K pipe?
16         MR. FITZPATRICK: Objection. Form.
17         THE DEPONENT: No. Again, what I told
18     Bob was that I would no longer give the
19     presentation.
20 BY MR. SHEEAN:
21     Q.  How long after you had that conversation
22 with Mr. Walker did you continue to display, if you
23 know, Exhibit 1 on your Plastics Pipe website?
24     A.  I don't recall the date. That would be
25 from that date until now, the date that I had the

233

1  conversation with Bob.
2      Q.  It's your testimony that on the date you
3  had the conversation with Mr. Walker you removed from
4  your website --
5      A.  No. It was on my website, and it's still
6  there now.
7      Q.  The butt fusion failures information?
8      A.  If that's part of the presentation, yeah.
9      Q.  So --
10     A.  I thought the paper I had on my website
11 was the RCP paper.
12     Q.  Today. But my question is: How long
13 after you had that conversation with Mr. Walker did
14 your website continue to display criticism of butt
15 fusion PVC joints?
16         MR. FITZPATRICK: Objection. Assumes
17     facts. Form.
18         THE DEPONENT: I thought the paper on my
19     website was the RCP paper.
20 BY MR. SHEEAN:
21     Q.  Today. My question is: Starting with
22 the date that you had this -- do you remember when you
23 had this conversation with Mr. Walker?
24     A.  A couple of years ago maybe. I don't
25 recall.

234

1      Q.  So after you had that conversation with
2  Mr. Walker a couple of years ago, do you know whether
3  or not for any period of time you continued to display
4  on your website articles critical of fusible PVC butt
5  fusion joints?
6          MR. FITZPATRICK: Again, objection to
7      form.
8          THE DEPONENT: I don't recall. I know I
9      updated it for the RCP presentation that I had
10     given. I -- I don't know if that included the
11     butt fusion information or not.
12 BY MR. SHEEAN:
13     Q.  The testing that you display in Exhibit 1
14 from pages 42 to 60, which is UGSI718 to 736 --
15     A.  Uh-huh.
16     Q.  -- did you personally perform those
17 tests?
18     A.  No. Most of the tests were conducted by
19 Jana Laboratories, and they were in the report. I
20 obtained the data in a report that was authored by Jana
21 Laboratories. A couple of the charts that I -- that
22 are in here are taken from a UGSI publication.
23     Q.  Which charts are taken from the UGSI
24 publication?
25     A.  These two. They don't have page numbers.

235

1  It would be after those, almost to the end of the butt
2  fusions. Yeah, that one.
3      Q.  So 734 and 735?
4      A.  If that's what you say it is, yeah.
5      Q.  Those -- those are taken from a UGSI
6  publication?
7      A.  Yes.
8      Q.  And that's the stress versus time F2634
9  control eight inch PVC pipe and F2634 butt fused eight
10 inch PVC pipe?
11     A.  Yes.
12     Q.  Okay. Other than those two slides, the
13 rest of the slides that we discussed -- that I just
14 mentioned, who performed those tests? You said Jana
15 Labs?
16     A.  Yes, Jana Labs.
17     Q.  Do you know who made the butt fusion
18 joints that were tested by Jana Labs?
19     A.  The butt fusions were
20 made -- polyethylene was made by Performance Pipe.
21 The butt fusions of PVC pipe were made by a contractor
22 or someone who was a licensed UGSI butt fusion person.
23     Q.  Do you know whether or not the entity
24 that made the PVC butt fusions joints was in good
25 standing with UGSI?

236