**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNDERGROUND SOLUTIONS, INC. | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 13-cv-8407 |
| | ) | |
| vs. | ) | Hon. Judge Matthew Kennelly |
| | ) | |
| EUGENE PALERMO a/k/a GENE PALERMO | ) ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MEMORANDUM IN OPPOSITION TO
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

This Court should deny UGSI's attempt to shoehorn its trade libel case into a Lanham Act claim. The Lanham Act is inapplicable because it does not regulate non-commercial speech or speech that is not promotional in nature. Here, Dr. Palermo's scientific presentations about avoiding rapid crack propagation ("RCP") in FPVC pipe were neither promotional nor intended to influence consumers' purchasing decisions. His central message – that municipalities must design pipelines (whether FPVC or HDPE) so that the operating pressure does not exceed the pipe's critical pressure – is far from advertising or promotional.

However, even if the Lanham Act were to apply, UGSI has not presented evidence that any of Dr. Palermo's statements were literally false or misleading. In fact, much of UGSI's evidence is nothing more than inadmissible hearsay from its two retained experts. The evidence UGSI claims to have adduced on damages is also non-existent. Despite its dedicated effort to canvass the industry for consumers Dr. Palermo supposedly misled, all UGSI can identify are engineers curious about why RCP failures continue occurring with FPVC lines. UGSI has no evidence that any customers avoided selecting FPVC because they relied on some falsehood within Dr. Palermo's analysis. For these reasons, this Court must deny UGSI's motion for partial summary judgment on the Lanham Act claim.

## I. UGSI CANNOT USE THE LANHAM ACT CLAIM TO STIFLE DR. PALERMO'S NON-COMMERCIAL, SCIENTIFIC ANALYSIS

The Lanham Act only prohibits false or misleading promotional speech that is commercial in nature. 15 U.S.C. § 1125(a); *Gordon & Breach Sci. Publrs. S.A. v. Am. Inst. of Physics*, 859 F. Supp. 1521, 1533, 1541 (S.D.N.Y. 1994) (focusing on the "central intent" of the message).[1] UGSI cites *Neuros Co. v. Kturbo, Inc.*, 698 F.3d 514 (7th Cir. 2012), for the proposition that Dr. Palermo's speech was inherently commercial because: (1) it criticized FPVC

---

[1] For a more fulsome discussion of the core notions of commercial speech under the Lanham Act, Dr. Palermo refers the Court to his motion for summary judgment (Dkt. 90), pp. 25-28. *See also First Health Group Corp. v. BCE Emergis Corp.*, 269 F.3d 800, 804 (7th Cir. 2001).

1

as being susceptible to RCP allegedly to influence consumers' purchases of piping products; and (2) Dr. Palermo received compensation from organizations in the HDPE industry. The Seventh Circuit's decision in *Neuros* does not dictate a finding that the Lanham Act should apply here because UGSI has no evidence that Dr. Palermo intended to influence consumers to purchase HDPE. The evidence UGSI presents is not close to the baseless fraud claims against a competitor that the Seventh Circuit found were clearly intended to direct business away from the competitor to the defendant, holding that it was "hard to imagine a more damaging accusation to make against a business." *Id.* at 519. Unlike in *Neuros*, Dr. Palermo is a scientist (not the CEO of a competitor), and nowhere in his presentation does he specifically refer to any competitive products. Furthermore, the fact that one of UGSI's competitors paid Dr. Palermo to speak does not transform otherwise-protected speech into commercial speech.

