**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **UNDERGROUND SOLUTIONS, INC.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Case No. 13 C 8407** |
| ) | |
| **EUGENE PALERMO,** ) | |
| ) | |
| **Defendant.** ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

Underground Solutions, Inc. (UGSI) sued Eugene Palermo, asserting claims of trade libel (count 1), intentional interference with prospective economic advantage (count 2), false advertising under California law, Cal. Bus. & Prof. Code § 17500 (count 3), and false advertising under the Lanham Act, 15 U.S.C. § 1125(a)(1) (count 4). UGSI alleged that Palermo, as a paid spokesperson for one of UGSI's competitors, made false or misleading statements about UGSI's products in order to disrupt its business and divert prospective clients to that competitor. After discovery, UGSI voluntarily dismissed count 2. Palermo has now moved for summary judgment on all of UGSI's remaining claims. UGSI has moved for summary judgment on the issue of liability on its Lanham Act claim and its request for an injunction and attorneys' fees on that claim.

For the reasons stated below, the Court grants partial summary judgment on the issue of liability in favor of UGSI on its Lanham Act claim, grants summary judgment in favor of Palermo on UGSI's trade libel claim, and otherwise denies both sides' motions.

**Background**

Except where otherwise noted, the following facts are undisputed.  This case is about subterranean pipes used for municipal and industrial water transmission. Different types of pipe are used for this purpose, including ductile iron pipe, high-density polyethylene (HDPE) pipe, and polyvinyl chloride (PVC) pipe.  Different types of pipe have different physical properties.  For example, HDPE pipe tends to be more bendable than PVC; PVC pipe tends to be lighter weight than ductile iron pipe; and each type of pipe exhibits varying degrees of resistance to puncture, cracking, and other types of pipe failure.

This last point is particularly important in light of a phenomenon known as rapid crack propagation, or "RCP."  RCP is a type of pipe failure in which a puncture, break, or rupture in a pipe causes a crack to progress rapidly from the point of failure—as quickly as several hundred feet per second.  Whether RCP transpires upon the occurrence of an initiating event depends on a variety of factors, including the pipe's diameter and wall thickness, the internal operating pressure of the pipe, and the pipe's chemical makeup.  There is no industry-wide standard that dictates how long a crack must be in order to be considered to be RCP, but cracks longer than forty feet are typically considered to be RCP in light of the unlikelihood that an initiating event will create a single puncture more than forty feet long.  RCP can occur in any type of pipe when the pipe is exposed to some type of rupturing event, such as a contractor bending or pressurizing a pipe in contravention of industry standards or an external object striking the pipe.

Scientists and engineers have spent the last half-century developing test

methods to measure the degree to which different pipe materials are prone to RCP. Because full-scale testing is difficult, time-consuming, and costly, two researchers in the United Kingdom, Chris Greenshield and Patrick Leevers, developed a small-scale test method in the 1990s. This testing method, known as the Small-Scale Steady State (S4) test method, used smaller pipes to test crack propensity in a controlled environment and then multiplied the resulting pressures by a correlation factor to convert results to full scale. Greenshield and Leevers determined that although RCP could not occur in 100% water pressurized pipe, the inclusion of a small amount of air in a pipe could enable RCP failure.

When municipalities seek to install water or wastewater pipes, they typically require more than one pipe to create their pipe network. HDPE pipe sections are often "butt fused," which means that they are connected end-to-end by thermal fusion techniques. To connect hundreds or thousands of feet of ductile iron or PVC pipe, the standard practice has long been to use "bell-and-spigot" joints to latch each pipe to the next. UGSI is the sole producer of what is known as Fusible PVC pipe. Unlike traditional PVC pipe, Fusible PVC thermally fuses pipe sections together at their ends, eliminating the need for bell-and-spigot junctures. Some Fusible PVC pipes stretch seamlessly for miles, which simplifies and speeds up installation, avoids the potential for corrosion and seepage intrinsic to bell-and-spigot joints, and eliminates associated maintenance requirements and costs.

Palermo is a scientist who has been involved in the pipe industry for roughly forty years. Since 2004, Palermo has operated a consulting firm that provides litigation consulting and failure analysis services. During the relevant period, Palermo had a

consulting agreement with Performance Pipe, a division of Chevron Phillips Chemical Company LP that manufactures HDPE water and wastewater pipe and does not manufacture or sell PVC pipe. Along with two HDPE pipe interest groups (the Plastics Pipe Institute and the Alliance for PE Pipe), Performance Pipe paid Palermo to attend trade shows and give presentations about Fusible PVC pipe.

This case is primarily focused on the PowerPoint slideshow Palermo designed for these presentations and uploaded to his website. The slideshow, titled "Plastic Pipe for Water Distribution – What You Need to Know About RCP and Butt Fusion Integrity", appeared to be designed to alert utilities, engineers, contractors, and other prospective pipe purchasers and purchasing advisors to the possibility that butt-fused pipe of all types might pose a higher RCP risk than pipe connected by other means. In reality, however, the presentation was primarily focused on illustrating the high RCP risk associated with butt-fused PVC pipe. In the presentation, Palermo pointed out that PVC pipe has a greater propensity for RCP than does HDPE and that butt-fused PVC pipe's RCP risk is even higher because without bell-and-spigot joints to relieve pressure, cracks can spread farther and faster without meeting resistance.