> A. **Dr. Palermo Does Not Promote HDPE Products By Identifying Design Recommendations To Avoid RCP**

While UGSI contends Dr. Palermo created his presentation to dissuade consumers from purchasing FPVC – thereby gaining a "competitive edge" for HDPE manufacturers – the evidence UGSI cited in its motion (UGSI LR 56.1 SMFs ¶¶ 17, 56) simply does not support that theory. Dr. Palermo's speech does not constitute "commercial advertising or promotion" under the Lanham Act because it was not offered "for the purpose of influencing consumers to buy defendant's goods or services." *Gordon & Breach*, 859 F. Supp. at 1536. UGSI focuses on the 2013 Minnesota Rural Water Association conference slide show because, unlike other presentations, the title page does not indicate Dr. Palermo's affiliation with any industry group. However, "[f]ailure to disclose a conflict of interest . . . does not give rise to a Lanham Act claim." *Id*. at 1542. Putting that aside, the slideshow does not refer to any company name, product or brand and, therefore, does not contain a representation made in connection with the sale of goods or services. *Id.* at 1533; *see also Almblad v. Scotsman Indus.*, No. 13-CV-1297,

2

2014 U.S. Dist. LEXIS 40515, at *7-8 (N.D. Ill. Mar. 26, 2014) (dismissing a claim for false advertising under the Lanham Act because statements made during an industry teleconference were not promotional.)

Dr. Palermo's purpose was not to promote HDPE – it was to educate his audiences on how to mitigate the risk of RCP. (*See* Resp. to UGSI LR 56.1 St., ¶ 17, 33, 35-38, 42, 51.) None of the fact citations UGSI provides indicate he intended to promote HDPE products. (*See id.*) Where scientists attempt to commence a dialogue on controversial subjects, courts routinely determine such speech is non-commercial to afford them breathing space to articulate opinions that will advance the areas of their expertise. *Pellegrini v. Ne. Univ.*, Civil Action No. 12-cv-40141-TSH, 2013 U.S. Dist. LEXIS 150447, at *15-16 (D. Mass. Aug. 23, 2013) (dismissing § 42(a) false advertising claim where the researchers published scientific work about the plaintiff's technology because the work was not commercial).

Additionally, because Dr. Palermo's work is critical of a new product he believes may pose a safety hazard – both to workers and civilians consuming the tap water FPVC lines transmit – it constitutes speech on an issue of public importance (rather than speech to propose a commercial transaction). *See New.Net, Inc. v. Lavasoft*, 356 F. Supp. 2d 1090, 1117 (C.D. Cal. 2004). The Lanham Act's prohibition against false advertising "has never been applied to stifle criticism of the goods or services of another by one, such as a consumer advocate, who is not engaged in marketing or promoting a competitive product or service." *Id.*

  **B. The consulting work Palermo performed for parties in the HDPE segment of the industry does not make his speech commercial.**

The fact that HDPE manufacturers paid Palermo fees to support his speech carries very little weight in assessing whether his speech is commercial. *See Va. State Bd. of Pharm. v. Va. Citizens Consumer Council*, 425 U.S. 748, 761 (1976) (stating "speech does not lose its First Amendment protection because money is spent to project it…") In highly specialized industries

3

such as this one, it is predictable that experts receive support from manufacturers and industry groups. (*See* Resp. to UGSI LR 56.1 Statement SMF 8.) As UGSI's Bo Boetticher put it:

> I don't think in the case of these particular experts that are in this – such a small tiny community of expertise, you know, I don't – I don't discount the motives or who funds the research or who funds the studies; because the people that want – you know, the people that are looking for the answers are the ones that are going to ask for these opinions and they're always the involved parties every time.

(*See id.*) If UGSI's theory that support from industry groups renders speech inherently commercial was true, it would chill the free exchange of ideas on technical matters affecting all sectors of industry. *Bd. of Trs. v. Fox,* 492 U.S. 469, 482 (1989) (stating "[s]ome of our most valued forms of fully protected speech are uttered for a profit.") Even assuming that Dr. Palermo's consulting relationship with trade organizations provides an economic interest for him to disseminate his work, such an attenuated economic motivation, but itself, does not transform his non-commercial work into commercial speech. *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 67 (1983).