The slide show began with a list of all known Fusible PVC RCP failures in the field. Palermo identified twenty failures throughout the country, ranging in length from 43 feet in Greencastle, Indiana, to 3,300 feet in Salt Lake City, Utah. He showed pictures of massive cracks in the butt-fused PVC pipe at some failure sites, and he provided details of the damage done and replacement requirements for some of the RCP events described. For example, one slide explained that the "Salt Lake City, Utah Water Company experienced RCP failures on two occasions." Pl.'s Ex. F, dkt. no. 87-3,

at 2.  "The first RCP failure occurred earlier this year when 16 [inch] DR 31 butt fused PVC pipe was being leak pressure tested—the crack ran 350 feet." *Id.*  "They also had another RCP failure when they were cleaning this pipe.  The crack ran 3300 feet.  This is the longest known RCP failure in butt fused PVC pipe.  They will replace all 13 miles of fused PVC pipe." *Id.*

Palermo then moved on to discussing test results from laboratory experiments conducted on PVC and HDPE pipe.  He began by explaining that the goal of RCP testing is to determine the "critical pressure" of a pipe:  "Critical Pressure ($P_C$) is the pressure above which RCP can be sustained.  As long as G (driving force) is greater than $G_D$ (material's dynamic fracture resistance), the crack will continue to propagate." *Id.* at 6.  Palermo showed his audiences that the results of Greenshield and Leevers' S4 tests in 1996 revealed HDPE's dynamic fracture resistance to be roughly 3.45 kJ/m$^2$, making it "not very susceptible to RCP".[1]  *Id.* at 6.  Palermo reported that the 1996 study showed PVC pipe to be "more susceptible to crack initiation" in light of its low dynamic fracture resistance of roughly 0.64 kJ/m$^2$.  *Id.*  He then projected graphed regression lines and data depicting the change in critical pressure of PVC pipe and HDPE pipe as more air is added.

Palermo described full-scale testing and its challenges, and he introduced the S4 method and explained its advantages.  He also pointed out that Greenshield and Leevers' tests revealed that critical pressure decreases—making RCP more likely— as more air is added to a water pressurized pipe, until the pipe contains so much air that critical pressure levels out.  Palermo, relying in part on Greenshield and Leevers' S4

---

[1]  "kJ/m$^2$" stands for kilojoules per square meter.

test results, explained that it is possible for pressurized pipes to contain as much as 10% air. He showed a graph from Greenshield and Leevers' report showing that when a PVC pipe has 10% air volume, its critical pressure is 2.3 bar. *Id.* at 12. (Although Palermo contends the graph is ambiguous, it is not.) From about 10.8% to 100% air volume, the graph shows that the critical pressure of the PVC pipe is 1.6 bar. *Id.* On the following slide, Palermo reported the pipe's critical pressure was "1.6 bar for DR 19 PVC pipe with ≥10% air." *Id.* at 13. Palermo also showed a graph and data for HDPE pipe. The HDPE graph showed that the pipe's critical pressure was over 7 bar at 10% air volume, and the critical pressure did not level off (at roughly 3 bar) until the pipe contained about 23% air volume. *Id.* at 14. Palermo reported HDPE pipe's critical pressure as "3 bar for DR 11 PE80 . . . with ≥ 20% air." *Id.* at 15. Palermo also included data for modern HDPE pipes, whose critical pressure he placed at over 10 bar, which meant that "RCP is never an issue". *Id.* at 16.

 After a few more slides describing HDPE's superior resistance to RCP and the dangers associated with PVC and butt-fused PVC, Palermo shared the results of a "Bent Strap Test" and a "Tensile Test" conducted on butt-fused polyethylene pipe and butt-fused PVC pipe. He reported that the polyethylene butt-fused joints passed the bent strap test, but the PVC butt-fused joints broke. He also reported that butt-fused joints in PVC pipe did not survive the tensile test, whereas butt-fused joints in polyethylene pipe did.

Some people who heard Palermo's presentation or viewed his slide show either at trade shows or on the Internet expressed reticence to use or recommend Fusible PVC as a result. Palermo e-mailed a representative from Performance Pipe to report

that at a presentation he gave in Michigan, he spoke with Andrew Parrott, an audience member who had been debating whether to use Fusible PVC or HDPE for a municipal project in Michigan.  After hearing the presentation, wrote Palermo, Parrott had chosen to use HDPE.  (In a sworn affidavit, Parrott attested that he in fact did not change his mind and ultimately ended up using Fusible PVC despite the impact Palermo's presentation had on him.)  Julie Morrison, a consulting engineer in Illinois, testified that she had been open to the possibility of recommending Fusible PVC for a project in Illinois but had changed her mind after finding and reading Palermo's presentation online.  Specifically, the presentation made her concerned that Fusible PVC was too brittle and prone to breaking.  Shortly thereafter, Steve Verseman, a project manager in Illinois, received an e-mail from a contractor with Palermo's slide show attached.  The e-mail expressed grave concerns about the safety and stability of Fusible PVC pipe and butt-fused joints.  Verseman forwarded the e-mail to UGSI's regional sales manager, Dan Christensen, and UGSI produced a slide show of its own to rebut Palermo's report and retain the contractor's business.