## II. GENUINE ISSUES OF MATERIAL FACT CLOUD THE ISSUES REGARDING THE VULNERABILITIES OF FPVC THAT UGSI CHARACTERIZES AS FALSE AND MISLEADING

Even if the Lanham Act were applicable, UGSI's claim still fails because it has not established literal falsity or a materially-misleading statement. UGSI claims that four aspects of Dr. Palermo's work are false or misleading: (1) his application of the Greenshields and Leevers study led to the dissemination of data UGSI asserts is literally false; (2) his alleged exaggeration of RCP crack lengths that end users experienced on projects; (3) his alleged failure to identify the causes of crack initiations in presentations; and (4) his alleged misapplication of inapplicable or unreliable data, assumptions and test methods was misleading in context (*e.g.*, his review of "bent strap" test results.) With the exception of the first issue – *i.e.*, how Palermo interpreted the Leevers study – UGSI improperly relies on *unsworn* retained expert reports to support its assertions of falsity. And, the first issue involves Dr. Palermo's scientific opinion as to the

4

application of the Greenshields and Leevers study – not subject to a falsity test. *See, e.g., Underwager v. Salter*, 22 F.3d 730, 735-36 (7th Cir. 1994) (holding that "[s]cientific truth is elusive" and therefore "[s]cientific controversies must be settled by the methods of science rather than by the methods of litigation."); *see also Coastal Abstract Service, Inc. v. First American Title Ins. Co.*, 173 F.3d 725, 730 (9th Cir. 1999) (Lanham Act case holding opinion is not subject to a claim of falsity). Because UGSI cannot meet its burden of proving any of the statements concerning its FPVC products are literally false or misleading, this Court should deny UGSI's motion.

      **A.**     **UGSI's Falsity Argument Rests On Inadmissible Expert Reports.**

UGSI repeatedly cites the Edwards and Ferry reports (Ex. I and J at Dkt. 87-5) to support its claim that Dr. Palermo's work is false. *See, e.g.*, UGSI citations to SMF 27, 28, 30-36, 38, 40, 45-47, 49, 54 (the Edwards report) and to SMF 44, 51 and 53 (the Ferry report.) These expert reports are inadmissible. Without them, UGSI is left with out-of-context citations to Dr. Palermo's deposition that do not establish falsity.

Fed. R. Civ. P. 56(c)(4) requires that all material submitted to support a summary judgment motion be "made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). The unsworn expert reports upon which UGSI primarily relies are inadmissible hearsay and cannot be considered in support of its motion. *Estate of Brown v. Thomas*, 771 F.3d 1001, 1006 (7th Cir. 2014); *Provident Life & Accident Ins. Co. v. Goel*, 274 F.3d 984, 1000 (5th Cir. 2001). By improperly relying on inadmissible expert reports, UGSI undercuts most of its argument on falsity.

      **B.**     **UGSI Cannot Establish Falsity With Respect To Its First Assertion – That Dr. Palermo Misapplied The Greenshields And Leevers Research**

Dr. Palermo used his scientific judgment to analyze the Greenshields and Leevers

research results. UGSI cannot establish as false the gist of his analysis, *i.e.*, that RCP poses a risk to FPVC when "excessive" air becomes entrapped within the line and reduces critical pressure.

Dr. Palermo relies on the S4 test methodology Chris Greenshields and Dr. Leevers developed in the mid-1990's to analyze whether an "excessive" amount of air becoming entrapped in a pressurized water line could cause the operating pressure to exceed the critical pressure, resulting in RCP. (*See* Resp. to UGSI LR 56.1 SMFs, ¶¶ 21-22, 24-25.) (*see also* Palermo LR 56.1 St., ¶¶ 9, 11.) Dr. Palermo approximated the S4 critical pressure for PVC pipe to be roughly 1.6 bar based on the regression line in Dr. Leevers' chart, assuming RCP critical pressure values would be roughly equivalent for pipe tested with 100% air and 10% air. (*See* Resp. to UGSI LR 56.1 SMF, ¶ 24.) Based on this analysis and his analysis of critical pressure on data from tests Jana Laboratories, Dr. Palermo concluded that critical pressure in FPVC was 1.6 bar at approximately 10% air. (*See* Resp. to UGSI LR 56.1 SMFs, ¶¶ 24-25.) His scientific opinion is not subject to a falsity test, even if other experts might reach a different opinion.