UGSI sought to stop Palermo from participating in conferences and sharing his presentation on the Internet because it believed his presentation contained numerous false or misleading statements that were designed to sabotage UGSI's business and divert consumers from Fusible PVC to HDPE pipe.  UGSI sent a cease-and-desist letter to Palermo on March 19, 2012.  Palermo stated in a July 6, 2013 e-mail to UGSI that he would "no longer provide negative information about butt fusion of PVC Pipe" because he felt "UGSI [had] conducted significant testing to develop the proper butt fusion procedure for PVC Pipe."  Pl.'s Ex. U, dkt. no. 107-21, at 2.  Even after this, however,

Palermo continued to deliver his message at trade shows and on the Internet.

UGSI filed suit against Palermo in November 2013 asserting state law claims for trade libel under California law (count 1), intentional interference with prospective economic advantage (count 2), violation of the Illinois Deceptive Trade Practices Act (count 3), violation of the Lanham Act, 15 U.S.C. § 1125(a) (count 4), and tortious interference with contract (count 5). The Court dismissed UGSI's claims for intentional interference with prospective economic advantage (count 2), violation of the Illinois Deceptive Trade Practices Act (count 3), and tortious interference with contract (count 5). *See Underground Sols., Inc. v. Palermo*, No. 13 C 8407, 2014 WL 4703925 (N.D. Ill. Sept. 22, 2014). UGSI filed an amended complaint adding allegations concerning a project in northern California, reasserting its claim for intentional interference with prospective economic advantage (count 2), and adding a claim for violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17500 (count 3). The Court subsequently denied Palermo's motion to dismiss counts 2 and 3 for failure to state a claim, *see Underground Sols., Inc. v. Palermo*, No. 13 8407, 2015 WL 1594189 (N.D. Ill. Apr. 7, 2015), but UGSI later voluntarily dismissed count 2. *See* dkt. no. 98. At the close of discovery, both sides moved for summary judgment.

**Discussion**

Summary judgment is proper when the moving party "shows that there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On a motion for summary judgment, the Court draws reasonable inferences in favor of the non-moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Mustafa v. City of Chicago*, 442 F.3d 544, 547 (7th Cir.

2006).  The Court's "function is not to weigh the evidence but merely to determine if there is a genuine issue for trial." *Bennett v. Roberts*, 295 F.3d 687, 694 (7th Cir. 2002). "Summary judgment is not appropriate 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

On cross-motions for summary judgment, the Court assesses whether each movant has satisfied the requirements of Rule 56.  *See Cont'l Cas. Co. v. Nw. Nat'l Ins. Co.*, 427 F.3d 1038, 1041 (7th Cir. 2005).  "As with any summary judgment motion, [the Court] review[s] cross-motions for summary judgment construing all facts, and drawing all reasonable inferences from those facts, in favor of the nonmoving party." *Laskin v. Siegel*, 728 F.3d 731, 734 (7th Cir. 2013) (internal quotation marks omitted).

UGSI moves for summary judgment on its Lanham Act claim (count 4) on the issue of liability and on its request for an injunction and attorney's fees, with damages to be tried to a jury.  It contends that Palermo's slide show and presentation contained five false or misleading statements that materially deceived consumers and prospective consumers and caused UGSI to incur damages.  First, UGSI contends that four of the crack lengths that Palermo disclosed in his presentation are grossly inaccurate and that he represented that cracks spread hundreds or thousands of feet farther than they actually did.  Second, UGSI argues that Palermo falsely stated that Greenshield and Leevers' report showed PVC's critical pressure at 10% air volume to be 1.6 bar, when their results in fact revealed it to be 2.3 bar—a more favorable figure for PVC pipe. Third, UGSI argues that it was misleading to disclose the results of Greenshield and Leevers' report without pointing out that Fusible PVC uses pipe that benefits from many

years of scientific advancement in PVC pipe.  Fourth, UGSI contends that even

Palermo's accurately reported crack lengths were misleading despite their accuracy,

because Palermo described them without disclosing the installation or maintenance

errors that caused them to rupture in the first place.  Fifth, UGSI says it was misleading

to report results from the bent-strap test and the tensile test because these testing

models are not designed to test PVC.

Palermo seeks summary judgment on all of UGSI's remaining claims.  He

contends that the content of his presentation was neither materially false nor misleading

and that in any event it is protected under the First Amendment.  He also argues that he

should prevail on UGSI's trade libel claim because his statements were not made with

actual malice, certain state-law privileges protect him, and UGSI failed to produce

evidence of special damages.  Finally, Palermo argues that he is entitled to summary

judgment on UGSI's unfair competition claim because UGSI is not within the zone of

interests protected by California's unfair competition law.