   **C.** **UGSI Cannot Establish Falsity With Respect To Its Second Assertion – That Dr. Palermo Exaggerated Crack Lengths**

Of the twenty RCP incidents Palermo reviews in his presentation, UGSI takes issue with four of the crack lengths he identifies by relying on an inadmissible expert report from Mr. Edwards. (*See* UGSI LR 56.1 SMF 31.) In fact, most of Palermo's estimates align with UGSI's sworn representations regarding the crack lengths and there is no question the incidents qualify as RCP events. (*See* Resp. to UGSI LR 56.1 SMFs 30, 41.) Even if the Edwards report were admissible, he retracted any assertions about the "actual" crack length on the Dorchester County, SC project during his deposition. Edwards testified the exact length of the crack is unknown because the pipe could not be extracted from the creek bed because it was so badly damaged. (*See* Resp. to UGSI LR 56.1 SMFs 30, 41.) Regardless, the 2200-foot length of pipe installed in South Carolina was rendered unusable by the RCP incident, and the end user needed to

6

remediate the entire pipe. (*See* Resp. to UGSI LR 56.1 SMF 31.) That Palermo did not set out to exaggerate crack lengths is evident from his *underestimating* a 200-foot crack occurring in a Tampa, Florida project when UGSI confirmed in another action the crack length was substantially longer than 200 feet. (*See* Resp. to UGSI LR 56.1 SMFs 30.) This criticism has no basis and cannot serve as the basis for a Lanham Act claim.

      **D.**    **UGSI Cannot Establish Falsity With Respect To Its Third Assertion – That Dr. Palermo Failed To Identify The Causes Of Crack Initiations**

Because UGSI cannot disprove Palermo's central thesis that FPVC is susceptible to RCP, it criticizes Palermo's judgment in not placing more emphasis on the RCP-initiating events. UGSI complains that Palermo "created the false impression that [FPVC] can experience spontaneous [RCP]" because he does not emphasize the significance of end user errors and challenging field conditions in his discussion. (*See* Dkt. 85, p. 9-10.) However, UGSI misses the point. The focus of Dr. Palermo's analysis is not on what initiated the crack that led to RCP (*e.g.*, a meteor, a bullet, a construction accident, overbending of a pipe, *etc*.) but rather what makes FPVC lines susceptible to RCP once the crack occurs. (*See* Palermo LR 56.1 St., ¶ 38.) (*see also* Resp. to UGSI LR 56.1 SMF 33-34.) In simple terms, Dr. Palermo concluded that while a rapidly propagating crack will stop at the joint in a bell and spigot line, there is no such backstop for a FPVC system. (*Id.*) Dr. Leevers concurs: "[t]he study of RCP and the resistance of material to RCP is not a study of initiation events. You don't care how a crack starts. What you're interested in is the fact that the material can stop it." (*See* Resp. to UGSI LR 56.1 SMF 33.) Dr. Palermo's assertion that FPVC is not fungible with other pipe materials for RCP risk is not only defensible but true.

Of course, Palermo's presentation states that an initiating event is necessary for RCP to occur. (*See* Resp. to UGSI LR 56.1 SMFs 33, 38, 42-43, and 54.) Because, as UGSI submits, the audience for his presentations is "well-informed, industry insiders" there is no need to belabor

7

the point. The analogy UGSI strains to make – that Dr. Palermo's analysis is akin to blaming a car manufacturer for accidents – does not hold up. It is more accurate to say Palermo recognizes the "unsafe at any speed" nature of FPVC piping. Accidents befall products – especially products installed by municipalities attempting to solve complex civil engineering problems – but consumers have a right to know if those accidents regularly cause catastrophic outcomes.

      **E.**     **UGSI Cannot Establish Falsity With Respect To Its Fourth Assertion – That Dr. Palermo Misleadingly Misapplied Data, Assumptions And Test Methods**

First, as set forth above, disputes over scientific methodology as not appropriate for the courts to decide. *See, e.g., Underwager*, 22 F.3d at 736. Second, UGSI must prove the representations it challenges are false or misleading, "not merely that it is unsubstantiated by acceptable tests or other proof." *Johnson & Johnson-Merck Consumer Pharms. Co. v. Rhone-Poulenc Rorer Pharms. Co.*, Civil Action No. 91-7099, 1993 U.S. Dist. LEXIS 1016, at *25-26 (E.D. Pa. Jan. 28, 1993). It fails to do so.