## A.    Lanham Act claim (count 4)

Section 43(a)(1)(B) of the Lanham Act prohibits false or misleading "commercial

advertising or promotion" that "misrepresents the nature, characteristics, qualities, or

geographic origin of his or her or another person's goods, services, or commercial

activities."  15 U.S.C. § 1125(a)(1)(B).  To establish a claim for false or deceptive

advertising under the Lanham Act, a plaintiff must prove:

> (1) a false statement of fact by the defendant in a commercial
> advertisement about its own or another's product; (2) the statement
> actually deceived or has the tendency to deceive a substantial segment of
> its audience; (3) the deception is material, in that it is likely to influence the
> purchasing decision; (4) the defendant caused its false statement to enter
> interstate commerce; and (5) the plaintiff has been or is likely to be injured

> as a result of the false statement, either by direct diversion of sales from itself to defendant or by a loss of goodwill associated with its products.

*Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 819 (7th Cir. 1999).

Palermo acknowledges that the Lanham Act circumscribes some speech and that Congress had the authority to legislate in this way because commercial speech may be subject to restriction and regulation in ways noncommercial speech may not be. *See Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509, 515 (7th Cir. 2014) ("Current doctrine holds that commercial speech is constitutionally protected but governmental burdens on this category of speech are scrutinized more leniently than burdens on fully protected noncommercial speech."). Palermo argues, however, that he did not make any statement in a commercial advertisement but rather engaged in private, noncommercial speech. He thus contends that he cannot be held liable, under either federal or state law, for any of the allegedly false or misleading statements he made in his presentation because he has an absolute right to make them under the First Amendment. He says that he did not advertise or promote HDPE's goods and that his presentations were primarily concerned with addressing a matter of public concern, namely the safety hazard that butt-fused PVC pipe poses due to its propensity for RCP. According to Palermo, the presentation was the result of his genuine effort to advance scientific inquiry and was therefore not commercial.

As the Court explained in its decision denying Palermo's motion to dismiss UGSI's Lanham Act claim, "an activity is promotional if it involves dissemination to anonymous members of the purchasing public." *Underground Sols., Inc.*, 2014 WL 4703925, at *10. It is undisputed that members of the polyethylene pipe industry, including Chevron Phillips' Performance Pipe, the Plastics Pipe Institute, and the

Alliance for PE Pipe paid Palermo to deliver presentations to anonymous purchasers and prospective consumers at trade shows throughout the country. These kinds of communications are commercial promotions subject to Lanham Act liability. *See Neuros Co. v. KTurbo, Inc.*, 698 F.3d 514, 522 (7th Cir. 2012). Moreover, "the commercial-speech category is not limited to speech that directly or indirectly proposes a commercial transaction." *Jordan*, 743 F.3d at 517. And Palermo's argument that his statements were made purely for the purpose of advancing scientific discourse and raising issues of public concern is contradicted by the fact that he was paid to make the statements in a commercial setting to potential purchasers of PVC and HDPE water pipes. *Cf. Eastman Chem. Co. v. Plastipure, Inc.*, 775 F.3d 230, 235–36 (5th Cir. 2014) (observing that statements made in a commercial setting and directed at customers "do not become immune from Lanham Act scrutiny simply because their claims are open to scientific or public debate. Otherwise, the Lanham Act would hardly ever be enforceable—many, if not most, products may be tied to public concerns with the environment, energy, economic policy, or individual health and safety") (internal quotation marks omitted). The First Amendment does not preclude liability under the Lanham Act—or for trade libel or false advertising under California law—for the statements Palermo made in his presentations.

Two types of false statements can violate the Lanham Act: "(1) commercial claims that are literally false as a factual matter; or (2) claims that may be literally true or ambiguous, but which implicitly convey a false impression, are misleading in context, or likely to deceive consumers." *Hot Wax*, 191 F.3d at 820. Where a commercial claim is literally false, meaning a "patently false statement that means what it says to any

linguistically competent person," a plaintiff need not show proof that anyone was or was likely to be misled by the statement. *Schering-Plough Healthcare Prods., Inc. v. Schwarz Pharm., Inc.*, 586 F.3d 500, 513 (7th Cir. 2009). "In contrast, when the statement is literally true or ambiguous, the plaintiff must prove that the statement is misleading in context by demonstrated actual consumer confusion." *Hot Wax*, 191 F.3d at 820.

UGSI contends that the record reflects two sets of "literally false" claims that Palermo made at UGSI's expense. First, Palermo stated that the Greenshield and Leevers test revealed that the critical pressure of PVC pipe at 10% air volume was 1.6 bar, when in reality, Greenshield and Leevers determined that the critical pressure of PVC pipe at 10% air volume was 2.3 bar. UGSI says that by reporting a lower critical pressure than test results actually produced, Palermo represented that PVC is more susceptible to RCP than it actually is. Second, Palermo listed crack lengths that UGSI's experts say were grossly exaggerated. Specifically, UGSI says that Palermo reported (1) a crack in a line in Baton Rouge, Louisiana was 300 feet long when in fact it was only three feet long; (2) a crack in Dorchester County, South Carolina was 2200 feet long, when in fact it was roughly 1700 feet long; (3) a crack in Greencastle, Indiana was 800 feet long, when in fact it was 430 feet long; and (4) a crack in Fremont, California was 2000 feet long, when in fact it was 200 feet long. *See* Pl.'s Memo., dkt. no. 85, at 9. UGSI also says Palermo falsely stated that thirteen miles of pipe needed to be replaced after an RCP event in Salt Lake City, Utah, when in fact there were only seven miles of pipe to begin with. *Id.* UGSI argues that by exaggerating the lengths of RCP cracks, Palermo represented that RCP failures in butt-fused PVC had been more catastrophic

than actually was the case.