      **1.**     **Fact questions surround the differences between the fracture resistance of the UK-manufactured pipe Leevers analyzed and FPVC.**

UGSI asserts Palermo should not have relied on research Dr. Leevers performed on pipe specimens in the 1990s because British-manufactured PVC is supposedly of a lesser quality than its FPVC piping, introduced in North America after 2000. (See Dkt. 85, p. 10 citing UGSI SMF 45.) However, Dr. Leevers' research results still apply because any product improvements in the interim do not change the fundamental qualities of the FPVC. (*See* Resp. to SMF 45.)

      **2.**     **The 10% air assumption is defensible and reflects field conditions that end users encounter.**

UGSI also inappropriately criticizes Dr. Palermo for calculating critical pressure in a pipeline under the assumption that water pipes could contain 10% air. UGSI, conversely, calculates critical pressure assuming little to no air in the water pipes. (*See* Palermo LR 56.1 St., ¶ 26.) Water-filled pipelines generally have a small amount of air entrapped within the line but as the entrapped air increases, a greater amount of internal energy is present that may drive a crack

to propagate. (Id.) It is extraordinarily unlikely to remove all air from a pressurized water line. (Id.) UGSI has also not conducted any empirical studies of the typical air percentage found in its FPCV lines and its lead engineers/failure investigators are not aware of any surveys that purport to measure the typical percentage of air present in pressurized FPVC lines. (Id.) Dr. Palermo's opinions are not susceptible to challenge at this stage of the research. To be actionable, the defamatory statement must be a false statement of fact; statements of opinion alone will not support a cause of action for trade libel. *Amaretto Ranch Breedables, LLC v. Ozimals, Inc.*, 2013 U.S. Dist. LEXIS 95685, *18 (N.D. Cal. July 9, 2013).

### 3. The criticism that the ISO 13477 test should not be applied to analyze pipe designed for water transmission is misplaced.

UGSI inappropriately criticizes Dr. Palermo for using ISO 13477 because it is primarily used for gas – not water – lines. The principle in the ISO standard states "[t]he fluid or mixture of fluids is identical to that used in the intended application, or is a substitute fluid which gives equivalent results." (*See* Ex. K to UGSI LR 56.1 Statement.) Palermo testified that "ISO13477 is a test method, and when you do research, you use that test method in order to find out certain effects. And the purpose of the study was to determine the effect of air in the water pipe." (*See* Resp. to UGSI LR 56.1 Statement 49.) In fact, UGSI itself uses ISO 13477 when making presentations to potential customers. (*Id.*)

### 4. The "bent strap" test gives engineers insight into a physical characteristic of FPVC.

Dr. Palermo relied on tests that Jana Laboratories ("Jana") conducted to characterize, quantify, and categorize the performance of butt fusion joints in plastic pipe when preparing his analysis of butt fusion integrity issues. (*See* Resp. to UGSI's LR 56.1 St., ¶ 51.) The test regimens Jana applies, particularly the energy-to-break results from tensile impact testing, are effective in differentiating the quality and durability of butt-fusion joints than simple tensile strength testing. (*Id.*) UGSI asserts that ductility and energy-to-break are irrelevant to the quality

9

of a PVC butt fusion joint, and that tensile strength testing alone is sufficient to assure the long-term performance of such joints. (*Id*.) This is not a generally-accepted technical position, and fusion joints that do not exhibit ductility are problematic in the field. (*Id*.) The testing UGSI has completed to date does not, in Palermo's assessment, give an adequate assurance of the long-term performance of butt-fusion joints. (*See* Resp. to UGSI's LR 56.1 St., ¶ 71.)