It is beyond dispute that Greenshield and Leevers reported that at 10% air volume, the critical pressure of PVC was 2.3 bar. The regression line upon which Palermo based what he now calls an "approximation"—though he did not say or suggest that at the time—unambiguously contains a data point whose coordinates are 10% air volume, 2.3 bar. Their written reports also stated that PVC's critical pressure at 10% air volume was 2.3 bar. And in a written report produced prior to the delivery of his presentations, Palermo himself acknowledged that Greenshield and Leevers found that PVC's critical pressure at 10% air volume was 2.3 bar. Pl.'s Ex. S, dkt. no. 107-19, at 12.

Palermo contends that this is simply a case of scientific disagreement. He says that he arrived at the conclusion that PVC's critical pressure at 10% air volume is 1.6 bar based on an approximation from Greenshield and Leevers' regression line and data generated by Jana Laboratories, the group that conducted the bent-strap and tensile tests Palermo relied upon in other slides. Because scientific truth is elusive, Palermo says, settling the dispute between methodologies should be left to the scientific community. *See Underwager v. Salter*, 22 F.3d 730, 736 (7th Cir. 1994). But Palermo's slides do not indicate that he was approximating, nor do they make reference to any other tests than those conducted by Greenshield and Leevers. Instead, they unequivocally state that Greenshield and Leevers found that the critical pressure at 10% air volume was 1.6 bar. In fact, they did not. Assigning a lower critical pressure than the test actually indicated is a classic example of literal falsity. *See BASF Corp. v. Old World Trading Co.*, 41 F.3d 1081, 1090 (7th Cir. 1994) ("Statements in the form 'tests

show x' are literally false if tests do not establish 'x.'").

Palermo disputes whether the evidence demonstrates that he misreported the length of the RCP crack in a pipe in Dorchester County, South Carolina. In fact, the evidence would permit a jury to determine that Palermo did not materially misrepresent the length of that crack. Dale Edwards, one of UGSI's experts, testified that the pipe could not be extracted due to the significant damage it sustained, so his measurement of the crack's length was approximate.

Palermo does not dispute, however, that he falsely reported the amount of pipe that needed to be replaced in Salt Lake City and the crack lengths in Baton Rouge, Greencastle, and Fremont. Instead, he makes two arguments against UGSI's contention that these claims were "literally false." First, he argues that UGSI's contention is supported only by expert reports that were not initially authenticated and should not be considered at summary judgment. Second, he contends that "his *underestimating* a 200-foot crack occurring in a Tampa, Florida project . . . [that] was substantially longer than 200 feet" is evidence "[t]hat [he] did not set out to exaggerate crack lengths". *See* Def.'s Resp., dkt. no. 109, at 8.

Neither of these arguments is persuasive. First, UGSI's expert reports may properly be considered at summary judgment. Both of UGSI's experts submitted sworn declarations affirming the content of their reports, and both experts were made available to testify (Edwards was deposed; UGSI's other expert, Steve Ferry, was not). *Compare Estate of Brown v. Thomas*, 771 F.3d 1001, 1005–06 (7th Cir. 2014) (finding that an expert report that was never supported by an affidavit attesting to its truthfulness could not be used to secure reversal of summary judgment and could not have been used to

oppose summary judgment). Second, for liability purposes it does not matter whether Palermo made one literally false claim whose inaccuracy was favorable to UGSI. This does not change the undisputed fact that Palermo falsely claimed that crack lengths in three cities were longer, and thus more severe, than they actually were, and that he falsely claimed that substantially more pipe needed to be replaced in another city than that city even had to begin with.

UGSI need not show that customers were or were likely to be misled by Palermo's literally false statements about PVC's critical pressure at 10% air volume, the crack lengths in Baton Rouge, Greencastle, and Fremont, and the amount of pipe that needed to be replaced in Salt Lake City. These statements were literally false, and they were made in the context of a commercial presentation that discouraged potential purchasers from buying butt-fused PVC for municipal water and wastewater transmission. This is a violation of the Lanham Act, and no reasonable jury could find otherwise. UGSI is entitled to summary judgment on the issue of liability on its Lanham Act claim regarding these particular statements by Palermo.

UGSI asks the Court to enjoin Palermo from continuing to make these false statements. The Lanham Act provides that a district court "shall have power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, . . . to prevent a violation under subsection (a) . . . of section 1125 of this title." 15 U.S.C. § 1116(a). To obtain a permanent injunction, a plaintiff must demonstrate that (1) it has suffered an irreparable injury; (2) legal remedies cannot adequately compensate for that injury; (3) "considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted"; and (4) "the

public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *accord e360 Insight v. The Spamhaus Project*, 500 F.3d 594, 604 (7th Cir. 2007).  UGSI argues that it has satisfied these requirements.  First, it cites a decision from this district for the contention that "injuries arising from Lanham Act violations are presumed to be irreparable, even if the plaintiff fails to demonstrate a business loss." *Neuros Co. v. KTurbo, Inc.*, No. 08 C 5939, 2013 WL 1706368, *3 (N.D. Ill. Apr. 17, 2013).  Second, it cites the same case to support the notion that the balance of hardships favors the injured plaintiff because there is "no hardship in having to refrain from repeating . . . false statements." *Id.* at *5.  UGSI also argues that granting injunctive relief in Lanham Act cases serves the public interest by protecting against deceptive advertising.