Because UGSI failed to prove – as a matter of law – that any aspect of Dr. Palermo's work was false or misleading, this Court should deny UGSI's motion.

### III. UGSI HAS NO BASIS TO ASSERT DAMAGES ARISING FROM DR. PALERMO'S ALLEGED MISSTATEMENTS

Because UGSI cannot prove Dr. Palermo's work is literally false or "misleading in context, as demonstrated by actual customer confusion," its Lanham Act claim cannot stand. *BASF Corp. v. Old World Trading Co.*, 41 F.3d 1081, 1088-89 (7th Cir. 1994). As described above, UGSI has no admissible evidence of literal falsity. Nor has UGSI adduced any evidence of any true, but misleading, statement leading to customer confusion.

"Section 43(a)(1)(B) offers relief only to one who 'is or is likely to be damaged by' the misrepresentation. Proof of likely confusion is essential to show injury--actual or potential--without which there is not even a case or controversy." *First Health Group Corp.*, 269 F.3d at 805-06. In *Lexmark*, the Supreme Court clarified the test for determining if an alleged misrepresentation proximately caused an injury such that a Lanham Act claim could be pursued, concluding a plaintiff "…ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that that occurs when deception of consumers causes them to withhold trade from the plaintiff." *Lexmark Int'l v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1391 (2014). Here, there is no evidence that any consumers withheld trade from UGSI because Dr. Palermo's analysis somehow confused them. Nor did UGSI conduct a consumer survey and any effort to obtain a reliable survey demonstrating the

10

misleading nature of Dr. Palermo's presentations would be fruitless. *See Mead Johnson & Co. v. Abbott Labs.,* 201 F.3d 883, 885-886 (7th Cir. 2000) (stating "[s]urveys are accepted ways to probe for things such as confusion about the source of goods, for confusion depends on the effect of a phrase or trade dress on the consumer. [ ] So far as we can tell, however, never before has survey research been used to determine the meaning of words, or to set the standard to which objectively verifiable claims must be held.") UGSI therefore cannot prove either an injury or likelihood of injury.

### A. UGSI'S Citation To The Testimony Of Mr. Verseman For Evidence Of Confusion Is Unavailing Because Dr. Palermo's Input Had No Impact On His Purchasing Decision

UGSI unsuccessfully attempts to establish customer confusion through the testimony of Steven Verseman, an engineer with Baxter & Woodman (an engineering consulting firm). Mr. Verseman testified he initially learned about RCP from a contractor that experienced an RCP incident in North Dakota. (*See* Resp. to UGSI LR 56.1 Statement, ¶ 64.) After reviewing the Palermo Slide Show, Mr. Verseman wanted to research the critical pressure issue further, but he concluded it would take a "specific project situation to create a problem for us, and our work normally does not involve those types of, be it pressures or air filled lines, that type of thing." (*See* Resp. to UGSI LR 56.1 Statement, ¶ 66.) Mr. Verseman deduced from the Palermo Slide Show that RCP was a possible outcome in circumstances where "air and high pressures [combine] and potentially some physical reason for that [RCP] to happen. It's hit by a back hoe or something that starts that crack and then extends it." (*Id*.) However, based on the types of lines that his employer typically installed, he discounted that risk prior to meeting with UGSI and never excluded FPVC from consideration on any project. (*Id*.)

### B. UGSI's Reliance On Ms. Morrison's Testimony Is Inappropriate Because She Had No Decision-Making Authority

Ms. Morrison, a junior engineer working for Engineering Enterprises, testified concerning a bid with the Village of Montgomery, Illinois. (*See* Resp. to UGSI LR 56.1

11

Statement, ¶¶ 57, 62.) She had no decision-making authority. (*Id*.) She reported to the CEO of Engineering Enterprises, Mr. Wallers, who then relayed his recommendation to the client. (*Id*.) Mr. Wallers had discretion to accept, reject, or partially accept any recommendation Morrison made to him. (*Id*.)