Palermo counters that UGSI has failed to show that his false statements caused irreparable harm and that the presumption of irreparable harm is no longer appropriate in the wake of the Supreme Court's decision in *eBay*.  Since *eBay* was decided, numerous courts in this district have applied the presumption of irreparable injury from Lanham Act violations.  In *Neuros*, the court applied the presumption when deciding whether to issue a permanent injunction, but most courts have done so in dealing with preliminary injunctions, where the question is whether irreparable harm is likely to ensue, not whether irreparable harm has already been suffered.  *See Market Track, LLC v. Efficient Collaborative Retail Mktg., LLC*, No. 14 C 4957, 2015 WL 3637740, *23 (N.D. Ill. June 12, 2015) (Tharp, J.).  The Fourth Circuit, acknowledging the importance of *eBay* and adhering to its framework, has continued to observe that injuries from false advertising violations of the Lanham Act typically will be irreparable because diminished

goodwill is difficult to quantify. *See PBM Prods., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 126–27 (4th Cir. 2011). The Third Circuit has expressly disavowed the presumption of irreparable harm from injuries sustained as a result of false advertising in violation of the Lanham Act. *See Ferring Pharm., Inc. v. Watson Pharm., Inc.*, 765 F.3d 205, 217 (3d Cir. 2014).

Because the Court has not completely disposed of UGSI's Lanham Act claim on the issue of liability, it declines to decide at this time whether an injunction is appropriate. The Court will address the matter during and after the upcoming jury trial. That trial likely will (assuming a special verdict form is given) result in further findings regarding the remaining statements by Palermo upon which UGSI bases its Lanham Act claim, and in general the trial will provide the Court with a better basis to assess the appropriateness of a permanent injunction. If the parties wish to present evidence that addresses only issues regarding the appropriateness of injunctive relief, that evidence will, of course, need to be presented outside the jury's presence.

UGSI also contends that the record shows Palermo made three sets of "literally true or ambiguous" claims that are misleading in context and cause confusion or deceive consumers. First, UGSI argues that relaying the results of the Greenfield and Leevers tests concerning PVC pipe without disclosing relevant concerns about the underlying assumptions and materials used is misleading. UGSI says its pipe has a different chemical makeup that makes them substantially superior to the pipe Greenshield and Leevers used in their experiments, which were conducted in the United Kingdom at least fifteen years before Palermo began disparaging UGSI's pipe. Greenshield and Leevers' test results also illustrated critical pressure in PVC and HDPE

pipe with varying amounts of air, from 2% to over 80%, which UGSI says is misleading because properly handled pipe will never contain more than 2% air. Second, UGSI says that even accurately reporting crack lengths in RCP-afflicted pipe is misleading without disclosing the initiating event that led to the RCP. Third, UGSI contends the evidence shows that the results of the bent-strap and tensile tests are misleading because PVC is not meant to be tested by use of these methodologies.

Genuine factual disputes remain about each of these allegations. UGSI's experts say that properly maintained pipe will never contain more than 2% air volume, but Palermo and his expert, Patrick Leevers (of Greenshield and Leevers), both testified regarding their view that water-pressurized pipe in the field commonly contains up to 10% air volume. A jury reasonably could find either way. The same can be said of UGSI's contention that its pipe is substantially different from the pipe Greenshield and Leevers used to develop the S4 test method and Palermo's contention that it is not. Leevers testified that product improvements between the time the S4 method was developed in the mid-1990s and the time Palermo developed his presentation likely did not change the fundamental qualities of the pipe such that his original test results would no longer apply. UGSI's experts expressed an opposite view, stating that UGSI's newer, American PVC had a substantially different molecular weight—which Leevers acknowledged was the most relevant factor in determining fracture resistance—than the pipe Leevers used in the United Kingdom in the mid-1990s.

Likewise, a genuine factual dispute remains over whether it is misleading to tell potential purchasers that RCP failures have occurred in Fusible PVC without disclosing the initiating events that started the cracks. UGSI's experts claim that in each of the

RCP events Palermo described in his presentation, the pipe was mishandled, twisted, punctured, bent, or otherwise mishandled in direct contravention of industry standards. By disclosing only the resulting RCP and not the fact that contractors or engineers caused the initiating event by violating industry norms, UGSI's experts say, Palermo created the false impression that PVC is more prone to RCP than it actually is because RCP simply will not occur if the pipe is handled in accordance with industry standards. Palermo and Leevers testified otherwise, stating that it is appropriate to assume that accidents will happen, either randomly or as a result of contractor or engineer error. Moreover, Palermo did not suggest in his slide show that RCP happens in PVC pipe without initiating events—indeed, he stated that RCP only occurs after an initiating event. A jury reasonably could find the initiating event irrelevant, or it could conclude that describing RCP events without disclosing their initiating events is misleading.