Morrison never made a commitment to UGSI to give its products a positive recommendation to clients of her engineering firm. (*See* Resp. to UGSI LR 56.1 Statement, ¶ 58.) She was reluctant, in part, because her employer had not specified FPVC products for installations on municipal projects in the past (prior to a meeting she ultimately had with UGSI.) (*See* Resp. to UGSI LR 56.1 Statement, ¶ 59.) That lack of familiarity was a factor in her recommendation to the Village. (*Id*.) Maintenance was another factor Morrison considered when assessing products that would be suitable for the installation. (*See* Resp. to UGSI LR 56.1 Statement, ¶ 60.) Morrison would not have felt comfortable making recommendations to the Village with respect to potential maintenance of a Fusible PVC product with which she had no experience. (*Id*.)

UGSI cannot identify any testimony from Ms. Morrison that indicates she steered business away from it, much less that she did so because she was confused by an alleged misrepresentation. *See, e.g.*, *First Health*, 269 F.3d at 805 (holding that expert testimony about how a client may react to different factual inputs would be conjecture and, therefore, such testimony could not establish customer confusion); *see also L.S. Heath & Son v. At & T Info. Sys.*, 9 F.3d 561, 575 (7th Cir. 1993) ("In order to recover damages for a purported Lanham Act violation, the plaintiff must demonstrate that it has been damaged by actual consumer reliance on the misleading statements"); *see also Cont'l Datalabel, Inc. v. Avery Dennison Corp.*, No. 09 C 5980, 2012 U.S. Dist. LEXIS 160802, at *20 (N.D. Ill. Nov. 9, 2012) (entering summary judgment against a plaintiff that had no proof the defendant's statements caused actual consumer confusion.)

### C. UGSI Has No Way Of Establishing What The Attendee At The Michigan Conference Found Persuasive And Therefore Such Testimony Provides No Evidence Of Customer Confusion

UGSI's last-ditch effort to establish consumer confusion is through Dr. Palermo's recitation in an email describing a meeting he had with a customer following a presentation wherein the customer does not identify what, if anything, the consumer found persuasive.[2] The email does not state that the written material in the Slide Show influenced the purchaser or otherwise attribute any purchasing decisions to information concerning RCP. (*See* Resp. to UGSI LR 56.1 Statement, ¶ 56.)

### D. UGSI Cannot Show A Loss Of Goodwill

UGSI's failure to adduce evidence of consumer confusion forecloses a claim of false advertising based on lost goodwill. UGSI has no proof of how a *substantial* segment of the consuming public actually reacts to the information Dr. Palermo provides them. See *Johnson & Johnson*, 1993 U.S. Dist. LEXIS 1016, at *25-26. "It is not the court's opinion but public reaction that is the measure of a commercial's impact. The success of that claim usually would turn on the persuasiveness of a consumer survey." *Id.*; citing *Sandoz Pharm.*, 902 F.2d at 228-29.

The claim for false advertising under the Lanham Act therefore cannot be substantiated because UGSI has no proof that Dr. Palermo's analysis – even if it was deemed commercial advertising – proximately caused any damage in the marketplace.

## IV. UGSI IS NOT ENTITLED TO PERMANENT INJUNCTIVE RELIEF OR AN AWARD OF ATTORNEYS' FEES

### A. UGSI merely recites the elements of injunctive relief for Lanham Act violations but does not identify any evidence of harm.

Lacking proof of literal falsehood or a willful violation of the Lanham Act, UGSI is required to produce "evidence of consumer impact using reliable consumer or market research" to obtain a permanent injunction—evidence UGSI made no attempt to gather. *See Navistar Int'l*

---

[2] UGSI made no effort to depose or otherwise obtain discovery from the non-party.

*Transp. Corp. v. Freightliner Corp.*, No. 97 C 3792, 1999 U.S. Dist. LEXIS 11876, at *10-11 (N.D. Ill. July 29, 1999) (entering summary judgment against the plaintiff in a § 43(a) case because it based its theory of consumer confusion on an affidavit from a corporate executive rather than market research). Here, UGSI relies on similar conjecture regarding the confusion Palermo may be causing in the market from Tom Marti – but has no research to substantiate what Marti surmises.