The same can be said of Palermo's claims that PVC pipe failed the bent-strap and tensile tests. Like the disputes about the applicability of Greenshield and Leevers' tests and the relevance of an RCP failure's initiating event, whether reporting the results of these two tests was misleading depends largely upon a factfinder's determination about how to weigh the testimony of each side's expert witnesses. This is a job for a jury at trial, not a judge on summary judgment. *See Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) ("[E]valuations of witness credibility are inappropriate at the summary judgment stage."); *Payne*, 337 F.3d at 770 ("On summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder.").

Palermo argues that even if these true or ambiguous statements were

misleading, summary judgment should be granted in his favor because UGSI cannot show that they deceived or were likely to deceive any prospective purchasers. As indicated earlier, to prove a false advertising claim under the Lanham Act based on true but misleading claims made in a commercial promotion or advertisement, a plaintiff must prove that consumers were actually confused. *See BASF*, 41 F.3d at 1089. Palermo contends that the Seventh Circuit requires a plaintiff to use a consumer survey to show consumer confusion and that because UGSI did not conduct such a survey, its claim fails as a matter of law. But the case upon which Palermo relies for this assertion does not establish this as an iron rule. *See Mead Johnson & Co. v. Abbott Labs.*, 201 F.3d 883, 885–86 (7th Cir. 2000) ("Surveys are accepted ways to probe for things such as confusion about the source of goods, for confusion depends on the effect of a phrase or trade dress on the consumer."). In fact, the court in *Mead Johnson* reversed the court below based on its improper reliance on survey evidence. *Id.*

UGSI adduced evidence that one consulting engineer in Illinois developed concerns about the brittleness of Fusible PVC after seeing Palermo's slide show and that the presentation led another Illinois engineer and contractor to fear that UGSI's product was dangerous. The evidence supports a reasonable inference that the slide show's false or misleading statements confused these consumers, for their worries were apparently assuaged only after UGSI presented information to rebut Palermo's claims. UGSI has adduced sufficient evidence to withstand summary judgment on this basis.

Finally, Palermo claims that even if his statements were misleading and caused consumer confusion, the Court should still grant summary judgment in his favor on UGSI's Lanham Act claim, because UGSI has not sustained injuries and is unlikely to

sustain injuries in the future. "[A] plaintiff suing under § 1125(a) ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and [ ] that occurs when deception of consumers causes them to withhold trade from the plaintiff." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1391 (2014). Palermo argues that in each of the examples of consumer confusion UGSI cites, it cannot show that the consumers withheld business from UGSI. Morrison had no decision-making authority, and the evidence does not show that Fusible PVC would have been chosen for the project in question had she not been confused by Palermo's presentation. Verseman and Parrott, meanwhile, ended up using Fusible PVC despite the concerns they developed after hearing from Palermo.

It cannot be the law that where a plaintiff succeeds in retaining its customers by spending an abundance of time, energy, and money to combat false advertising, the defendant who produced and disseminated the false advertisement or commercial promotion escapes liability for violating the Lanham Act. *Cf. Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 265 (2d Cir. 2014) ("In a false-advertising case [under the Lanham Act], actual damages under section 35(a) can include . . . the costs of any completed advertising that actually and reasonably responds to the defendant's offending ads . . . .") (quoting *ALPO Petfoods, Inc. v. Ralston Purina Co.*, 913 F.2d 958, 969 (D.C. Cir. 1990)) (internal quotation marks omitted). The evidence would permit a finding that at least one consumer made its continued use of UGSI's product contingent on UGSI making overtures, producing its own rebuttal presentation for the consumer's executives, and rehabilitating its product's reputation. This permits a reasonable inference that Palermo's presentation directly led to a diminution in goodwill and

reputation for Fusible PVC.  Summary judgment is therefore not appropriate.

In sum, the Court grants UGSI's motion for summary judgment on the issue of liability under the Lanham Act for the literally false statements Palermo made concerning (1) the results of Greenshield and Leevers' report; (2) the crack lengths for RCP failures in Baton Rouge, Greencastle, and Fremont; and (3) the amount of pipe replaced in Salt Lake City.  The Court otherwise denies UGSI's motion.  This includes UGSI's request for attorneys' fees, which may be renewed after trial.  The Court denies Palermo's motion for summary judgment on count 4.

**B.    Trade libel claim (count 1)**

Palermo next seeks summary judgment on UGSI's claim for trade libel under California law.  To prove a claim of trade libel under California law, a plaintiff must demonstrate that the defendant made "false statements concerning the quality of services or product of a business which are intended to cause that business financial harm and in fact do so."  *Computer Xpress, Inc. v. Jackson*, 93 Cal. App. 4th 993, 1010, 113 Cal. Rptr. 2d 625, 641 (2001) (quoting *Leonardini v. Shell Oil Co.*, 216 Cal. App. 3d 547, 572, 264 Cal. Rptr. 883, 899 (1989)) (internal quotation marks omitted).  This means that a plaintiff must show that the defendant made a false statement of fact, the statement was made with actual malice, and the false statement diverted business away from the plaintiff or diminished the value of the disparaged product.  *See Melaleuca Inc. v. Clark*, 66 Cal. App. 4th 1344, 1362, 78 Cal. Rptr. 2d 627, 637 (1998).  Palermo argues again that the evidence cannot support a finding of falsity.  He also argues that the evidence does not show that he acted with actual malice, and that summary judgment must be granted in his favor because UGSI has not identified any

customers whose business it lost as a result of his disparaging statements. Lastly, Palermo argues that he should be protected under privileges that protect statements involving matters of public concern and statements made between persons with a common interest.