Even if UGSI were not required to provide a consumer survey to support its injunctive relief, it neglects to adduce proof of the irreparable harm, citing to *Neuros* as authority for the presumption of irreparable harm when a claimant establishes liability for a Lanham Act violation. *Neuros* is no longer good law on this issue following the Supreme Court's ruling in *eBay v. MercExchange, L.L.C.*, 547 U.S. 388, 393-94 (2006). *See also Nat'l Fin. Partners Corp. v. Paycom Software, Inc.*, 2015 U.S. Dist. LEXIS 74700, *37 (N.D. Ill. June 10, 2015) (this Court analyzing the irreparable harm requirement in an action for trademark infringement post-*eBay* and stating "[t]he Court sees no reason why the Seventh Circuit would reach a different conclusion [requiring irreparable harm before issuing an injunction] in a Lanham Act case."). Because UGSI opts to rely on a presumption of harm that is no longer recognized, it fails to meet its burden of proving how damages would be an insufficient remedy. The drastic remedy of a permanent injunction is unwarranted, especially in light of the impingement such an injunction would have on Dr. Palermo's freedom of speech.

### B. There Is No Basis For Awarding Attorneys' Fees

An award of attorneys' fees is allowed under 15 U.S.C. § 1117(a) only in "exceptional cases." *Nightingale Home Healthcare, Inc. v. Anodyne Therapy, L.L.C.*, 626 F.3d 958, 960 (7th Cir. 2010). A case is "exceptional" under the Lanham Act "if the losing party was the defendant and had no defense yet persisted in the trademark infringement or false advertising for which he was being sued, in order to impose costs on his opponent." *Id.* at 963-64. Here, Dr. Palermo is

14

not maintaining any defense that is fairly characterized as "objectively unreasonable" – defined in *Nightingale* as a defense "…a rational litigant would pursue only because it would impose disproportionate costs on his opponent—in other words only because it was extortionate in character if not necessarily in provable intention." *Id.* at 965. It is UGSI that aims to impose its will on Dr. Palermo by forcing him to incur significant defense costs. Dr. Palermo mounts this defense to preserve his right to inform municipalities of his expertise on the subjects in his presentations. It is absurd to suggest he intends to disadvantage his corporate adversary by forcing UGSI to incur litigation costs.

UGSI cites two cases in which the district court awarded fees and neither bears any relation to the facts of this case. In *Engineered Abrasives, Inc. v. Am. Mach. Prods. & Serv.*, No. 13 C 7342, 2015 U.S. Dist. LEXIS 33691, at *32 (N.D. Ill. Mar. 18, 2015), the court found blatant violations of the Lanham Act – palming off and using knowledge gained from litigation to pursue further business from the victimized plaintiff – despite an "entry of default, and the certain entry of judgment against [the defendants.]" In other words, a disregard for consequences that would result from behavior the defendant knew was wrong. Likewise, in *Neuros*, the Seventh Circuit described the false accusations of fraud to be "not only disreputable but reprehensible." *Neuros*, 698 F.3d at 519. Dr. Palermo, on the other hand, continues to defend his scientific opinions. Awarding attorneys' fees in this case would make the carve-out for fees only in "exceptional" cases meaningless.

## **CONCLUSION**

For the reasons stated herein, Defendant Dr. Eugene Palermo respectfully requests that this Court deny Plaintiff's Motion for Partial Summary Judgment and order any other relief deemed just under the circumstances.

Dated: April 25, 2016            Respectfully Submitted,

                                                 DR. EUGENE PALERMO

                                                 By: /s/ Stephen J. Rosenfeld
                                                         One of his attorneys

Steven P. Mandell (ARDC #6183729)
Stephen J. Rosenfeld (ARDC #6216769)
John D. Fitzpatrick (ARDC #6277475)
MANDELL MENKES LLC
One N. Franklin Avenue, Suite 3600
Chicago, IL 60606
Telephone: (312) 251-1000
smandell@mandellmenkes.com
srosenfeld@mandellmenkes.com
jfitzpatrick@mandellmenkes.com