The Court has already explained why a jury reasonably could find that Palermo's presentation contained false or materially misleading statements that disparaged UGSI's product. There is no need to repeat that discussion here. Palermo's position on this issue is untenable, just as it was on the Lanham Act claim.

Also untenable is UGSI's assertion that it need not prove actual malice to sustain its claim against Palermo for trade libel. UGSI's convoluted argument is that when a person disparages the only product a plaintiff sells, he defames the plaintiff personally as a matter of course. According to UGSI, this must mean that defamation's negligence standard, rather than trade libel's actual malice standard, should apply in such cases. This theory has no basis in law and would appear to directly contradict all relevant precedent. *See id.*

That said, the Court need not resolve whether the record would permit a reasonable jury to find actual malice in this case. UGSI has failed to adduce evidence that shows that "particular purchasers . . . refrained from dealing with [it]," and that it was deprived of any particular transactions. *See Erlich v. Etner*, 224 Cal. App. 2d 69, 74, 36 Cal. Rptr. 256, 259 (1964). Unlike claims under the Lanham Act, trade libel claims under California law must be centered on particular losses emanating from lost business opportunities. The evidence in this case shows that Morrison, Verseman, and Parrott all expressed concern about Fusible PVC's propensity for RCP after seeing

Palermo's presentation. No evidence in the record would permit a finding that but for

Palermo alerting Morrison to RCP failures in Fusible PVC, the product would have been

selected for the project Morrison was working on. And Verseman and Parrott did

business with UGSI despite their concerns, so neither client's business was diverted

elsewhere. Because UGSI has offered no evidence that Palermo's false statements

caused UGSI to lose any particular customers, Palermo is entitled to summary

judgment on count 1.

**B.      California False Advertising claim (count 3)**

Finally, Palermo seeks summary judgment on UGSI's claim under the California

False Advertising Act. As the Court explained in its decision denying Palermo's motion

to dismiss this count:

> California's false advertising law prohibits the dissemination of false or
> misleading statements in connection with advertising. Cal. Bus. & Prof.
> Code § 17500. At one time, "any person acting for the interests of itself,
> its members or the general public" had standing to sue under the law.
> *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 320, 246 P.3d 877, 884
> (2011). In 2004, however, California voters passed Proposition 64, which
> restricted standing to "any person who has suffered injury in fact and has
> lost money or property as a result of a violation" of the law. *Id.* at 321, 246
> P.3d at 884 (citing Cal. Bus. & Prof. Code § 17535).

*Underground Sols., Inc.*, 2015 WL 159418, at *3.

Palermo says that summary judgment should be granted in his favor for three

reasons, none of which is persuasive. First, he argues that UGSI's claim is deficient

because UGSI lacks standing to sue under the Act. The Court addressed this argument

in its decision denying Palermo's motion to dismiss UGSI's state-law false advertising

claim. *See id.* UGSI has adduced evidence to support the allegation that this Court

found sufficient to state an injury in fact and the loss of money or property as a result of

a violation of the law: it has shown that it spent significant resources corresponding and meeting with clients and prospective clients to combat Palermo's false or misleading statements.

Second, Palermo argues that the evidence does not show that UGSI relied on the false advertising. The Court also rejected this theory at the Rule 12(b)(6) stage of the case. As the Court explained then, although California courts have required that *consumers* allege and prove that they sustained damages as a result of reliance on false representations, requiring a *competitor* to prove reliance "would effectively read unfair competition claims out of the statute." *Id.* Doing so would undermine the purpose of California's unfair competition statute and would suggest that Proposition 64 was designed to preclude competitors from bringing false advertising claims. There is no basis to conclude that this was Proposition 64's goal; indeed, the text of Proposition 64 itself suggests the opposite, specifically, it was intended to protect both businesses and consumers. *Id.*

Lastly, Palermo contends that the First Amendment should protect him against UGSI's claims because he was not engaged in commercial speech and he was addressing matters of public concern. For the reasons discussed in parts A and B of this opinion, this argument lacks merit.

The Court denies Palermo's motion for summary judgment on count 3.

## Conclusion

For the foregoing reasons, the Court grants partial summary judgment in UGSI's favor on the issue of liability on its Lanham Act claim (count 4), as more fully described in the body of this decision. The Court otherwise denies UGSI's motion for summary

judgment [dkt. no. 82].  The Court grants summary judgment in favor of Palermo on UGSI's trade libel claim (count 1) but otherwise denies his motion for summary judgment [dkt. no. 89].  The final pretrial conference remains set for May 23, 2016 at 3:00 p.m. as previously ordered.  The parties are directed to promptly confer regarding how the Court's summary judgment ruling impacts their pending motions *in limine*, and they are to file a joint status report in this regard by no later than 12:00 p.m. on May 20, 2016.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  May 17, 2016